PAUL M. WARNER, United States Attorney (#3389)
CARYN D. MARK, Special Assistant United States Attorney
D. LOREN WASHBURN, Assistant United States Attorney
Attorneys for the United States of America
185 South State Street, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

FILED
U.S. DISTRICT COURT

2005 NOV -2 P 4: 34

DISTRICT OF UTAH

BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | No. |
| ) | |
| v.          Plaintiff, ) | **Count 1**: 18 U.S.C. § 371 |
| ) | **Counts 2 - 27**: 26 U.S.C. § 7201 |
| **DENNIS B. EVANSON** ) | **Counts 28 - 49**: 26 U.S.C. § 7206(2) |
| **BRENT H. METCALF** ) | 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. |
| **STEPHEN F. PETERSEN** ) | § 2461(c) (Forfeiture Allegation) |
| **REED H. BARKER** ) | |
| **WAYNE F. DEMEESTER** ) | |
| **GRAHAM R. TAYLOR** ) | |
| ) | |
| Defendants. | Judge Tena Campbell |
| | DECK TYPE: Criminal |
| | DATE STAMP: 11/02/2005 @ 10:32:53 |
| | CASE NUMBER:   2:05CR00805   TC |

THE GRAND JURY CHARGES:

## Background

## THE DEFENDANTS

At all times relevant to this Indictment:

EVANSON

1.      Defendant DENNIS B. EVANSON, age 49, of Sandy, Utah, was an attorney licensed to

practice law in Colorado.  EVANSON directly and indirectly controlled numerous domestic and

offshore companies.



Government
Exhibit 4

METCALF

2.     Defendant BRENT H. METCALF, age 54, of Cottonwood, Utah, was a Certified Public

Accountant (C.P.A.) in Utah until 1984, when his license expired.

PETERSEN

3.     Defendant STEPHEN F. PETERSEN, age 54, of Coalville, Utah, was a C.P.A. licensed in

Utah.

BARKER

4.     Defendant REED H. BARKER, age 51, of Littleton, Colorado, was a C.P.A. licensed in

Colorado.

DEMEESTER

5.     Defendant WAYNE F. DEMEESTER, age 54, of Sammamish, Washington, worked as an

account executive with numerous Bellevue, Washington brokerage firms including Wachovia

Securities, Everen Financial, and First Clearing Corp.

TAYLOR

6.     Defendant GRAHAM R. TAYLOR, age 53, of Tiburon, California, was an attorney licensed

to practice law in California. During the relevant periods, TAYLOR worked for various law firms in

the San Francisco area including Pillsbury Madison & Sutro and LeBoeuf, Lamb, Greene & MacRae

LLP.

## PERTINENT ENTITIES

CAPITAL WEST L.C.

7.     Capital West L.C. (Capital West) was incorporated in the state of Utah on April 20, 1994. It

was officially granted registration as a 'Commodity Trading Advisor' effective October 18, 1994 by

the National Futures Association, an organization affiliated with the Commodities Futures Trading
Commission. Capital West was wholly owned by EVANSON and D.E, his wife.

## FOREX TRADE MANAGEMENT

8.    Forex Trade Management (Forex Trade Mgt.) was incorporated in the state of Utah on June
7, 1994. It was officially granted registration as a 'Commodity Pool Operator' effective October 18,
1994 by the National Futures Association. Forex Trade Mgt. was wholly owned by EVANSON and
R.T., an EVANSON client.

## OMEGA FOREX GROUP L.C.

9.    Omega Forex Group L.C. (Omega Forex) was incorporated in the state of Utah on June 23,
1994. It was wholly owned by EVANSON and Forex Trade Mgt.

## COTTONWOOD FINANCIAL SERVICES L.C.

10.    Cottonwood Financial Services L.C. (Cottonwood Financial) was incorporated in the state of
Utah on November 18, 1994 and was a licensed financial institution. Cottonwood Financial was
wholly owned by EVANSON and METCALF.

## EURO PACIFIC CORPORATION

11.    EVANSON and TAYLOR organized Euro Pacific Corporation as a hybrid corporation under
the Companies Law (1995 Revision) of the Cayman Islands. Euro Pacific Corporation was indirectly
controlled by EVANSON. A "hybrid" corporation is a Cayman Island private company limited by
guarantee. A U.S. citizen may become a guarantee member of such a Cayman Island corporation and
not be legally liable for taxes on income earned by said corporation.

## EURO PACIFIC COMMODITIES

12.    Euro Pacific Commodities, an offshore entity established in the Cayman Islands was

3

indirectly controlled by EVANSON and wholly owned by Euro Pacific Corporation.

COMMONWEALTH PROFESSIONAL REINSURANCE L.T.D.

13.     Commonwealth Professional Reinsurance L.T.D. (Commonwealth), an offshore entity
established in Nevis, was wholly owned by Euro Pacific Corporation and was controlled by
EVANSON.

PRESS SERVICES LIMITED

14.     Press Services Limited (Press Services), an offshore entity established in the Cayman Islands,
was indirectly controlled by EVANSON and wholly owned by Euro Pacific Corporation.

MEDCAP MANAGEMENT LIMITED

15.     Medcap Management Limited (Medcap), an offshore entity established in the Cayman
Islands, was indirectly controlled by EVANSON and wholly owned by Euro Pacific Corporation.

INTERNATIONAL CAPITAL GROUP

16.     International Capital Group (I.C.G.), an offshore hybrid company established in the Cayman
Islands, was indirectly controlled by EVANSON. Each client allegedly became a Guarantor Member
of I.C.G. by paying a $5,000 subscription fee

INTERNATIONAL CAPITAL MANAGEMENT

17.     The DEFENDANTS maintained a general ledger in order to track the payments to and from
each client. The DEFENDANTS maintained this general ledger in the name of International Capital
Management (I.C.M.). Each client had a sub-ledger account within the I.C.M. general ledger. The
DEFENDANTS mailed periodic "Protector Reports," which summarized the activity in the clients'
I.C.M. sub-ledger accounts, however, these statements were mailed on I.C.G. letterhead, an entity

4

with no apparent link to I.C.M. These Protector Reports included cryptic descriptions of the
transactions each client participated in and tracked the payments the client had received.

INTERNAL REVENUE SERVICE

18. The Internal Revenue Service (IRS) was an agency of the United States Department of the
Treasury, responsible for administering and enforcing the tax laws of the United States.

## INTRODUCTORY ALLEGATIONS

## THE SCHEME

19. The DEFENDANTS devised, organized, promoted and sold a scheme, the purpose and effect
of which was to defraud the United States of America, by attempting to fraudulently conceal their
clients' income from the IRS, by evading the DEFENDANTS and their clients' income tax liability,
and by defrauding the United States in its revenue collecting capacity. In all, approximately 75
clients throughout the United States purchased and used the DEFENDANTS' scheme. The
DEFENDANTS caused over $60 million dollars in income to be concealed from the IRS, which
resulted in a loss to the United States of at least $20 million.

20. The various methods used and promoted by the DEFENDANTS to carry out the scheme
shared certain common characteristics. Each method used fictitious transactions to move clients'
untaxed income into offshore entities and returned those funds to the clients predominantly under the
pretense of loans. The most common methods are described below.

SECTION 988 CURRENCY LOSS METHOD

21. Section 988 of the Internal Revenue Code allows preferential treatment of certain
currency gains and losses when those gains or losses are caused by fluctuations in currency
exchange rates. More specifically, Section 988(a)(1)(B) provides that any loss from currency

5

futures, options, or forward contracts will be treated as an ordinary loss and thus may be used to offset any of the taxpayer's income.

22.     The DEFENDANTS created a method whereby clients purportedly entered into currency contracts that qualified for Section 988 treatment. These purported currency contracts were designed to always produce losses for the clients. In fact, in almost every case there were no actual currency trades; rather, the DEFENDANTS merely created paperwork reflecting a fictitious contract which concluded with a loss for the client. Moreover, in many cases, the documents reflecting the trades were backdated; the documents were prepared after the trades supposedly took place. The purpose of this was to create false deductions to offset the clients' ordinary income and thereby evade their income taxes.

23.     In order to obtain these bogus currency losses clients became partners in Omega Forex and entered into fictitious foreign currency contracts indirectly through Omega Forex. To become partners in Omega Forex the clients were required either to contribute cash or to sign a promissory note with Omega Forex. The amount of the cash contribution or the loan was determined by and equivalent to the amount of income the client wanted to shelter from taxation.

24.     For clients who had signed promissory notes as their contribution to Omega Forex there was no expectation that the clients would ever make payments on these loans. For those clients who had contributed cash, an amount equal to the clients' contributed cash, less the DEFENDANTS' fees, was credited to the clients' I.C.M. sub-ledger account, and was thus available for the clients to make use of immediately.

25.     Regardless of whether the clients had contributed cash or had become partners in Omega Forex by taking out loans, the DEFENDANTS prepared or caused to be prepared tax returns for

the clients on which these fictional currency losses were reported. These losses effectively

eliminated a large portion of the clients' taxable income resulting in the clients paying

dramatically reduced taxes. In this manner the clients were able to enjoy the benefit of income

on which they had not paid taxes.

FRAUDULENT INSURANCE EXPENSE METHOD

26.     The DEFENDANTS created a second method whereby clients purchased fictitious

insurance from Commonwealth. The DEFENDANTS caused the clients to purchase various

types of insurance including professional malpractice, directors and officers' liability, disability

and various other types of insurance. The amount of the insurance premium was determined

based upon the amount of income the client wished to shelter.

27.     In fact, Commonwealth provided no actual insurance coverage. Moreover, the premiums

for these fictitious insurance contracts were substantially more than the cost of actual insurance

purchased on the domestic market.

28.     The DEFENDANTS caused the clients to deduct the insurance premiums paid to

Commonwealth on their business and personal tax returns. In many cases, the DEFENDANTS

prepared the tax returns for the clients. In other cases the DEFENDANTS provided phony

paperwork for the clients to present to their independent tax preparers to be deducted on the

clients' returns. By causing the clients to report these fraudulent deductions on their tax returns,

the DEFENDANTS caused the clients to pay dramatically reduced taxes or eliminated the

clients' taxes altogether.

29.     The DEFENDANTS credited the amount of the "premiums," less the DEFENDANTS'

fees, to the clients' individual I.C.M. sub-ledger accounts. In this manner the premiums paid by

7

the clients were returned to the clients for their use without the clients ever having paid taxes on the funds.

FRAUDULENT CAPITAL LOSSES METHOD

30. The DEFENDANTS solicited and promoted a third method whereby clients claimed fraudulent capital losses on their personal tax returns to offset legitimate capital gains the clients had earned from transactions unrelated to the DEFENDANTS' scheme. The clients allegedly purchased large quantities of Press Services stock, either from Press Services or from another entity controlled by the DEFENDANTS. The clients allegedly paid for the shares by signing a promissory note for the purchase price. Before year-end, the clients allegedly sold their Press Services stock to another entity controlled by the DEFENDANTS for a fraction of the original purchase price. This rigged transaction purported to create a short-term capital loss.

31. The DEFENDANTS instructed the clients to deduct the Press Services stock losses on their personal tax returns. The losses from the sale of the Press Services stock were used to offset the clients' legitimate capital gains, even though the clients did not actually purchase or sell any real stock and the alleged promissory notes were shams. In this manner the clients were able to enjoy the benefit of income on which they had not paid taxes.

FRAUDULENT STOCK PURCHASES (INVESTMENT ACCOUNTS) METHOD

32. The DEFENDANTS solicited and promoted a fourth method that allowed clients to gain immediate access to funds in their Individual Retirement Accounts (I.R.A.s) without incurring penalties or triggering taxation. The DEFENDANTS caused the clients to transfer their I.R.A. accounts to the brokerage firm where DEMEESTER worked. DEMEESTER liquidated the

legitimate assets from the clients' I.R.A. accounts. DEMEESTER then caused the clients' I.R.A.s

to purchase worthless shares of Press Services.

33.    The funds from the clients' I.R.A. accounts that were used to purchase the Press Services

stock were credited to a Press Services account at DEMEESTER'S brokerage firm. The

DEFENDANTS then credited the clients' respective I.C.M. sub-ledger accounts in an amount

equal to the price of the Press Services shares DEMEESTER had caused them to purchase, less

the DEFENDANTS' fees. The clients were able to make immediate use of these funds, which

had previously been subject to the restrictions of their I.R.A. accounts, without incurring

penalties or taxation.

MORTGAGE INTEREST DEDUCTIONS METHOD

34.    As part of the scheme, the DEFENDANTS caused many of the clients to enter fictitious

loan arrangements. These fictitious loans were often characterized as home equity loans.

Although there was no expectation that these loans would ever be paid, if the clients elected to

make payments on these fictitious loans, the DEFENDANTS caused the clients to report these

payments as home mortgage interest deductions on their personal tax returns. The amount of the

loan payments were then credited to the clients through an entry in the clients' I.C.M. sub-ledger

account and these untaxed funds were available for the clients' immediate use.

RETURNING CLIENTS' FUNDS

35.    Regardless of which version of the scheme the clients used, the method for returning the

untaxed funds to the clients was generally the same. In those cases where the clients contributed

cash or assets as payment for fictitious losses or expenses, the monies were accumulated in

9

accounts controlled by the DEFENDANTS. The DEFENDANTS kept track of these payments
in the I.C.M. general ledger.

36.     When clients had accumulated funds in their I.C.M. sub-ledger accounts, as detailed on
their I.C.G. Protector Reports, they could elect to receive payment in a number of ways. The way
most clients received their money was through fraudulent loans from Cottonwood Financial.
Although Cottonwood Financial created paperwork for each loan detailing the terms of the loan,
the clients uniformly understood that they were not required to pay back these loans. Indeed,
Cottonwood Financial did not secure the loans, many of which were purportedly home equity
loans, with liens, did not actively pursue payments from clients, and never foreclosed on a loan.
To the extent that clients made payments on these loans, these payments were usually made in
furtherance of a further fraudulent tax deduction (see Mortgage Interest Deductions Method,
Supra). These payments were credited to the client's I.C.M. sub-ledger and were available for
the client to use.

37.     Another way clients received their funds back was through nominee purchases. Clients
would direct the DEFENDANTS to purchase an asset such as stock, real property or boats in
nominee names. The clients were the beneficial owners of these purchased assets; they had sole
dominion and control over the property or boats or they could direct the disposition of stock
purchased at their direction.

38.     The DEFENDANTS also created an entity called Northwest Rentals, L.C. that purchased
vehicles for the clients under the guise of leases. The clients selected the vehicle themselves and
directed the DEFENDANTS to purchase the vehicle using funds from their I.C.M. sub-ledger
accounts. The DEFENDANTS then created false paperwork that reflected leases between

10

Northwest Rentals and the clients. In most cases the clients made few, if any, lease payments to Northwest Rentals.

39.     Clients were also able to receive the funds in their I.C.M. sub-ledger account in the form of scholarships for their children. Using Children's Charities International, an entity created by the DEFENDANTS, the clients could direct the payment of tuition for their children's primary, secondary, or post-secondary education. These "scholarships" were merely a vehicle for clients to spend their pre-tax dollars. The money used to fund these scholarships was deducted from the clients' I.C.M. sub-ledger accounts.

40.     In each instance the DEFENDANTS characterized the return of funds to the clients as non-taxable events. In this manner, the clients were able to receive their money back without ever having paid taxes on it.

DEFENDANTS' FEES

41.     The DEFENDANTS charged the clients fees to participate in the scheme. Regardless of the method the client participated in, each client was charged a base fee of at least $19,700, which was paid to Capital West. The DEFENDANTS also charged a tax savings fee to the clients; these fees were calculated as a percentage of tax savings, which was calculated by comparing the clients' tax liability without the DEFENDANTS' scheme to the clients' tax liability with the DEFENDANTS' scheme. These tax savings fees ranged from 10 to 30 percent of the tax savings. During the course of the conspiracy the DEFENDANTS caused the United States to be deprived of at least $20,000,000 in federal income taxes resulting in total fees for DEFENDANTS of at least $4,000,000.

**COUNT ONE**
**(Conspiracy)**
11

## STATUTORY ALLEGATIONS

42. Beginning at least on or about April 20, 1994 and continuing to a date unknown, but at least until on or about April 26, 2005, within the Central Division of the District of Utah, and elsewhere,

DENNIS B. EVANSON
BRENT H. METCALF
STEPHEN F. PETERSEN
REED H. BARKER
WAYNE F. DEMEESTER
GRAHAM R. TAYLOR

DEFENDANTS herein, and others known and unknown to the Grand Jury, did unlawfully and knowingly conspire, combine, confederate and agree together and with each other to:

    A.    Commit offenses against the United States, that is:

        1.  To violate Title 18, United States Code, Section 1341; and

        2.  To violate Title 18, United States Code, Section 1343; and

    B.    Defraud the I.R.S., Department of Treasury in the ascertainment, computation, assessment, and collection of the revenue, namely federal income taxes.

## THE OBJECTIVES OF THE CONSPIRACY

43. It was a part and an object of the conspiracy to defraud that the DEFENDANTS having devised and intending to devise and carry out a scheme and artifice to defraud the United States of tax revenue and to obtain money and property from the United States by means of false and fraudulent pretenses, representations and promises and for purposes of executing this fraudulent scheme did knowingly use or cause to be used the United States Postal Service or private commercial interstate carriers, in violation of Title 18, United States Code, Section 1341; and

12

44.    It was a part and an object of the conspiracy to defraud that the DEFENDANTS having

devised and intending to devise and carrying out a scheme to defraud the United States of tax

revenue and to obtain money and property by means of false and fraudulent pretenses,

representations and promises and for purposes of executing this fraudulent scheme did knowingly

use or cause to be used interstate wire communications, in violation of Title 18, United States Code,

Section 1343; and

45.    It was a part and an object of the conspiracy that the DEFENDANTS carried out a

scheme to defraud the United States for the purpose of impeding, impairing, obstructing and

defeating through deceit, craft, trickery and dishonest means the lawful government functions of

the I.R.S., Department of Treasury, in the ascertainment, computation, assessment, and collection

of the revenue, namely federal income taxes.

### THE CONSPIRACY TO DEFRAUD THE UNITED STATES, THE SCHEME OR ARTIFICE TO DEFRAUD AND THE MANNER AND MEANS USED TO EXECUTE IT

46.    The DEFENDANTS, using the scheme delineated above, promoted, solicited and sold to

approximately 75 clients, for a substantial fee, a fraudulent scheme which defrauded the United

States and the I.R.S., Department of Treasury in excess of $20 million of federal income taxes.

The manner and means employed by the DEFENDANTS and others to effect the objects of the

conspiracy were as follows:

47.    The DEFENDANTS promoted and solicited their scheme through conferences,

promotional materials and opinion letters;

48.    The DEFENDANTS falsely represented that the scheme would lawfully eliminate or

substantially reduce the clients' federal income tax liabilities;

13

49.     The DEFENDANTS falsely represented that the opinion letter proffered to the clients
provided a legal basis for the clients' participation in the scheme;

50.     The DEFENDANTS represented that the clients could covertly maintain control of the
untaxed funds which under the guise of losses and expenses, had been transmitted, mailed and/or
wired to EVANSON-controlled domestic and foreign accounts;

51.     The DEFENDANTS caused clients' I.R.A. accounts to purchase valueless shares of Press
Services stock, moving untaxed funds into EVANSON-controlled accounts;

52.     The DEFENDANTS represented that they could legally return the clients' funds under
the guise of loans, transmitting and/or wiring said funds from Cottonwood Financial to the
clients, with no expectation of repayment;

53.     The DEFENDANTS opened and maintained and caused to be opened and maintained
accounts at various financial institutions in the United States and elsewhere using nominee
entities;

54.     The DEFENDANTS opened, caused to be opened, and assisted in the opening of
brokerage accounts using nominee entities and the assistance of Cayman Island citizens;

55.     The DEFENDANTS charged the clients a fee equal to a percentage of the tax savings
obtained due to participating in the scheme (tax savings fee);

56.     The DEFENDANTS transmitted said fees to EVANSON-controlled accounts, both
domestic and foreign. EVANSON and PETERSEN used said fees for their personal benefit; and

57.     The DEFENDANTS prepared and caused to be prepared, mailed and filed with the IRS,
false and fraudulent income tax returns.

14

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the District of Utah and elsewhere, including the following:

58. On or about April 20, 1994, EVANSON incorporated Capital West in the state of Utah.

59. On or about June 7, 1994, EVANSON incorporated Forex Trade Mgt. in the state of Utah.

60. On or about June 23, 1994, EVANSON incorporated Omega Forex in the state of Utah.

61. On or about November 3, 1994, EVANSON faxed METCALF a summary of the DEFENDANTS' scheme.

62. On or about November 18, 1994, EVANSON incorporated Cottonwood in the state of Utah.

63. Beginning in or about at least 1995 and continuing until in or about at least August 2002, EVANSON and/or METCALF created and caused to be created and maintained general ledgers for I.C.M.

64. In or about at least 1995, EVANSON became the beneficial owner of Press Services, which was originally incorporated in the Cayman Islands on November 6, 1991.

65. On or about October 26, 1995, EVANSON and DEMEESTER caused M.S.'s I.R.A. to purchase 55,000 shares of Press Services stock, moving $55,000 in untaxed funds out of M.S's I.R.A. These funds were credited to M.S.'s I.C.M. sub-ledger account.

66. On or about November 23, 1995, EVANSON caused DEMEESTER to open a brokerage account at DEMEESTER'S firm for Euro Pacific Commodities. This account was opened using a Cayman Island nominee owner.

67. Beginning in or about at least 1996 and continuing until in or about at least August 2002, EVANSON faxed instructions to DEMEESTER to transfer funds from and/or to various brokerage accounts at DEMEESTER's firm to and/or from other bank accounts under EVANSON'S control.

68. In or about at least 1996, EVANSON became the beneficial owner of Euro Pacific Commodities which was incorporated in the Cayman Islands on or about December 7, 1994.

69. In or about at least 1996, EVANSON became the beneficial owner of Medcap Management which was incorporated in the Cayman Islands on or about December 7, 1994.

70. In or about at least 1996, EVANSON became the beneficial owner of Commonwealth Professional which was incorporated in Nevis, Bahamas, on or about January 24, 1995. .

71. On or about February 16, 1996, EVANSON caused DEMEESTER to open a brokerage account at DEMEESTER'S firm for Medcap Management. This account was opened using a Cayman Island nominee owner.

72. On or about December 2, 1996, EVANSON prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1995 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

73. In or about 1997, BARKER, in promoting and soliciting the currency loss scheme to his client, B.B., calculated B.B.'s tax liability both with and without the Omega Forex loss.

74. On or about February 18, 1997, PETERSEN faxed a letter to EVANSON representing that PETERSEN had clients he was interested in introducing to DEFENDANTS' scheme.

75. On or about August 29, 1997, EVANSON created certain currency contract documents on his computer, these documents related to a currency transaction between B.B., a BARKER client,

16

and Omega Forex that was in fact concluded in June 1997. EVANSON dated the documents April 1, 1997, and caused B.B. to sign and backdate the documents accordingly.

76. On or about October 20, 1997, EVANSON prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1996 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

77. On or about October 20, 1997, DEMEESTER prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1996 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

78. On or about October 27, 1997, EVANSON mailed a letter to K.K., a BARKER client, that discussed an alleged currency transaction that K.K. was entering into. The letter was mailed to BARKER'S business address.

79. On or about December 18, 1997, EVANSON caused TAYLOR to form and incorporate Euro Pacific Corporation as a hybrid company in the Cayman Islands.

80. In or about January 1998, EVANSON caused TAYLOR to render a legal opinion letter as to the legal attributes and characteristics of Euro Pacific Corporation, and its members, under U.S. tax laws. The opinion letter addressed, in particular, whether a U.S. citizen, who is a Guarantor Member of Euro Pacific Corporation, a Cayman hybrid corporation, would be considered a shareholder under U.S. tax law and would, therefore, have U.S. reporting requirements.

81. On or about April 15, 1998, DEMEESTER prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1997 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

17

82.     In or about March 1998, EVANSON caused DEMEESTER to open a brokerage account
at DEMEESTER'S firm for Commonwealth. This account was opened using a Cayman Island
nominee owner.

83.     On or about April 22, 1998, EVANSON caused I.C.G. to be incorporated as a Cayman
Island hybrid company in the Cayman Islands.

84.     On or about September 16, 1998, PETERSEN prepared and caused to be prepared,
signed, mailed and filed with the I.R.S., his 1997 U.S. Individual Income Tax Return, Form
1040, which was false and fraudulent.

85.     On or about October 12, 1998, TAYLOR faxed EVANSON regarding a letter from D.P.,
an attorney representing an EVANSON client. The letter concerned EVANSON's use of the
legal opinion letter crafted by TAYLOR for soliciting clients. TAYLOR asked that EVANSON
call him "re the enclosed."

86.     On or about October 19, 1998, EVANSON prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 1997 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

87.     On or about October 19, 1998, METCALF prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 1997 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent

88.     Beginning on or about November 30, 1998 and continuing until in or about at least 2004,
METCALF, in order to lend credence to fictitious promissory notes, mailed letters to clients,
which included a schedule of interest due on clients' purported loan obligations to Cottonwood
Financial.

89.     In or about 1999, EVANSON and PETERSEN caused P.C. to sign and backdate
currency documents for a 1998 transaction, which was claimed as a currency loss on P.C's 1998
personal tax return.

90.     On or about March 16, 1999, EVANSON and/or METCALF wired and caused to be
wired $182,365 from Cottonwood Financial's bank account ending in 00022-97 at First Security
Bank/Wells Fargo to DEMEESTER.

91.     Beginning on or about March 23, 1999, and continuing until in or about at least January
2003, EVANSON and/or METCALF created and caused to be created "Protector's Fund
Allocation Reports," which were periodically mailed to clients summarizing each clients'
available funds and assets within the DEFENDANTS' scheme.

92.     On or about April 15, 1999, DEMEESTER prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 1998 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

93.     On or about April 30, 1999, PETERSEN prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 1998 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

94.     On or about October 1, 1999, EVANSON prepared and caused to be prepared, mailed
and filed with the I.R.S. Service Center in Ogden, Utah, a false and fraudulent 1998 U.S.
Partnership Return of Income, Form 1065, for Omega Forex, which claimed false Section 988
currency losses totaling $4,698,325.00.

95. On or about October 1, 1999, METCALF prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1998 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

96. On or about October 3, 1999, EVANSON prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1998 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

97. On or about October 22, 1999, EVANSON, METCALF and BARKER prepared and caused to be prepared, mailed and filed with the I.R.S. a false and fraudulent 1998 U.S. Individual Income Tax Return, Form 1040, for P.M.

98. On or about November 14, 1999, EVANSON and BARKER caused a client, M.B., to execute a Capital Contribution Agreement and Subscription for Membership in Omega Forex.

99. On or about November 14, 1999, EVANSON and BARKER caused M.B. to remit $5,000 as a subscription fee for membership in I.C.G.

100. On or about November 14, 1999, EVANSON and BARKER caused M.B. to remit $21,700 as payment for participating in DEFENDANTS' scheme.

101. On or about December 16, 1999, EVANSON and BARKER caused a client, B.B., to remit $23,700 as payment for participating in DEFENDANTS' scheme.

102. On or around December 17, 1999, EVANSON and PETERSEN caused a client, P.R, to issue a letter to DEMEESTER requesting that DEMEESTER transfer 20,612 shares of Service Corp stock valued at $137,676 from P.R.'s brokerage account into Commonwealth's brokerage account.

20

103.    On or about April 15, 2000, EVANSON, METCALF and PETERSEN prepared and caused

to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 1999 U.S. Individual

Income Tax Return, Form 1040, for W.S.

104.    On or about April 15, 2000, EVANSON, METCALF and PETERSEN prepared and caused

to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 1999 U.S. Individual

Income Tax Return, Form 1040, for P.R.

105.    On or about April 15, 2000, EVANSON, METCALF and BARKER prepared and caused to

be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 1999 U.S. Individual

Income Tax Return, Form 1040, for R.H.

106.    On or about April 15, 2000, EVANSON, METCALF and BARKER prepared and caused to

be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 1999 U.S. Individual

Income Tax Return, Form 1040, for M.B.

107.    On or about June 9, 2000, EVANSON, METCALF and PETERSEN prepared and caused to

be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 1999 U.S. Individual

Income Tax Return, Form 1040, for P.C.

108.    On or about June 18, 2000, DEMEESTER prepared and caused to be prepared, signed,

mailed and filed with the I.R.S. his 1999 U.S. Individual Income Tax Return, Form 1040, which

was false and fraudulent.

109.    On or about July 7, 2000, EVANSON and BARKER caused a client, M.B., to remit a

check in the amount of $9,556 in payment of M.B.'s tax saving fees for participation in a 1999

Omega Forex currency loss.

21

110. On or about July 21, 2000, PETERSEN prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1999 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

111. On or about July 23, 2000, EVANSON, METCALF and PETERSEN prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 1999 U.S. Individual Income Tax Return, Form 1040, for D.R.

112. On or about July 27, 2000, EVANSON prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1999 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

113. On or about July 28, 2000, METCALF prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1999 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

114. On or about October 3, 2000, TAYLOR met with R.H., the Chief Financial Officer for M. Company, at TAYLOR'S office in San Francisco. At this meeting TAYLOR promoted the DEFENDANTS' scheme. TAYLOR told R.H. that the untaxed income could come back to the owners of M. Company in the form of personal loans and that the loan terms could be indefinite.

115. In or about October 2000, TAYLOR traveled to Provo, Utah. TAYLOR, with EVANSON present, promoted the DEFENDANTS' scheme to J.W. and K.A., owners of M. Company, and others. During this meeting TAYLOR informed J.W. and K.A. that they could bring the untaxed monies back from offshore in the form of loans and that there would be no obligation to repay the loans.

22

116.    On or about October 22, 2000, BARKER prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 1999 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

117.    In or about November 2000, EVANSON caused DEMEESTER to open a brokerage account at DEMEESTER'S firm for Press Services. This account was opened using a Cayman Island nominee owner.

118.    In or about December 2000, BARKER suggested to a client, J.S., that he (J.S.) should talk to EVANSON about obtaining a $100,000 to $150,000 loss for his 2000 tax year.

119.    On or about January 4, 2001, BARKER wired and caused to be wired $25,000 from his Colorado Business Bank account ending in 0215 to Omega Forex.

120.    On or about January 5, 2001, BARKER provided a letter to EVANSON requesting that EVANSON wire $25,000 out of BARKER'S I.C.G. account to the account of World Traders Group, L.L.C., for the purchase of stock. BARKER further instructed World Traders Group, L.L.C. to issue the stock certificate in the name of I.C.G., and requested that EVANSON hold the shares in his office.

121.    In or about March 2001, BARKER, while meeting with a client, R.W., calculated the tax savings R.W. would obtain should R.W. participate in the DEFENDANTS' scheme.

122.    In or about March 2001, PETERSEN told a client, P.H., what P.H.'s 2000 tax liability would be with and without a currency loss offered by DEFENDANTS.

123.    In or about March 2001, EVANSON and PETERSEN caused P.H. to sign currency transaction documents which were backdated to October 1, 2000.

124.    On or about April 15, 2001, PETERSEN prepared and caused to be prepared, signed,

23

mailed and filed with the I.R.S., his 2000 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent

125.     On or about April 15, 2001, EVANSON, METCALF and PETERSEN prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2000 U.S.
Individual Income Tax Return, Form 1040, for P.C.

126.     On or about April 15, 2001, EVANSON, METCALF and PETERSEN prepared and ´
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2000 U.S.
Individual Income Tax Return, Form 1040, for P.H.

127.     On or about April 15, 2001, EVANSON, METCALF and PETERSEN prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2000 U.S.
Individual Income Tax Return, Form 1040, for D.R.

128.     On or about May 15, 2001, EVANSON, METCALF and PETERSEN prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2000 U.S.
Individual Income Tax Return, Form 1040, for W.S.

129.     On or about May 24, 2001, DEMEESTER prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 2000 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

130.     On or about June 27, 2001, DEMEESTER caused an internal Wachovia document titled
"OUTSIDE INVESTMENT INDEMNIFICATION LETTER" to be filed with his company. This
letter purported that P.H. was aware of and had made certain warranties and representations as to
the character and nature of the Press Services' shares being purchased by P.H.'s I.R.A.

24

131. On or about July 3, 2001, EVANSON and DEMEESTER caused the transfer of $400,000 of untaxed funds from P.H.'s I.R.A. to the brokerage account of Press Services.

132. On or about September 16, 2001, METCALF prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 2000 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

133. On or about October 17, 2001, EVANSON prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 2000 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent

134. On or about October 19, 2001, EVANSON, METCALF and BARKER prepared and caused to be prepared, signed, mailed, and filed with the I.R.S. a false and fraudulent 2000 U.S. Individual Income Tax Return, Form 1040, for P.M.

135. On or about October 22, 2001, BARKER prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 2000 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

136. On or about December 14, 2001, BARKER wrote a letter to a client, P.M., requesting that P.M. make payment to Capital West for P.M.'s involvement in the DEFENDANTS' scheme in 1998, 1999 and 2000. The letter represented what P.M.'S 1998 through 2000 tax liabilities would have been both with and without the Omega Forex losses.

137. On or about September 16, 2001, EVANSON prepared and caused to be prepared, mailed and filed with the I.R.S. Service Center in Ogden, Utah, a false and fraudulent 2000 U.S. Partnership Return of Income, Form 1065, for Omega Forex, which claimed false Section 988 currency losses totaling $12,445,387.

25

138. In or about 2002, DEMEESTER, in speaking with his supervisor, S.H., denied that he had any other business activities with EVANSON other than as the investment advisor on the many EVANSON-related accounts at the brokerage firm

139. On or about April 15, 2002, EVANSON, METCALF and PETERSEN prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S. Individual Income Tax Return, Form 1040, for W.S.

140. On or about April 15, 2002, EVANSON, METCALF and PETERSEN prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S. Individual Income Tax Return, Form 1040, for D.R.

141. On or about April 15, 2002, EVANSON, METCALF and BARKER prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S. Individual Income Tax Return, Form 1040, for R.H.

142. On or about May 6, 2002, BARKER mailed a letter to EVANSON representing BARKER'S fees due Capital West for his own personal usage of the DEFENDANTS' scheme. The letter represented what BARKER'S 1999 through 2000 tax liabilities would have been with and without the Omega Forex loss.

143. On or about May 20, 2002, DEMEESTER prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 2001 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

144. On or about July 2, 2002, PETERSEN prepared and caused to be prepared, signed, mailed and filed with the I.R.S., his 2001 U.S. Individual Income Tax Return, Form 1040, which was false and fraudulent.

26

145.     On or about July 11, 2002, EVANSON, METCALF and PETERSEN prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S.
Individual Income Tax Return, Form 1040, for P.R.

146.     On or about July 29, 2002, EVANSON, METCALF and PETERSEN prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S.
Individual Income Tax Return, Form 1040, for P.C.

147.     On or about October 13, 2002, METCALF prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 2001 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

148.     On or about October 17, 2002, BARKER prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 2001 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

149.     On or about October 18, 2002, EVANSON, METCALF and BARKER prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S.
Individual Income Tax Return, Form 1040, for P.M.

150.     On or about October 20, 2002, EVANSON, METCALF and PETERSEN prepared and
caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S.
Individual Income Tax Return, Form 1040, for P.R.

151.     On or about October 21, 2002, EVANSON prepared and caused to be prepared, signed,
mailed and filed with the I.R.S., his 2001 U.S. Individual Income Tax Return, Form 1040, which
was false and fraudulent.

27

152. On or about October 22, 2002, EVANSON, METCALF and BARKER prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2001 U.S. Individual Income Tax Return, Form 1040, for M.B.

153. On or about April 15, 2003, EVANSON, METCALF and PETERSEN prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2002 U.S. Individual Income Tax Return, Form 1040, for D.R.

154. On or about April 25, 2003, EVANSON, METCALF and BARKER prepared and caused to be prepared, signed, mailed and filed with the I.R.S. a false and fraudulent 2002 U.S. Individual Income Tax Return, Form 1040, for R.H.

155. From in or about January 1997 through in or about at least August 2002, METCALF'S I.C.M. sub-ledger account was credited with approximately $331,006 in fees for his efforts in maintaining the I.C.M. and other relevant general ledgers. METCALF utilized the funds in his I.C.M. sub-ledger account for the purchase of stocks and other assets.

156. From in or about November 1995 through in or about at least August 2002, EVANSON'S I.C.M. sub-ledger account was credited with approximately $3,166,672.32 in fees which were charged to clients for their involvement in the DEFENDANTS' scheme. EVANSON withdrew approximately $2,737,097.99 from his I.C.M. sub-ledger account for purposes of purchasing personal and real property.

157. From in or about 1997 through in or about at least August 2002, PETERSEN'S I.C.M. sub-ledger account was credited with approximately $1,110,337.46 in fees charged to clients he personally brought in to the DEFENDANTS' scheme. PETERSEN withdrew the majority of these funds from his I.C.M. sub-ledger account, utilizing them for the purchase of real property.

158.     On or about April 26, 2005, EVANSON faxed BARKER a package of documents, including

a new promissory note, in an attempt to reestablish the original debt between Cottonwood and a

client, P.M. The original promissory note, which was several years overdue, originated from P.M'S

earlier involvement in the DEFENDANTS' scheme. The package also included an affidavit from

METCALF, acting as manager of Cottonwood, authenticating the original debt between Cottonwood

and P.M.  BARKER attempted to get P.M. to sign the new promissory note; however, P.M. refused.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

159. Beginning on or about January 1, 1995 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1995, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about December 2, 1996, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1995 was the sum of $(274,368) and that the amount of tax due and owing thereon was the sum of $3,391, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $72,031, upon which said taxable income there was owing to the United States of America an income tax of $26,034; and on or about January 1, 1995 and continuing until in or about at least July 2002, EVANSON withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT THREE
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

160.     Beginning on or about January 1, 1996 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1996, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 20, 1997, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1996 was the sum of $(234,759) and that the amount of tax due and owing thereon was the sum of $0, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $242,902, upon which said taxable income there was owing to the United States of America an income tax of $137,399; and on or about January 1, 1996 and continuing until in or about at least July 2002, EVANSON withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.All in violation of Title 26, United States Code, Section 7201.

31

## COUNT FOUR
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

161. Beginning on or about January 1, 1997 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1997, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 19, 1998, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1997 was the sum of $(107,100) and that the amount of tax due and owing thereon was the sum of $0, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $1,080,300, upon which said taxable income there was owing to the United States of America an income tax of $340,494; and on or about January 1, 1997 and continuing until in or about at least July 2002, EVANSON withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT FIVE
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

162. Beginning on or about January 1, 1998 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1998, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 3, 1999, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1998 was the sum of $(7,187) and that the amount of tax due and owing thereon was the sum of $0, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $260,489, upon which said taxable income there was owing to the United States of America an income tax of $78,604; and on or about January 1, 1998 and continuing until in or about at least July 2002, EVANSON withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.All in violation of Title 26, United States Code, Section 7201.

## COUNT SIX
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

163. Beginning on or about January 1, 1999 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1999, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about July 27, 2000, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1999 was the sum of $(57,360) and that the amount of tax due and owing thereon was the sum of $0, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $891,395, upon which said taxable income there was owing to the United States of America an income tax of $257,997; and on or about January 1, 1999 and continuing until in or about at least July 2002, EVANSON withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

34

## COUNT SEVEN
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

164. Beginning on or about January 1, 2000 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2000, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 17, 2001, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2000 was the sum of $(201,534) and that the amount of tax due and owing thereon was the sum of $0, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $702,825, upon which said taxable income there was owing to the United States of America an income tax of $250,987.

All in violation of Title 26, United States Code, Section 7201.

35

## COUNT EIGHT
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

165. Beginning on or about January 1, 2001 and continuing until in or about at least October 21, 2002, within the District of Utah and elsewhere, EVANSON, a resident of Sandy, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2001, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 21, 2002, by filing and causing to be filed with the Director, Internal Revenue Service at Kansas City, Missouri, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2001 was the sum of $(101,994) and that the amount of tax due and owing thereon was the sum of $3,222, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $1,491,440, upon which said taxable income there was owing to the United States of America an income tax of $545,646.

All in violation of Title 26, United States Code, Section 7201.

36

## COUNT NINE
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

166.    Beginning on or about January 1, 1997 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, METCALF, a resident of Cottonwood, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1997, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 19, 1998, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1997 was the sum of $10,640 and that the amount of tax due and owing thereon was the sum of $1,873, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $111,318, upon which said taxable income there was owing to the United States of America an income tax of $26,444; and on or about January 1, 1997 and continuing until in or about at least July 2002, METCALF withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

37

## COUNT TEN
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

167.    Beginning on or about January 1, 1998 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, METCALF, a resident of Cottonwood, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1998, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 1, 1999, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1998 was the sum of $23,549 and that the amount of tax due and owing thereon was the sum of $148, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $255,172, upon which said taxable income there was owing to the United States of America an income tax of $75,638; and on or about January 1, 1998 and continuing until in or about at least July 2002, METCALF withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT ELEVEN
38

## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

168.      Beginning on or about January 1, 1999 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, METCALF, a resident of Cottonwood, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1999, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about July 28, 2000, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1999 was the sum of $30,540 and that the amount of tax due and owing thereon was the sum of $696, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $125,767, upon which said taxable income there was owing to the United States of America an income tax of $24,576; and on or about January 1, 1995 and continuing until in or about at least July 2002, METCALF withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT TWELVE
39

## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

169.    Beginning on or about January 1, 2000 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, METCALF, a resident of Cottonwood, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2000, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about September 16, 2001, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2000 was the sum of $13,048 and that the amount of tax due and owing thereon was the sum of $586, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $79,351, upon which said taxable income there was owing to the United States of America an income tax of $20,392.

All in violation of Title 26, United States Code, Section 7201.

## COUNT THIRTEEN
40

## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

170. Beginning on or about January 1, 2001 and continuing until in or about at least Octob er 13, 2002, within the District of Utah and elsewhere, METCALF, a resident of Cottonwood, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2001, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 13, 2002, by filing and causing to be filed with the Director, Internal Revenue Service at Kansas City, Missouri, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2001 was the sum of $11,818 and that the amount of tax due and owing thereon was the sum of $212, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $58,976, upon which said taxable income there was owing to the United States of America an income tax of $13,044.

All in violation of Title 26, United States Code, Section 7201.

## COUNT FOURTEEN
41

## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

171. Beginning on or about January 1, 1997 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, PETERSEN, a resident of Coalville, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1997, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about September 16, 1998, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1997 was the sum of $59, 047 and that the amount of tax due and owing thereon was the sum of $11,288, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $82,547, upon which said taxable income there was owing to the United States of America an income tax of $17,868; on or about January 1, 1997 and continuing until in or about at least July 2002, PETERSEN withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT FIFTEEN
42

## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

172.    Beginning on or about January 1, 1998 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, PETERSEN, a resident of Coalville, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1998, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about April 30, 1999, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1998 was the sum of $45,905 and that the amount of tax due and owing thereon was the sum of $5,337, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $130,854, upon which said taxable income there was owing to the United States of America an income tax of $30,296; on or about January 1, 1998 and continuing until in or about at least July 2002, PETERSEN withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT SIXTEEN
43

## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

173.    Beginning on or about January 1, 1999 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, PETERSEN, a resident of Coalville, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1999, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about July 21, 2000, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1999 was the sum of $4,716 and that the amount of tax due and owing thereon was the sum of $263, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $174,780, upon which said taxable income there was owing to the United States of America an income tax of $46,341; on or about January 1, 1999 and continuing until in or about at least July 2002, PETERSEN withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. Instead, the alleged loan balances increased and remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

44

## COUNT SEVENTEEN
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

174. Beginning on or about January 1, 2000 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, PETERSEN, a resident of Coalville, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2000, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about April 15, 2001 by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2000 was the sum of $16,043 and that the amount of tax due and owing thereon was the sum of $2,381, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $164,098, upon which said taxable income there was owing to the United States of America an income tax of $42,052.

All in violation of Title 26, United States Code, Section 7201.

## COUNT EIGHTEEN
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

175.    Beginning on or about January 1, 2001 and continuing until in or about at least July 2, 2002, within the District of Utah and elsewhere, PETERSEN, a resident of Coalville, Utah, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2001, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about July 2, 2002, by filing and causing to be filed with the Director, Internal Revenue Service at Kansas City, Missouri, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2001 was the sum of $(40,764) and that the amount of tax due and owing thereon was the sum of $0, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $466,390, upon which said taxable income there was owing to the United States of America an income tax of $154,401.

All in violation of Title 26, United States Code, Section 7201.

## COUNT NINETEEN
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

176.    Beginning on or about January 1, 1999 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, BARKER, a resident of Littleton, Colorado, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1999, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 22, 2000, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1999 was the sum of $54,183 and that the amount of tax due and owing thereon was the sum of $24,266, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $212,833, upon which said taxable income there was owing to the United States of America an income tax of $75,167; and in or about July 2001, BARKER made an alleged payment on his 1999 Omega Forex Promissory Note for a fictitious currency loss BARKER took on his 1999 individual income tax return, Form 1040.

All in violation of Title 26, United States Code, Section 7201.

47

## COUNT TWENTY
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

177. Beginning on or about January 1, 2000 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, BARKER, a resident of Littleton, Colorado, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2000, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 22, 2001, by filing and causing to be filed with the Director, Internal Revenue Service at Austin, Texas, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2000 was the sum of $98,487 and that the amount of tax due and owing thereon was the sum of $21,873, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $321,452, upon which said taxable income there was owing to the United States of America an income tax of $99,963.

All in violation of Title 26, United States Code, Section 7201.

48

## COUNT TWENTY ONE
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

178.    Beginning on or about January 1, 2001 and continuing until in or about at least October 17, 2002, within the District of Utah and elsewhere, BARKER, a resident of Littleton, Colorado, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2001, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 17, 2002, by filing and causing to be filed with the Director, Internal Revenue Service at Austin, Texas, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2001 was the sum of $190,019 and that the amount of tax due and owing thereon was the sum of $45,204, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $299,749, upon which said taxable income there was owing to the United States of America an income tax of $84,245.

All in violation of Title 26, United States Code, Section 7201.

49

## COUNT TWENTY TWO
### TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

179. Beginning on or about January 1, 1996 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, DEMEESTER, a resident of Sammamish, Washington, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1996, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about October 20, 1997, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1996 was the sum of $304,479 and that the amount of tax due and owing thereon was the sum of $97,208, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $333,531, upon which said taxable income there was owing to the United States of America an income tax of $108,713; and on or about March 16, 1999, as well as on or about February 29, 2000, DEMEESTER withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. The alleged loans included income earned by DEMEESTER in 1996 that was not reported on his 1996 individual income tax return, Form 1040. The alleged loan balances remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

50

## COUNT TWENTY THREE
### TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

180. Beginning on or about January 1, 1997 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, DEMEESTER, a resident of Sammamish, Washington, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1997, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about April 15, 1998, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1997 was the sum of $516,653 and that the amount of tax due and owing thereon was the sum of $179,058, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $547,217, upon which said taxable income there was owing to the United States of America an income tax of $191,161; and on or about March 16, 1999, as well as on or about February 29, 2000, DEMEESTER withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. The alleged loans included income earned by DEMEESTER in 1997 that was not reported on his 1997 individual income tax return, Form 1040. The alleged loan balances remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT TWENTY FOUR
### TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

181.    Beginning on or about January 1, 1998 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, DEMEESTER, a resident of Sammamish, Washington, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1998, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about April 15, 1999, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 1998 was the sum of $667,137 and that the amount of tax due and owing thereon was the sum of $239,844, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $697,701, upon which said taxable income there was owing to the United States of America an income tax of $251,947; and on or about March 16, 1999, as well as on or about February 29, 2000, DEMEESTER withdrew funds from his I.C.M. sub-ledger account in the form of fictitious loans from Cottonwood Financial which were never repaid. The alleged loans included income earned by DEMEESTER in 1998 that was not reported on his 1998 individual income tax return, Form 1040. The alleged loan balances remained on the books and records of Cottonwood Financial through in or about at least July 2002.

All in violation of Title 26, United States Code, Section 7201.

## COUNT TWENTY FIVE
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and

further alleges:

182.     Beginning on or about January 1, 1999 and continuing until in or about at least July 2002,

within the District of Utah and elsewhere, DEMEESTER, a resident of Sammamish,

Washington, did willfully attempt to evade and defeat a large part of the income tax due and

owing by him to the United States of America for the calendar year 1999, by committing and

causing to be committed affirmative acts of evasion, including but not limited to: on or about

June 18, 2000, by filing and causing to be filed with the Director, Internal Revenue Service at

Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he

stated that his taxable income for 1999 was the sum of $723,596 and that the amount of tax due

and owing thereon was the sum of $261,848, whereas he then and there well knew and believed,

that his taxable income for said calendar year was the sum of $777,232, upon which said taxable

income there was owing to the United States of America an income tax of $283,088.

All in violation of Title 26, United States Code, Section 7201.

## COUNT TWENTY SIX
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

183.    Beginning on or about January 1, 2000 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, DEMEESTER, a resident of Sammamish, Washington, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2000, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about May 24, 2001, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2000 was the sum of $630,105 and that the amount of tax due and owing thereon was the sum of $222,189, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $680,412, upon which said taxable income there was owing to the United States of America an income tax of $242,111.

All in violation of Title 26, United States Code, Section 7201.

## COUNT TWENTY SEVEN
## TAX EVASION

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and further alleges:

184. Beginning on or about January 1, 2001 and continuing until in or about at least July 2002, within the District of Utah and elsewhere, DEMEESTER, a resident of Sammamish, Washington, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2001, by committing and causing to be committed affirmative acts of evasion, including but not limited to: on or about May 20, 2002, by filing and causing to be filed with the Director, Internal Revenue Service at Ogden, Utah, a false and fraudulent U.S. Individual Income Tax Return, Form 1040 wherein he stated that his taxable income for 2001 was the sum of $572,639 and that the amount of tax due and owing thereon was the sum of $195,945, whereas he then and there well knew and believed, that his taxable income for said calendar year was the sum of $593,094, upon which said taxable income there was owing to the United States of America an income tax of $203,943.

All in violation of Title 26, United States Code, Section 7201.

## COUNTS TWENTY EIGHT THROUGH FORTY ONE

## AIDING AND ASSISTING THE PREPARATION OF A
## FALSE INCOME TAX RETURN

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and

further alleges:

185.    That on or about the dates hereinafter set forth, in the District of Utah, EVANSON,

METCALF and PETERSEN, did willfully aid and assist in, and procure, counsel, and advise the

preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax

Returns, Forms 1040, either individual or joint, for the taxpayers and calendar years hereinafter

specified, which were false and fraudulent as to a material matter, in that Line 22 of said tax

returns stated that each taxpayer's total income was as specified below, when, as EVANSON,

METCALF and PETERSEN then and there well knew and believed, the total income listed on

Line 22 was substantially understated:

| COUNT | TAXPAYER | TAX YEAR | DATE OF OFFENSE | AMOUNT ON LINE 22 PER RETURN |
|-------|----------|----------|-----------------|------------------------------|
| 28 | W.S. | 1999 | 4-15-00 | $105,709 |
| 29 | W.S. | 2000 | 5-15-01 | ($57,526) |
| 30 | W.S. | 2001 | 4-15-02 | $175,809 |
| 31 | P.C. | 1999 | 6-9-00 | $358,933 |
| 32 | P.C. | 2000 | 4-15-01 | $415,943 |
| 33 | P.C. | 2001 | 7-29-02 | $209,513 |
| 34 | P.H. | 2000 | 4-15-01 | $55,843 |
| 35 | P.R. | 1999 | 4-15-00 | $201,288 |
| 36 | P.R. | 2000 | 7-11-02 | $225,839 |

| 37 | P.R. | 2001 | 10-20-02 | $169,413 |
| 38 | D.R. | 1999 | 7-23-00 | $219,468 |
| 39 | D.R. | 2000 | 4-15-01 | $212,633 |
| 40 | D.R. | 2001 | 4-15-02 | $36,327 |
| 41 | D.R. | 2002 | 4-15-03 | $189,509 |

All in violation of Title 26, United States Code, Section 7206(2).

## COUNTS FORTY TWO THROUGH FORTY NINE

### AIDING AND ASSISTING THE PREPARATION OF A
### FALSE INCOME TAX RETURN

The Grand Jury realleges Paragraphs 1 through 42 as though fully set forth herein and

further alleges:

186. That on or about the dates hereinafter set forth, in the District of Utah, EVANSON,

METCALF and BARKER, did willfully aid and assist in, and procure, counsel, and advise the

preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax

Returns, Forms 1040, either individual or joint, for the taxpayers and calendar years hereinafter

specified, which were false and fraudulent as to a material matter, in that Line 22 of said tax

returns stated that each taxpayer's total income was as specified below, when, as EVANSON,

METCALF and BARKER then and there well knew and believed, the total income listed on Line

22 was substantially understated:

| COUNT | TAXPAYER | TAX YEAR | DATE OF OFFENSE | AMOUNT ON LINE 22 PER RETURN |
|-------|----------|----------|-----------------|------------------------------|
| 42 | R.H. | 1999 | 4-15-00 | $304,078 |
| 43 | R.H, | 2000 | 4-15-02 | ($615,474). |
| 44 | R.H. | 2002 | 4-25-03 | $142,128 |
| 45 | P.M. | 1998 | 10-22-99 | $175,288 |
| 46 | P.M. | 2000 | 10-19-01 | $40,962 |
| 47 | P.M. | 2001 | 10-18-02 | $507,138 |
| 48 | M.B. | 1999 | 4-15-00 | $92,922 |
| 49 | M.B. | 2001 | 10-22-02 | $117,571 |

All in violation of Title 26, United States Code, Section 7206(2).

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

187.   Upon conviction of the offense alleged in Count One of this Indictment, the defendants,

DENNIS B. EVANSON
and
STEPHEN F. PETERSEN,

shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C)
and Title 28, United States Code, Section 2461(c), any property constituting or derived from
proceeds obtained directly or indirectly as a result of the said violation, including but not limited
to the following:

MONEY JUDGMENT

188.   A sum of money equal to at least $4,277,009.77 in United States currency, representing
the amount of proceeds obtained as a result of the offense set out in Count One, for which the
DEFENDANTS are jointly and severally liable.

REAL PROPERTY

189.   All that lot or parcel of land, together with its building, appurtenances, improvements,
fixtures, attachments and easements, located at 3645 East Weber Canyon Road, Oakley Utah,
more particularly described as: Lot 142 Hidden Lake Ranch Subdivision aka Hidden Lake
Subdivision. Serial #HL-142 Book 01700 Page 01756-10756.

190.   All that lot or parcel of land, together with its building, appurtenances, improvements,
fixtures, attachments and easements, located at Lot 141, Hidden Lake Ranch Subdivision in
Oakley, Utah, more particularly described as beginning at a point North 957.51 feet and East
227.48 feet from the SW corner, SE ¼ NW ¼ Section 6T.1S.R.7E. S.L.B.M., thence N.70° 40'E.
131.76 feet; then S. 50° 18'E. 69.68 feet; thence S. 39° 37'W. 161.6 feet; thence N31° 05'W.

59

145.83 feet to the point of beginning. Deed #581063 Book 01350 Page 01141-01141. Together
with a membership, Certificate No. 8, in the Hidden Lake Association.

191.     All that lot or parcel of land, together with its building, appurtenances, improvements,
fixtures, attachments and easements, located at1751 N. Ridge Road and 1653 N. Ridge Road,
Wanship, Utah, more particularly described as Lots 12 and 13, Bridge Hollow Subdivision,
according to the official plat thereof recorded February 4, 1993 as Entry No. 373417 of the
official records in the office of the Summit County Recorder. Entry # 565496, Book 01319, Page
00088-00088.

192.     All that lot or parcel of land, together with its building, appurtenances, improvements,
fixtures, attachments and easements, located at 1633 Lake Blaine Road, Kalispell, Montana,
more particularly described as a certain tract of land in Lot 1, Section 36, Township 29 North,
Range 20 West, P.M.M., Flathead County, Montana, and more particularly described as follows:
beginning at a point on the Westerly boundary of the Lake Blaine County road and 899.00 feet
South of the North boundary of the aforesaid Government Lot 1; thence from this True Point of
Beginning of the tract to be conveyed Southerly along the Westerly boundary of the County Road
aforesaid to a point which is South 1065.00 feet from the North boundary of the aforesaid
Government Lot 1; thence West and on a line parallel to the aforesaid North boundary of
aforesaid Government Lot 1 a distance of 160.00 feet, more or less, to the low water of Lake
Blain; thence Northerly along the low water line of Lake Blaine to a pint which is West a
distance of 137.44 feet, more or less, to the point of beginning, thence East a distance of 137.44
feet, more or less, to the Point of Beginning, said tract being 166.00 feet in width, the sidelines of
which are parallel with the North boundary line of aforesaid Government Lot 1 and lies between

60

the Lake Blaine County Road and the low water of Lake Blaine. Assessor #040600.

193. All that lot or parcel of land, together with its building, appurtenances, improvements,

fixtures, attachments and easements, located at 1951 N. Ridge Road, Wanship, Utah, more

particularly described as Lot 10, Bridge Hollow Subdivision, according to the official plat

thereof; On File and of Record in the Summit County Recorder's Office, State of Utah. Parcel #

BH-10, Entry No. 637425, Book 01486, Page 00545-00545.

CONVEYANCES

194. 2000 Hummer H1, VIN: 137ZA8439YE186484, with all attachments thereon;

195. 2002 Toyota Tundra, VIN: 5TBBT481X2S258216, with all attachments thereon.


A TRUE BILL:


/s/
FOREPERSEON OF THE GRAND JURY


PAUL M. WARNER
United States Attorney

CARYN D. MARK
Special Assistant United States Attorney


D. LOREN WASHBURN
Assistant United States Attorney


61

8/O-245C    (Rev. 02/05) Amended Judgment in a Criminal Case    Document 584    Filed 09/09/2008    (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT

CENTRAL      District of      UTAH

U.S. DISTRICT COURT

| UNITED STATES OF AMERICA | **SECOND AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **v.** | |
| Dennis B. Evanson | Case Number:    DUTX 2:05CR00805-001 TC |
| | USM Number:    13115-081 |

2008 SEP -9 A 7:01

DISTR. OF OF UTAH

BY:_____
DEPUTY CLERK

**Date of Original Judgment:** _____ 8/15/2008
(Or Date of Last Amended Judgment)

Charles J. Muller
Defendant's Attorney

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)

☒ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☒ was found guilty on count(s)   1, 2-8, 28-36 and 39-49 of the Indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 USC § 371 | Conspiracy to Commit Tax Fraud | | 1 |
| 26 USC § 7201 | Tax Evasion | | 2-8 |
| 26 USC § 7206(2) | Aiding and Assisting in the Preparation of a False Income Tax Return | | 28-36,39-49 |

The defendant is sentenced as provided in pages 2 _____ to page 6 _____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s)   37 and 38 of the Indictment

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/15/2008
Date of Imposition of Judgment

_____
Signature of Judge

Tena Campbell      Chief, United States District Court Judge
Name and Title of Judge

9-8-2008
Date

Government
Exhibit 5

AO 245C    (Rev. 06/05) Amended Judgment in a Criminal Case
          Sheet 2 — Imprisonment                                          (NOTE: Identify Changes with Asterisks (*))

                                                                  Judgment — Page ___2___ of ____6____

DEFENDANT:      Dennis B. Evanson
CASE NUMBER:    2:05CR00805-001 TC

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term

**120 Months** .

✗  The court makes the following recommendations to the Bureau of Prisons:
   **The Court recommends the defendant serve his sentence at an appropriate level facility in Colorado, to allow family visitations.**

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at _____ ☐ a.m.  ☐ p.m.  on _____ .

   ☐  as notified by the United States Marshal.

✗  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ✗  before 12 p.m. on _____9/26/2008 at 12:00 Noon_____ .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

a _____ with a certified copy of this judgment.


                                        _____
                                                  UNITED STATES MARSHAL


                              By _____
                                        DEPUTY UNITED STATES MARSHAL

AO 245C  (Rev. 06/05) Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release

Case 2:05-cr-00805-TC-DN Document 584  Filed 09/09/2008  Page 3 of 6 (NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___3___ of ___6___

DEFENDANT:        Dennis B. Evanson
CASE NUMBER:      2:05CR00805-001 TC

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of

**36 Months**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

✗  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

✗  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

✗  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record, personal history, or characteristics and shall permit the probation officer to make such notifications and confirm the defendant's compliance with such notification requirement.

AO 245C    (Rev. 06/05) Amended Judgment in a Criminal Case
           Sheet 3C — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___4___ of ___6___

DEFENDANT:       Dennis B. Evanson
CASE NUMBER:     2:05CR00805-001 TC

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall maintain full-time, verifiable employment throughout the term of supervision as deemed appropriate by the probation office.

2. The defendant shall refrain from incurring new credit charges or opening additional lines of credit, unless he is in compliance with any established payment schedule and obtains the approval of the probation office.

3. The defendant shall provide the probation office access to all requested financial information.

4. The defendant shall file all delinquent tax returns with the IRS case investigator within 30 days of the date of sentencing.

5. The defendant shall establish a payment schedule with the IRS for the payment of his delinquent tax obligations within 30 days from the date of sentencing.

6. During the 30 days prior to his self surrender date, the defendant shall fully cooperate with the IRS to prepare a assessment of all delinquent tax returns and be in full compliance with a payment schedule.  Payment schedule will be made available by the IRS to the Probation Office to ensure compliance.

AO 245C   (Rev. 06/05) Amended Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties                              (NOTE: Identify Changes with Asterisks (*))

Judgment — Page   5   of     6

DEFENDANT:         Dennis B. Evanson
CASE NUMBER:     2:05CR00805-001 TC

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 2800.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ | $ | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☐ the interest requirement is waived for   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C (Rev 06/03) Amended Judgment in a Criminal Case Document 584 Filed 09/09/2008 Page 6 of 6
Sheet 6 — Schedule of Payments (NOTE: Identify Changes with Asterisks (*))

Judgment — Page  6  of  6

DEFENDANT: Dennis B. Evanson
CASE NUMBER: 2:05CR00805-001 TC

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  ☒  Lump sum payment of $ 2800.00  due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☒  Special instructions regarding the payment of criminal monetary penalties:

    **Restitution payments shall begin upon release from incarcerations, payments shall be made in accordance with a schedule established with the IRS, as directed by the United States Probation Office.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States:
    **Property forfeited and a money judgment in the amount of $2,774,133.04, pursuant to the Preliminary Order of Forfeiture filed August 4, 2008 (Docket No. 556), included herein.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.





**DOUGLAS COUNTY, CO**
Transaction #: **217957**
Receipt #: **215049**
Cashier Date: **12/11/2012 2:36:02 PM (DMORRIS)**

**Print Date:**
12/11/2012 2:36:03 PM

Jack Arrowsmith
Clerk and Recorder
P.O. Box 1360
Castle Rock, CO 80104
(303) 660-7446

| Customer Information | Transaction Information | Payment Summary | |
|---|---|---|---|
| () HILL PROPERTY LLC<br>10175 S ONEIDA ST<br>LITTLETON, CO 80124 | DateReceived: 12/11/2012<br>OVER<br>Source Code:THE<br>COUNTER<br>OVER<br>Return Code:THE<br>COUNTER<br>Trans Type: Recording | Total Fees<br>Total Payments | $21.00<br>$21.00 |

**1 Payments**

| | |
|---|---|
| P☐ CASH | $21.00 |

**1 Recorded Items**

| | |
|---|---|
| R☐ (ASN) ASSIGNMENT | *Reception #:2012095509   Date:12/11/2012 2:36:01 PM*<br>*From: To:* |
| Recordings Fees | 3 | $21.00 |

**0 Search Items**

**0 Miscellaneous Items**

Government Exhibit 6

12/11/2012

## ASSIGNMENT AND TRANSFER IN CANCELLATION OF OBLIGATION

THIS ASSIGNMENT AND TRANSFER IN CANCELLATION OF OBLIGATION is made and effective June 4, 2012, by Cottonwood Financial Services, LC, an expired Utah limited liability company by and through its manager, Brent Metcalf of 1638 E Ensign Ct., Salt Lake City UT 84121 ("**Cottonwood**"), and Ronald Hill dba – Hill Property ("**Hill**").

### RECITALS

**WHEREAS**, Cottonwood is an expired Utah limited liability company; and

**WHEREAS**, Cottonwood has substantial assets and liabilities on its books; and

**WHEREAS**, Brent Metcalf was the manager of Cottonwood and desires to wind up the business of Cottonwood and close out Cottonwoods books; and

**WHEREAS**, Cottonwood shows obligations to Medcap Management Ltd. A Grand Cayman based Limited Company ("**Medcap Obligation**"), including an obligation known as the Terry & Lynette Evanson Home Mortgage ("**Evanson Mortgage**") as of the end of the year in 2008; and

**WHEREAS**, the Medcap Obligation has corresponding assets shown on the books of Cottonwood that were derived from the Medcap Obligation; and

**WHEREAS**, one of the corresponding assets shown on the books of Cottonwood at the end of the year 2008 that were derived from the Medcap Obligation is in the form of obligations to Cottonwood from the Evanson Mortgage; and

**WHEREAS**, it is the desire of Evanson and Cottonwood to satisfy the "Evanson Obligation," to Cottonwood on a dollar for dollar basis using the Evanson Loan values shown on the books of Cottonwood at the end of 2008, by transfer of the Cottonwood Corresponding Evanson Mortgage Asset of Evanson to Ronald Hill dba - Hill Property ("**Hill**"); and

**WHEREAS**, it is the desire of Ronald Hill dba - Hill Property  to assume the asset of Cottonwood described herein as the Evanson Mortgage as well as assuming the obligation payable to Medcap concerning the sole asset of the "**Evanson Mortgage**" on a dollar for dollar basis; and

**WHEREAS**, the asset described in this agreement is the mortgage secured by the land and property known as Tract 37 McArthur Ranch 3 5.03 AM/l; state parcel # 223121114003 at the address of 10175 S Oneida St, Littleton, CO, 80124; and

#2012095509, 12/11/2012 at 02:35:01 PM,
1 OF 3,Rec Fee $21.00
Douglas County CO Jack Arrowsmith,
Clerk & Recorder

**WHEREAS,** Cottonwood has full authority and rights from Medcap to transfer said asset and obligations on a dollar for dollar basis to any person or entity so long as said entity or person agrees to assume the Medcap obligation on a dollar for dollar basis according to the same terms and conditions as exist under the Cottonwood obligation to Medcap;

**NOW, THEREFORE,** in consideration of the mutual covenants set forth herein the parties agree as follows:

## ASSIGNMENT AND TRANSFER IN CANCELLATION OF OBLIGATION

1. Cottonwood hereby assigns and transfers to Hill, all of its rights, title and interest in the asset, accounts, receivables, notes, and obligations of the Evanson Mortgage listed in the recitals above in the actual amount of the loan obligation of the Evanson Mortgage, for whatever amount it is shown to be.
2. Cottonwood hereby agrees to release their existing deed of trust on said property as registered with Douglas County in the State of Colorado and Hill agrees to register by a deed of trust against the asset described in the Recitals listed above (Evanson Mortgage).
3. Hill hereby accepts the assignment and transfer of the listed and described Cottonwood Corresponding Asset as listed in the recitals above known as the Evanson Mortgage, in full satisfaction and cancellation of the a corresponding amount of the Cottonwood Obligation.
4. Hill also hereby accepts and acknowledges the transfer of the Cottonwood obligation (payable by Cottonwood to Medcap) and herewith accepts all of the obligation due to Medcap for the amount of the outstanding loan amount due Medcap on the Evanson Mortgage.
5. Hill agrees to provide documentation to Medcap of this transaction and to correspond and work with them directly in meeting the obligations due Medcap under their agreement on the Evanson Mortgage.

Cottonwood Financial Services, LC
an expired Utah limited liability company

By _____

Brent Metcalf, its Manager holding assets in trust
for purposes of winding up the business.

Ronald Hill dba - Hill Property

By _____

Page **2** of **3**

Transaction Approved by

Brent Metcalf, its Manager holding assets in trust for purposes of winding up the business
for Cottonwood Financial Services, LC


Terry and Lynette Evanson hereby accept this assignment and transfer of the listed asset and
described Cottonwood Corresponding mortgage obligations to Ronald Hill dba - Hill Property;

Terry and Lynette Evanson further agree to work with Ronald Hill dba - Hill Property on this
loan obligation and hereby agree to release Cottonwood Financial Services of any further
responsibility or obligations for the Evanson Mortgage.

Terry and Lynette Evanson further agree to forthwith work through Ronald Hill dba - Hill
Property to fulfill all obligations which exist under the mortgage agreement.

Terry and Lynette Evanson further agree to the release of Cottonwood Financial on the recorded
Deed of Trust on the asset described in this agreement and the recording of Ronald Hill dba - Hill
Property on the Deed of Trust as security for the obligations accepted by Ronald Hill dba - Hill
Property assumed under this agreement.

By
Terry Evanson


By
Lynette Evanson


Page 3 of 3

**Internal Revenue Service**
Appeals Office
Suite 325, MS8000SLC
150 E Social Hall Avenue
Salt Lake City, UT 84111

Date: March 19, 2013

TERRY L & LYNETTE EVANSON
10175 VALLEY RD
LITTLETON CO 80124-9607

**Department of the Treasury**

014

**Person to Contact:**
Chad R Sorenson
Employee ID Number: 141861
Tel: 801-799-6640
Fax: 801-799-6662
**Refer Reply to:**
AP:FW:SLC:CRS
**In Re:**
Closing Agreement
**Tax Period(s) Ended:**
200812

Dear Mr. & Mrs. Evanson:

I am writing concerning the closing agreement for those who were associated with the Omega Forex and Fishpaw Currency Group partnerships. I am in the process of collecting the final closing agreements for those partners who have agreed to the settlement position offered in the 2008 tax year.

I have checked your records and noticed that the tax and penalty for the 2008 tax year have been assessed. If you are going to agree to that deficiency, you will be precluded from the partnership adjustments from Omega and Fishpaw for the earlier 1999, 2000, and 2001 tax years. In order to remove you from those TEFRA partnership procedings, you will need to sign the enclosed closing agreements. These agreements state the information summarized above.

I apologize for the delay in providing this information to you, but there have been many partners associated with these entities and we are now in the process of wrapping up the appeal. If you have any questions, please feel free to contact me at the number listed above. Please return this form no later than 7 days from the date of this letter.

Sincerely,

Chad Sorenson
Appeals Officer

Enclosures:
Envelope
Closing Agreement

cc: Kevin Planegger

Government Exhibit 7

Form 906
(Rev. August 1994)

Department of the Treasury-Internal Revenue Service

015

## Closing Agreement as to Final Determination
## Covering Specific Matters

Under section 7121 of the Internal Revenue Code ("I.R.C."), Terry L. Evanson (SSN 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) & Lynette Evanson (SSN 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), as well as Netco, LLC (TIN 84-1585425), which is a single member LLC owned by Lynette Evanson, and the Commissioner of Internal Revenue ("the Commissioner") make the following closing agreement:

WHEREAS the taxpayers were married during all the years at issue, and filed joint federal income tax returns for all such years;

WHEREAS, the taxpayers have had business dealings with, and/or has had ownership interest in certain partnership entities known as Omega Forex Group, LC since prior to the taxable year 2000;

WHEREAS, Omega Forex Group, LC engaged in numerous alleged financial activities including foreign currency transactions and loans to the partners;

WHEREAS, during the taxable years 1998, 1999 and 2000, Omega Forex Group, LC has filed U.S. Partnership Returns, Form 1065 claiming I.R.C. § 988 currency trading losses of $4,698,325, $3,058,405 and $12,445,387;

WHEREAS, the respondent has alleged that the partnership returns filed by Omega Forex Group, LC were false and fraudulent returns in that the foreign currency transactions never occurred, but were reported as a method of moving the partners untaxed income to offshore accounts and then "loaning" the money back to the partners with no intent or requirement that the loans be repaid;

WHEREAS, Fishpaw Currency Group was a successor entity to Omega Forex Group, LC, and which filed a partnership return, Form 1065, for tax year 2001;

WHEREAS, Capital West LC was a registered commodity trading advisor, who was responsible for the preparation and signed the partnership returns for Omega Forex Group, LC and Fishpaw Currency Group;

WHEREAS, International Capital Management (ICM) was a related entity created by Dennis Evanson and Brent Metcalf wherein a general ledger was maintained to track and credit each partner with the payments to the partnership;

WHEREAS, Cottonwood Financial Services LC was a licensed financial institution in the State of Utah;

Page 1 of 4

016

Closing Agreement With: Terry & Lynette Evanson

WHEREAS, Omega Forex Group LC, Fishpaw Currency Group, Capital West LC and Cottonwood Financial Services LC were owned, operated and controlled by Dennis Evanson and Brent Metcalf;

WHEREAS, Dennis Evanson, Brent Metcalf, Stephen Petersen, Reed Barker and Graham Taylor were indicted and charged with federal offenses related to the activities of Omega Forex Group LC, Fishpaw Currency Group, Capital West LC and Cottonwood Financial Services LC;

WHEREAS, pursuant to the testimony and evidence at the criminal trial, the following steps were utilized in the scheme to convert untaxed money of the taxpayer into loans that were never required to be repaid;

    a. The taxpayers purportedly entered into currency contracts that qualified for I.R.C. § 988 treatment through his partnership interest.

    b. The purported contracts were designed to always produce losses for the taxpayers.

    c. There were no actual currency transactions. The promoters simply created false paperwork which reflected fictitious currency transactions.

    d. To become a partner, and enjoy the benefits of the currency transactions, Terry & Lynette Evanson were required to contribute cash in the amount of $505,000 or to sign a promissory note in the amount of $505,000.

    e. To become a partner, and enjoy the benefits of the currency transactions, Netco, LLC was required to contribute cash in the amount of $250,000 or to sign a promissory note in the amount of $250,000.

    f. The cash contributed by the taxpayer was then transferred and accumulated in ICM's sub-ledger account for the benefit of the taxpayer.

    g. In 2000, the taxpayer entered into a "loan" arrangement with Cottonwood Financial to "borrow" money from them.

    h. Cottonwood Financial created the paperwork required for a valid loan, but the taxpayer and Cottonwood Financial agreed that the taxpayer was not required to pay the "loan" back.

    i. The taxpayer did not pay taxes on the funds contributed to Omega Forex Group LC in tax years 2000 and before, as the income was offset by the purported I.R.C. § 988 currency transaction losses.

    j. The taxpayers did not report as income the amounts received from Cottonwood Financial in tax year $1,433,990, as the parties claimed those amounts were loans.

017

Closing Agreement With: Terry & Lynette Evanson

k. The $1,433,990 represents outstanding balances on Cottonwood Financial's loan documents for Terry and Lynette Evanson in the amount of $1,183,990 and $250,000 from Netco, LLC, which was owned by Lynette Evanson as the sole member.

WHEREAS, in 2008, Brent Metcalf, Stephen Petersen, Reed Barker and Graham Taylor pled guilty to various fraudulent tax related offenses related to the activities of Omega Forex Group LC, Fishpaw Currency Group, Capital West LC and Cottonwood Financial Services LC;

WHEREAS, in February 2008, Dennis Evanson, following a trial in the United States District Court, was found guilty of fraudulent tax related offenses related to the activities of Omega Forex Group LC, Fishpaw Currency Group, Capital West LC and Cottonwood Financial Services LC;

WHEREAS, Cottonwood Financial Services LC ceased all operations in 2008;

WHEREAS, a dispute has arisen between the parties as to whether the amounts claimed on the partnership returns were actual losses and whether the partnership returns are false and fraudulent income tax returns, which if determined to be fraudulent would allow the I.R.S. to assess the amounts of income and fraud penalties pursuant to the TEFRA provisions of the I.R.C. §§ 6221 - 6234 ;

WHEREAS, the Commissioner has issued or will issue a notice of federal partnership administrative adjustment to the partnership alleging the fictitious currency transactions and the fraudulent filing of the returns, as a result of the foregoing dispute;

WHEREAS, the Commissioner issued statutory a notice of deficiency to the taxpayer alleging debt forgiveness income in 2008 as a result of the foregoing dispute;

WHEREAS, the parties desire to convert their partnership items involved in the partnership case to non-partnership items pursuant to I.R.C. § 6231(b)(1)(C); ...

WHEREAS, the parties now agree that, for purposes of federal income taxes, the amounts claimed as loans received from Cottonwood Financial Services, LC, if in fact loans, were discharged in 2008 when Cottonwood Financial ceased to exist and conduct business;

WHEREAS, the parties agree that penalty pursuant to I.R.C. § 6662 is applicable to the items at issue in the notice of deficiency issued for 2008;

WHEREAS, the parties desire to resolve their disputes regarding I.R.C. § 988 currency trading transactions, income tax liabilities and penalties for any portion of the 2008 debt forgiveness, with finality, and believe this agreement is in each parties' best interests.

NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes, and for additional tax imposed by I.R.C. § 6662, that: ·

**Closing Agreement With: Terry & Lynette Evanson**

018

1. For the taxable year ended December 31, 2008, the amount of $1,433,990 is includible in the taxpayer's gross income as ordinary income, representing the net amount claimed as debt forgiveness by the Commissioner.

2. For the taxable year ended December 31, 2008, the taxpayer is liable for the additional penalty imposed by I.R.C. § 6662, as asserted by the Commissioner.

3. For the taxable year ended December 31, 2008, the taxpayer is liable for interest which will accrue and be assessed as provided by I.R.C. § 6601 on the deficiency, penalties, and additions to tax due from petitioner.

4. By virtue of this settlement, the taxpayer's partnership items in any partnership related to the Omega Forex Group, LC transactions will cease to be partnership items pursuant to I.R.C. § 6231(b)(1)(C).

This agreement is final and conclusive except:

(1) the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact;

(2) it is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for Code section 7122) notwithstanding any other law or rule of law; and

(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

By signing, the above parties certify that they have read and agreed to the terms of this document.

Your signature _____     Date Signed _____
                        TAXPAYER

Taxpayer's representative _____     Date Signed _____

Commissioner of Internal Revenue

By _____     Date Signed _____

Title   Appeals Team Manager

Page 4 of 4

Closing Agreement With: Terry & Lynette Evanson

I have examined the specific matters involved and recommend approval of the proposed agreement.

I have reviewed the specific matters involved and recommend approval of the proposed agreement.

_____
*(Receiving Officer)*          *(Date)*

_____
*(Reviewing Officer)*          *(Date)*

_____
*(Title)*

_____
*(Title)*

Duplicate Original                                                              053

**Department of the Treasury**                    Letter Number: 894(cg)-c
**Internal Revenue Service**
Appeals Office                                    **Person to Contact:**
Suite 325, MS8000SLC                                 Chad R Sorenson
150 E Social Hall Avenue                             Employee ID Number: 141861
Salt Lake City, UT 84111                             Tel: 801-799-6640
                                                     Fax: 801-799-6662
                                                  **Refer Reply to:**
Date:     MAR 0 8 2012                               AP:FW:SLC:CRS
                                                  **In Re:**
                                                     Income Tax Liability
TERRY L & LYNETTE EVANSON                          **Form Number:**
10175 VALLEY RD                                      1040
LITTLETON CO 80124-9607                            **SSN/EIN Number:**
                                                     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
                                                  **Last Day to File a Petition with the
                                                  United States Tax Court:**   JUN 0 6 2012


**CERTIFIED MAIL**        7011 0470 0000 4265 8337

---

Notice of Deficiency

| Tax Year(s) Ended | Tax | Penalties or Additions to Tax IRC SEC. 6662 |
|---|---|---|
| December 31, 2008 | $470,661.00 | $94,132.20 |


Dear Mr. & Mrs. Evanson:

We have determined that you owe additional tax or other amounts, or both, for the tax
year(s) identified above. This letter is your NOTICE OF DEFICIENCY as required by
law. The enclosed statement shows how we figured the deficiency.

If you want to contest this determination in court before making any payment, you have
90 days from the date of this letter (150 days if this letter is addressed to you outside of
the United States) to file a petition with the United States (U.S.) Tax Court for a
redetermination of the deficiency. You can get a copy of the rules for filing a petition
and a petition form you can use by writing to the address below:

> United States Tax Court
> 400 Second Street, NW
> Washington DC 20217



054

The Tax Court has a simplified procedure for small tax cases when the amount in dispute for **each** tax year is $50,000 or less. If you intend to file a petition for multiple tax years and the amount in dispute for any one or more of the tax years exceeds $50,000, this simplified procedure is not available to you. If you use this simplified procedure, you cannot appeal the Tax Court's decision. You can get information pertaining to the simplified procedure for small cases from the Tax Court by writing to the court at the above address or from the court's internet site at www.ustaxcourt.gov.

Send the completed petition form, a copy of this letter, and copies of all statements and/or schedules you received with this letter to the Tax Court at the above address. The court cannot consider your case if you file the petition late. The petition is considered timely filed if the postmark date falls within the prescribed 90 or 150 day period and the envelope containing the petition is properly addressed with the correct postage.

The time you have to file a petition with the court is set by law and cannot be extended or suspended. Thus, contacting the Internal Revenue Service (IRS) for more information, or receiving other correspondence from the IRS won't change the allowable period for filing a petition with the Tax Court.

As required by law, separate notices are sent to husbands and wives. If this letter is addressed to both husband and wife, and both want to petition the Tax Court, both must sign and file the petition or each must file a separate, signed petition. If only one spouse petitions the Tax Court, the full amount of the deficiency will be assessed against the non-petitioning spouse. If more than one tax year is shown above, you may file one petition form showing all of the years you are contesting.

If you decide not to file a petition with the Tax Court, please sign the enclosed waiver form and return it to us at the IRS address on the top of the first page of this letter. This will permit us to assess the deficiency quickly and can help limit the accumulation of interest. The enclosed envelope is for your convenience.

If you decide not to sign and return the waiver, and you don't file a petition with the Tax Court within the time limit, the law requires us to assess and bill you for the deficiency after 90 days from the date of this letter (150 days if this letter is addressed to you outside the United States).

If you are a C corporation, under Internal Revenue Code Section 6621(c), large corporate underpayments may be subject to a higher rate of interest than the normal rate of interest for underpayments.

If you have questions about this letter, you may write to or call the contact person whose name, telephone number, and IRS address are shown on the first page of this letter. If you write, please include your telephone number, the best time for us to call you if we need more information, and a copy of this letter to help us identify your account. Keep the original letter for your records. If you prefer to call and the telephone number is outside your local calling area, there will be a long distance charge to you.

The contact person identified on the front of this letter can access your tax information          055
and help you get answers. You also have the right to contact the office of the Taxpayer
Advocate. You can call 1-877-777-4778 and ask for Taxpayer Advocate assistance. Or
you can contact the Taxpayer Advocate for the IRS office that issued this notice of
deficiency by calling (801) 799-6958 or writing to 50 South 200 East, Stop 1005 SLC,
Salt Lake City, UT 84111.   Taxpayer Advocate assistance is not a substitute for
established IRS procedures such as the formal appeals process. The Taxpayer
Advocate is not able to reverse legally correct tax determinations, nor extend the time
fixed by law that you have to file a petition in the U.S. Tax Court. The Taxpayer
Advocate can, however, see that a tax matter that may not have been resolved through
normal channels gets prompt and proper handling.

Thank you for your cooperation.

Sincerely,
Douglas H. Shulman
Commissioner
By

Gary Easley
Appeals Team Manager

Enclosures:
  Waiver
  Envelope
  Statement

cc: Kevin A Planegger
cc: Ted H. Merriam
cc: Olena Ruth

| Form **4089**<br>(Rev. January 1983) | Department of the Treasury - Internal Revenue Service<br>**Notice of Deficiency - Waiver** | Symbols:<br>AP:FW:SLC:CRS | 056 |
|---|---|---|---|

Name(s), SSN or EIN, and address of taxpayer(s)

TERRY L & LYNETTE EVANSON
10175 VALLEY RD       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
LITTLETON CO 80124-9607

| Kind of Tax | **X**   Copy to Authorized Representative |
|---|---|
| Income | Planegger, Kevin A ; Merriam, Ted H ; Ruth, Olena<br>1625 BROADWAY STE 770<br>DENVER CO 80202-4717 |

| Tax Year Ended | Deficiency | |
|---|---|---|
| | Increase in Tax | Penalties or Additions to Tax<br>IRC SEC. 6662 |
| 12/31/2008 | $470,661.00 | $94,132.20 |

---

**Interest, as provided by law, will be charged on the unpaid liability until it is paid in full.**
**See the attached explanation for the above deficiencies**

I consent to the immediate assessment and collection of the deficiencies (increase in tax and penalties) shown above, plus any interest provided by law.

| Your<br>Signature | |
|---|---|
| | _(Date signed)_ |
| Spouse's Signature,<br>If A Joint Return<br>Was Filed | |
| | _(Date signed)_ |
| Taxpayer's<br>Representative<br>Sign Here | |
| | _(Date signed)_ |
| Corporate<br>Name: | |
| Corporate<br>Officers<br>Sign Here | _(Signature)_     _(Title)_     _(Date signed)_ |
| | _(Signature)_     _(Title)_     _(Date signed)_ |

**Note:**

If you consent to the assessment of the amounts shown in this waiver, please sign and return it in order to limit the accumulation of interest and expedite our bill to you. Your consent will not prevent you from filing a claim for refund (after you have paid the tax) if you later believe you are entitled to a refund. It will not prevent us from later determining, if necessary, that you owe additional tax; nor will it extend the time provided by law for either action.

If you later file a claim and the Internal Revenue Service disallows it, you may file suit for refund in a district court or in the United States Claims Court, but you may not file a petition with the United States Tax Court.

**Who Must Sign**

If this waiver is for any year(s) for which you filed a joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

**If you agree, please sign one copy and return it; keep the other copy for your records.**

Department of the Treasury - Internal Revenue Service     www.irs.gov     Form **4089**-c (Rev. 01/1983)

057

| Taxpayer Name: | EVANSON | Examiner: | Ben Sparks |
|---|---|---|---|
| TIN: | | | |
| Tax Form: | 1040 | Date: | 10/22/2010 |
| Tax Year (s): | 200812 | | 10/29/2010 |

## Other Income- Cancellation of Indebtedness Lead Sheet

- Cottonwood Financial carried a note receivable in the name of the taxpayer as shown:
  - ➢ Name on Account:  Terry Evanson     *Home Mortgage -* (handwritten)
  - ➢ Account Number: 10900A17
  - ➢ 1996 balance – 180,208
  - ➢ 1997 balance - 241,356
  - ➢ 1998 balance - 335,511
  - ➢ 1999 balance - 455,834
  - ➢ 2000 balance - 476,990
  - ➢ 2001 balance - 678,990
  - ➢ 2002 balance - 689990
  - ➢ 2003 balance - 689,990

- As of December 31, 2001 Omega Forex Group LC (Assignor) assigned their notes over to Cottonwood Financial Services LC (Assignee). An assignment document was prepared and signed by Dennis Evanson for Omega Forex and Brent Metcalf for Cottonwood Financial. A Schedule was attached summarizing the outstanding note receivables. The assignment documented stated that Omega Forex held promissory notes, of which the payor and principal amount outstanding under each note, was summarized on Schedule A.

- The Schedule A attached to the assignment document included the following:
  - ➢ *Terry Evanson – Loan balance $505,000*
  - ➢ *Both of the Taxpayer's loans are now with Cottonwood Financial.*

- Cottonwood Financial carried two notes receivables in the name of the taxpayer as follows:
  - ➢ Account Name:  Terry Evanson
  - ➢ Account Number:1900A133 and 1900A17

- Cottonwood Financial carried this note(s) on their books. The year end balances for the taxpayers note(s) were as follows: *(handwritten: 1999 - 2001 par value)*

| | 1900A133 | 1900A17 | TOTAL |
|---|---|---|---|
| ➢ 2001 Balance | $505,000 | $678,990 | $1,183,990 |
| ➢ 2002 Balance | 494,000 | 689,990 | 1,183,990 |
| ➢ 2003 Balance | 494,000 | 689,990 | 1,183,990 |

Rev. 4/2008

058

| Taxpayer Name: | EVANSON | Examiner: | Ben Sparks |
|---|---|---|---|
| TIN: | | | |
| Tax Form: | 1040 | Date: | 10/22/2010 |
| Tax Year (s): | 200812 | | 10/29/2010 |

## Other Income- Cancellation of Indebtedness Lead Sheet

income from the discharge of this debt ( Code Sec. 61(a)(12);  Reg. §1.61-12(a)) in 2008.

The taxpayer has not shown that any of the exceptions, under Code Sec. 108(a)(1), to the general rule that DOI income must be included in the debtor's gross income, would apply.

The loan amounts included in income from debt cancellation are as follows.

- Taxpayer Terry Evanson - $1,183,990.00
- NETCO LLC  (issue addressed at partnership level)  250,000.00
- TOTAL $1,433,990.00

Alternate Issue:  To the extent the taxpayer does not have Cancellation of Indebtedness income, did the taxpayer have a recovery of an amount previously deducted, which would be required to be included in income under IRC 111(a)?

The tax benefit rule applies only if there is a direct connection between the recovery of a previously deducted (or credited) amount and the amount recovered (Code Sec. 111(a)).

Recoveries must be included in income only if attributable to deductions or credits claimed in a previous tax year. These amounts are included only to the extent that the deductions or credits actually reduced income tax in the earlier year. In other words, although the tax benefit rule requires inclusion in income of recoveries related to prior deductions or credits, the amount included is limited by the taxpayer's actual tax benefit.

The tax benefit rule has five elements. Under the rule, an amount must be included in gross income in the current year if, and to the extent that:

(1) the amount was deducted in a prior year;

(2) the deduction resulted in a tax benefit;

(3) there is some type of recovery of the amount previously deducted;

(4) an event occurs in the current year that is fundamentally inconsistent with the premises on which the deduction was originally based; and

(5) the inclusion of the recovery in gross income is not precluded by a no recognition provision of the Code.

The tax benefit rule generally applies when an amount deducted from the taxpayer's gross income in one tax year is recovered in a later year. The purpose of the tax benefit rule is to permit a balancing entry when a seemingly proper expense turns out to be improper —that is, when a transaction has been reported on the basis of assumptions that in a subsequent year prove to have been erroneous.

Rev. 4/2008

059

| Form 5278 (Rev. June 2004) | Department of the Treasury - Internal Revenue Service **Statement - Income Tax Changes** | | Schedule 1 | |
|---|---|---|---|---|

**1. Name(s) of taxpayer(s)**
TERRY L & LYNETTE EVANSON

**2.** ☑ Notice of Deficiency   ☐ Other *(specify)*
☐ Settlement computation

**3. Taxpayer Identification Number**
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

| 4. Form number | 5. Docket number | 6. Office symbols |
|---|---|---|
| 1040 | | AP:FW:SLC:CRS |

**Tax years ended**

| 7. Adjustments to Income | Year: 12/31/2008 | Year: | Year: |
|---|---|---|---|
| a. Other Income - Cancellation of Loan Debt | 1,433,990.00 | | |
| b. Tuition & fees ded. | 2,965.00 | | |
| c. Itemized Deductions | 12,870.00 | | |
| d. Exemptions | 5,835.00 | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| **8. Total adjustments** | 1,455,660.00 | | |
| 9. Taxable income as shown in: ☐ Preliminary letter dated _____ ☐ Notice of deficiency dated _____ ☑ Return as filed | 21,907.00 | | |
| **10. Taxable income as revised** | 1,477,567.00 | | |
| 11. Tax   Tax method _____   Filing status _____ | 488,658.00 SCHEDULE D Joint | | |
| 12. Alternative tax, if applicable | | | |
| 13. Alternative minimum tax *(Starting tax year 2000)* | | | |
| 14. Corrected tax liability *(lesser of line 11 or 12 plus line 13)* | 488,658.00 | | |
| 15. Less credits   a. Foreign Tax Credit | 48.00 | | |
| b. Prior Year Min Tax Credit | 19,249.00 | | |
| c. Child Tax Credit | 0.00 | | |
| **16. Balance** *(line 14 less total of lines 15a - 15c)* | 469,361.00 | | |
| 17. Plus other taxes   a. Self Employment Tax | 276.00 | | |
| b. | | | |
| c. | | | |
| 18. Total corrected tax liability *(line 16 plus lines 17a - 17c)* | 469,637.00 | | |
| 19. Total tax shown on return or as previously adjusted | 276.00 | | |
| 20. Adjustments: increase (decrease) to: | | | |
| a. Earned income credit | | | |
| b. Additional child tax credit | | | |
| c. Fuel credits / other | (1,300.00) | | |
| 21. Deficiency - increase in tax (overassessment - decrease in tax) *(line 18 less line 19 adjusted by lines 20a - 20c)* | 470,661.00 | | |
| 22. Adjustments to prepayment credits - Increase (decrease) | | | |
| 23. Balance due or (Overpayment) excluding interest and penalties *(line 21 adjusted by line 22)* | 470,661.00 | | |
| 24. Penalties and/or Additions to Tax *(listed below)* Accuracy-IRC 6662 | 94,132.20 | | |

Catalog Number 23735U

Form **5278** (Rev. June 2004)

060

| Form 886-A<br>(Rev. January 1994) | **EXPLANATION OF ITEMS** | | Schedule number or exhibit |
|---|---|---|---|
| Name of Taxpayer<br>EVANSON, TERRY L & LYNETTE | | Tax Identification Number<br>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 | Year/Period ended |

Adjustment to Miscellaneous
Prepayment Credits Subject to
Deficiency (Form 4549 series Line 13a):                   200812

Recovery rebate credit                              (1,300.00)

Total Adjustment Amount:                             (1,300.00)

---

Adjustment to Prepayment Credit Not
Subject to Deficiency (Form 4549 series Line 15):            200812

Total Adjustment Amount:

---

Form 886-A (1-1994)                  Department of the Treasury-Internal Revenue Service

FORM 886-A

SCHEDULE NUMBER
1 of 2

**EXPLANATION OF ITEMS**

NAME OF TAXPAYER

YEAR/PERIOD ENDED

**Terry & Lynette Evanson**

**December 31, 2008**

## 7a. Other Income - Cancellation of Loan Debt

It is determined your debt of $ 1,433,990.00 that was canceled or forgiven is includible in income for tax year ended December 31, 2008. Accordingly, taxable income is increased $ 1,433,990.00 for tax year ended December 31, 2008.

## 7b. Tuition & fees deduction.

It is determined that the amount you can claim for your *Tuition & fees deduction* is reduced if your income is more than the dollar limit for your filing status. Your income is more than that limit, so we reduced the amount you can claim to $0.00 rather than $ 2,965.00 as claimed on your tax return for tax year ended December 31, 2008. We have attached a computation on Form 8917 – Tuition & Fees Deduction to show you how we figured the change. Accordingly, taxable income is increased $ 2,965.00 for tax year ended December 31, 2008.

## 7c. Itemized Deductions

It is determined that adjustments to total itemized deductions in the amounts of $ 12.870.00 for the tax year ended December 31,2008 since the amount of itemized deductions is subject to adjusted gross income limitations, and your adjusted gross income increased due to adjustments made in this report. See computation on Schedule A – Itemized Deductions. Therefore, total itemized deductions of $ 35,409.00 for tax year ended December 31, 2008 is allowable instead of the amounts of $ 48,279.00 claimed on your return for tax years ended December 31, 2008. Accordingly, taxable income is increased $ 12,870.00 for tax year ended December 31, 2008.

## 7d. Exemptions

It is determined that the amount you can claim for your exemptions is reduced if your income is more than the dollar limit for your filing status. Your income is more than that limit, so we reduced the amount you can claim to $11,665.00 rather than $ 17,500.00 as claimed on your tax return for tax year ended December 31, 2008. We have attached a computation on Personal Exemption Worksheet to show you how we figured the change. Accordingly, taxable income is increased $ 5,835.00 for tax year ended December 31, 2008.

FORM 886-A

SCHEDULE NUMBER
2 of 2

**EXPLANATION OF ITEMS**

NAME OF TAXPAYER

YEAR/PERIOD ENDED

**Terry & Lynette Evanson**

**December 31, 2008**

## 15 b. Prior Year Min Tax Credit

It is determined that your *Prior Year Min Tax Credit* is $ 19,249.00 as computed on Form 8801 – Credit for Prior Year Minimum Tax rather than $ 1,386.00 as claimed on your tax return for tax year ended December 31, 2008. Accordingly, tax is decreased by $ 17,863.00 for tax year ended December 31, 2008.

## 15 c. Child Tax Credit

It is determined that your *Child Tax Credit* is $ 0.00 as computed on Child Tax Credit and Form 8812 Additional Child Tax Credit Worksheet rather than $ 1,000.00 as claimed on your tax return for tax year ended December 31, 2008. Accordingly, tax is increased by $ 1,000.00 for tax year ended December 31, 2008.

## 20 c. Recovery rebate credit

It is determined that your *Recovery rebate credit* is $ 0.00 rather than $ 1,300.00 as claimed on your tax return for tax year ended December 31, 2008. Accordingly, tax is increased by $ 1,300.00 for tax year ended December 31, 2008.

## Penalties and/or Additions to Tax

## Accuracy – IRC Sec. 6662

It is determined that you are liable for the accuracy-related penalty imposed under Section 6662(a) of the Internal Revenue Code for the tax years ended December 31, 2008 because there was (1) a substantial understatement of income tax, (2) valuation misstatement(s), or (3) you were negligent or disregarded rules or regulations. You have not shown you had reasonable cause for the underpayment of tax or that any exceptions to the penalty apply. The penalty is 20 percent of the portion of the underpayment of tax attributable to each component of this penalty.

# TERRY LEE EVANSON IN RE

<u>Deposition</u>

## TERRY LEE EVANSON

*06/30/2016*

---

### Agren Blando Court Reporting & Video, Inc.

*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

Government
Exhibit 11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

Case No. 13-19032 MER
Chapter 11

---

DEPOSITION OF TERRY LEE EVANSON          June 30, 2016

---

In re:

TERRY LEE EVANSON
SSN/ITIN:  xxx-xx-9483
LYNETTE PEARCE EVANSON
SSN/ITIN:  xxx-xx-5531

Debtors.

---

APPEARANCES:

    OFFICE OF THE UNITED STATES TRUSTEE
        By Alan K. Motes, Esq.
            1961 Stout Street
            Suite 12-200
            Denver, Colorado 80294
              Appearing on behalf of U.S. Trustee.


    WEINMAN & ASSOCIATES, P.C.

        By Jeffrey A. Weinman, Esq.
            730 17th Street
            Suite 240
            Denver, Colorado 80202
              Appearing on behalf of Debtors.



    Also Present:  Sherri L. Barnett

*Agren Blando Court Reporting & Video, Inc.*

1               Pursuant to Notice, the Federal Rules of

2    Bankruptcy Procedure and the Federal Rules of Civil

3    Procedure, the deposition of TERRY LEE EVANSON,

4    called by the U.S. Trustee, was taken on Thursday,

5    June 30, 2016, commencing at 9:05 a.m., at 1961

6    Stout Street, Suite 12-200, Denver, Colorado, before

7    Ellen Leifer, Professional Reporter and Notary

8    Public within and for the State of Colorado.

9

10

11                        I N D E X

12

13   DEPOSITION OF TERRY LEE EVANSON

14   EXAMINATION BY:                          PAGE

15      Mr. Motes                              4

16

17
     EXHIBITS                         INITIAL REFERENCE
18
     Exhibit 1   Printout from Ironclad Wealth   12
19               Strategies' Web site

20   Exhibit 2   Assignment and transfer in      22
                 cancellation of obligation
21
     Exhibit 3   Statement of financial affairs 34
22               and schedules filed in
                 bankruptcy case, Docket 21
23
     Exhibit 4   Amended schedules               66
24
     Exhibit 5   Monthly operating report for    71
25               period ending 5/31/16

*Agren Blando Court Reporting & Video, Inc.*

1                    I N D E X (Continued)

2    EXHIBITS                              INITIAL REFERENCE

3    Exhibit 6    Form 4564, information          87
                  document request
4
     Exhibit 7    Cover letter from the IRS       89
5                 dated March of 2013 with form
                  of closing agreement as to final
6                 determination covering specific
                  matters
7
     Exhibit 8    Form 4089, notice of            98
8                 deficiency - waiver

9    Exhibit 9    Loan application and personal  102
                  financial statement
10
     Exhibit 10   Letter dated 8/1/95 from       103
11                Dennis Evanson to Terry and
                  Lynette Evanson
12
     Exhibit 11   Home equity line, revolving    104
13                credit agreement, note and
                  disclosure statement
14
     Exhibit 12   Statements showing loan        106
15                amounts, sent from Dennis
                  Evanson
16
     Exhibit 13   Annual mortgage statement      107
17                from Hill Property

18   Exhibit 14   Deed of trust                  109

19   Exhibit 15   Advice of wire transfer        112

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2              TERRY LEE EVANSON,
 3  being first duly sworn in the above cause, was
 4  examined and testified as follows:
 5              MR. MOTES:  Good morning.  We are here
 6  for the deposition of Terry Lee Evanson in
 7  connection with the Chapter 11 bankruptcy case of
 8  Terry Lee Evanson and Lynette Pearce Evanson, Case
 9  No. 13-19032.
10              It's Thursday, June 30, 2016, at
11  9:00 a.m., and we are located at the offices of the
12  U.S. Trustee of Region 19 in the Byron G. Rogers
13  Federal Building, 1961 Stout Street, Suite 12-200,
14  Denver, Colorado 80294.
15              My name is Alan Motes.  I am an attorney
16  with the U.S. Trustee Program, which is a component
17  of the Department of Justice.  With me today,
18  although she is making copies at the moment, is
19  Sherri Barnett, who is a paralegal specialist in our
20  office.  I will note for the record that Jeffrey
21  Weinman is present, counsel for the debtor, Terry
22  Lee Evanson.
23                       EXAMINATION
24  BY MR. MOTES:
25       Q     Just some preliminary information, or
```

1    questions, concerning this deposition, Mr. Evanson.

2              If you -- I am going to ask a series of

3    questions.  If you don't understand a question that

4    I ask, just let me know and I will repeat it.  If

5    you can't hear the question, just let me know and I

6    will repeat it.

7              If I ask you a question and you

8    realize -- and you answer it, perhaps, or don't

9    answer it and then later on realize that you have

10   the information to answer it or to correct it, just

11   let me know, and you have the opportunity to go back

12   and correct an answer or supplement an answer.

13             If you want to take a break at any point,

14   just let me know, to get some water or whatever.  If

15   I ask a question and you do not remember the

16   information necessary to answer the question, just

17   let me know that you don't remember that information

18   or don't have access to it.

19             Is there any medical or physical reason

20   that would prevent you from testifying accurately

21   today?

22        A    I don't believe so.

23        Q    Okay.  Did you say you do not believe so?

24        A    No, I don't believe there's anything.

25        Q    Are you under the influence of any drug

1    or alcohol that would affect your testimony today?

2         A    I am not, no.

3         Q    Thank you.  As the court reporter just

4    requested, please speak clearly because she is

5    recording your testimony today, and speak loud, if

6    you can, please.

7         A    I have a tendency to nod sometimes, and I

8    might need to be reminded.

9         Q    Do you understand those instructions?

10        A    Yes.

11        Q    Do you have any questions?

12        A    No.

13        Q    Would you please state your full name for

14   the record?

15        A    Terry Lee Evanson.

16        Q    What is your current address?

17        A    10175 South Oneida Street, Littleton,

18   Colorado 80124.

19        Q    And you have lived there for quite some

20   time?

21        A    Yes.

22        Q    Since maybe the Eighties?

23        A    Yes.  '87, I believe it was.

24        Q    What do you do for a living, Mr. Evanson?

25        A    I help my wife with her flower and

```
 1    catering business, plus I also have a new job with a

 2    company doing insurance sales, which I have done

 3    throughout my life.

 4        Q     As a career, you have been an insurance

 5    salesman?

 6        A     Yes.

 7        Q     And you said you have a new job now?

 8        A     Yes, with a new entity.

 9        Q     What is that?

10        A     It's Lighthouse Professionals Benefit

11    Health Advisors.  I think that's the full correct

12    name.  It's Brent Hillier's company.  Brent Hillier

13    owns the company, him and his sons.

14        Q     When did you start that?

15        A     I have been kind of consulting with them

16    but now I am on full time, probably starting, I

17    think, the first part of June.

18        Q     And you are doing insurance sales there

19    as well?

20        A     I am, yes.

21        Q     How do you get compensated there?

22        A     With a salary.

23        Q     And what is that?

24        A     $3,000 a month.

25        Q     Are you eligible for bonuses?
```

1      A      I don't know.

2      Q      Are you eligible for commissions?

3      A      Yes, additional commissions if I make the

4   sales.

5      Q      Have you made a sale yet?

6      A      I have made some, but not enough to

7   generate over the salary a month.  You have to

8   generate more than the salary a month before they

9   will pay anything.

10      Q      Do you have any expectation as to what

11   your income will be with this employer once you get

12   established?

13      A      Well, I hope it will be like 50 to

14   $75,000 a year, at least.

15      Q      You were previously, my recollection was,

16   you were involved in a company called Advantedge

17   Business Group?

18      A      I did some work for them, but I was not

19   involved in the company in an ownership position, if

20   that's what you mean.

21      Q      No, that's not what I meant.

22             So you were employed by Advantedge

23   Business Group?

24      A      I was employed.

25      Q      Throughout your bankruptcy case?

1    A    Through part of it.  My last paycheck

2  from them was, I believe, in 2015.

3    Q    Okay.  What have you been doing between

4  that and Lighthouse Professionals Benefit Health

5  Advisors?

6    A    Helping my wife.

7    Q    Okay.  Do you have any source of income

8  besides your current employment with Lighthouse

9  Professionals?

10   A    No.

11   Q    Do you have a Canadian pension?

12   A    Oh, yes, I do.  I believe it's about $250

13  a month, something like that.  And I do have a

14  dividend that I get from Sun Life Insurance once a

15  quarter that's about 50 or $60 a quarter.  And I

16  have Social Security that's coming, and that will be

17  about $2,100 a month.

18   Q    When does that start?

19   A    It's going on now.

20   Q    When did it start, approximately?

21   A    When I turned 66, so it would have been

22  January of last year.

23   Q    January of 2015?

24   A    Yes.

25   Q    Okay.  So you have the -- your current

1    employment with Lighthouse Professionals Benefit

2    Health Advisors, you have your Canadian pension, you

3    have the 50 to $60 per quarter dividend, I think is

4    what you said?

5         A    Uh-hum.

6         Q    And then you have Social Security which

7    you have been receiving in the amount of $2,100 a

8    month since January of last year?

9         A    Yes.

10        Q    Any other source of income for you?

11        A    No.

12        Q    And then -- so for Mrs. Evanson, you said

13   that she has her flower and catering business?

14        A    That's correct, yes.

15        Q    And does she have another source of

16   income?

17        A    No, she doesn't.  She does have Social

18   Security of $725 a month.

19        Q    725?

20        A    Yes.

21        Q    Okay.  So she has her catering business,

22   she has the Social Security.

23             Any other income other than that?

24        A    No.

25        Q    I know that you just started at

1   Lighthouse Professionals, so perhaps your income

2   will change there, just depending on getting

3   established, I suppose?

4       A     Yes.

5       Q     Do you expect any other changes to your

6   income or to Mrs. Evanson's income in the near

7   future?

8       A     No, not in the near future.

9             I mean, what do you mean by "near

10  future"?

11      Q     Does Mrs. Evanson, for example,

12  anticipate taking on different employment?

13      A     No, she does not.

14      Q     In 2016 or 2017, do you expect her income

15  to change from what you just told me?

16      A     No, I do not.

17      Q     Okay.  What is Ironclad Wealth

18  Strategies?

19      A     That's a company that my son owns.

20      Q     And are you involved in Ironclad Wealth

21  Strategies?

22      A     I am not.

23      Q     Have you ever been?

24      A     When it was originally set up, I was

25  licensed, but I have never sold anything or done

*Agren Blando Court Reporting & Video, Inc.*

```
 1    anything with it, and I have never been paid any

 2    money from it.

 3        Q    Okay.  Do you know that you are listed as

 4    the vice president for Ironclad Wealth Strategies on

 5    their Web site?

 6        A    No, I did not know that.

 7             MR. WEINMAN:  Congratulations, Mr. Biden.

 8        Q    (BY MR. MOTES)  Did Ironclad Wealth

 9    Strategies have office space in the same building as

10    Advantedge?

11        A    Yes, they did.

12        Q    Was it space that you leased or that

13    Advantedge leased?  Did they share the same space?

14        A    They had separate offices.

15        Q    Okay.  Just in the same building?

16        A    Same building.

17        Q    Okay.

18             MR. MOTES:  Would you please mark this

19    one as an exhibit.

20             (Exhibit 1 marked.)

21        Q    (BY MR. MOTES)  I will represent to you

22    that this is a printout from Ironclad Wealth

23    Strategies' Web site.

24             Do you recall posing for the picture

25    that's on the front?
```

1     A     Yes, I do.

2     Q     Were you part of the company at that

3     point?

4     A     Yes.

5     Q     What was your role?

6     A     I was in sales.

7     Q     So you did perform some work for Ironclad

8     Wealth Strategies?

9     A     When they originally opened up and

10    started, but this is going back -- I don't know --

11    four or five years.

12          Is this still on the Web site?

13    Q     It was when I -- if you look at the

14    bottom, you will see there's a March 2014 date.

15          Is Troy Evanson your son?

16    A     He is.

17    Q     But you haven't received any income from

18    Ironclad Wealth Strategies since four or five years

19    ago?

20    A     I never received any income from Ironclad

21    Wealth Strategies.

22    Q     You did some sales for them, but you

23    didn't receive any compensation?

24    A     I never made any sales for them.

25    Q     Okay.

*Agren Blando Court Reporting & Video, Inc.*

```
 1        A      None of these people -- I mean, it
 2   doesn't exist anymore with any of these people
 3   except Troy.
 4        Q      None of these people are at Ironclad
 5   anymore?
 6        A      None of them are.
 7        Q      This is dated information?
 8        A      Oh, yeah.  It's very dated.
 9        Q      We requested a lot of documentation
10   concerning your mortgage on the house on Oneida.
11              That mortgage is currently held by Hill
12   Property?
13        A      It's an entity in Canada that does
14   business as Hill Property.
15        Q      Do you know the name of the entity?
16        A      I do not.
17        Q      Is it Ron Hill that individually does
18   business at Hill Property?
19        A      No.  Ron Hill is deceased.  He was killed
20   in an accident -- I don't know -- a year and a half
21   or so ago.  He was an agent for the company.
22        Q      You don't know the actual name of the
23   mortgage holder?
24        A      It is under Hill Properties, but it's a
25   company doing business as Hill Properties, and I
```

1    don't -- I don't know that full name.

2        Q    Who is involved in that company now?

3        A    I don't know the name of the owner, but I

4    was contacted by a fellow here just this week who

5    said that they are tired of waiting and they are

6    looking for an attorney down here because they are

7    going to file for foreclosure.

8        Q    Tired of waiting for what?

9        A    Well, because I haven't been making

10   payments on it.

11       Q    When was the last time you made a payment

12   on that loan?

13       A    It was prior to bankruptcy. I made

14   payments prior to bankruptcy, and then with

15   bankruptcy, I haven't made a payment on it since.

16       Q    So you don't personally know the people

17   that are associated with the holder of that loan?

18       A    I don't, no. I did Ron Hill, but I don't

19   know the others.

20       Q    How did you know Ron Hill?

21       A    When I moved to Canada, him and I worked

22   in the same company up there.

23       Q    When did you move to Canada?

24       A    '73, and '74 I was working with him in

25   that company in Canada.

*Agren Blando Court Reporting & Video, Inc.*

1    Q    And you became acquaintances?

2    A    Yeah.  We were good friends.

3    Q    Okay.  So does the mortgage company that

4  does business as Hill Property, to your knowledge,

5  does it service other mortgage loans?

6    A    I don't know.  I don't know what they do.

7    Q    Do they send you monthly statements?

8    A    No, they have not.

9    Q    Do they send you demands, pay this

10  amount?

11    A    They haven't yet.

12    Q    They don't send you delinquency notices?

13    A    No.

14    Q    Do they send you e-mails?

15    A    No.

16    Q    So you have only spoken to a

17  representative of that company over the phone?

18    A    Yes.

19    Q    And that was just last week or so?

20    A    Just this last week, yes.

21    Q    Is that the first time you have spoken to

22  someone purporting to be the holder of the mortgage

23  since the beginning of your bankruptcy case?

24    A    No, I have talked to individuals that

25  have wanted to know about the bankruptcy and where

*Agren Blando Court Reporting & Video, Inc.*

1    it was at and what was happening with it.

2        Q     When was that?

3        A     Earlier this year there was a couple of

4    conversations, and last year there was a

5    conversation.

6        Q     Who were these conversations with?

7        A     Well, one was initially one of the

8    fellows, and then there's a fellow named DeLinn.

9        Q     Is that his last name?

10       A     I don't know his last name.  He is the

11   guy that just called me, and he is the one that

12   advised that they were not going to wait any longer,

13   that they were going to take some action, get an

14   attorney down here and take some action on my notes.

15       Q     Do you know of anybody else you have

16   spoken to besides DeLinn?

17       A     I don't remember any other names off the

18   top of my head, no.

19       Q     So you have had some conversations over

20   the phone with representatives of the mortgage

21   holder?

22       A     Uh-hum.

23       Q     They are wondering what's going on;

24   correct?

25       A     Yes.

1     Q    Most recently DeLinn contacted you.

2          Do you know how to spell that?

3     A    I do not.

4     Q    So as recently as last week, DeLinn

5 contacted you and let you know that they were tired

6 of waiting?

7     A    Yes, that they were going to take some

8 action.

9     Q    Do you know what the current balance of

10 your mortgage loan is?

11     A    I know it's over $800,000, but I couldn't

12 give you the exact amount.

13     Q    Do you have a monthly payment that you

14 owe on that?

15     A    Yeah, and it's over $2,000, but again, I

16 couldn't give you an exact amount on that.

17     Q    Is it a fixed-rate mortgage?

18     A    I don't know for sure.

19     Q    Is it --

20     A    I think it might have some variable

21 clauses to it, but I don't remember.

22     Q    In the history of the loan, have you ever

23 received a notice from the lender advising you that

24 the mortgage rate has changed, that the interest

25 rate has changed?

1      A      I think Cottonwood might have sent

2   notices out, but I don't remember for sure.

3      Q      Certainly not in the last five years or

4   so?

5      A      Not since Hill took over the note, since

6   they bought the note out from Cottonwood.  No, I

7   don't recall.

8      Q      Is it an interest-only loan?

9      A      I honestly don't know.  I probably need

10  to ask for a copy of the document.

11     Q      When you say there's a monthly payment,

12  is that a payment of principal and interest, or is

13  it a payment of just interest?

14     A      I thought it was principal and interest,

15  but I am not a hundred percent positive on that,

16  either.

17     Q      Is there a term for the loan?

18     A      I thought there was a 30-year term on the

19  loan, on the note, but again, I am not sure.

20     Q      Since you filed your bankruptcy case, did

21  you speak to Mr. Hill?

22            You filed it back in 2013.  Have you

23  spoken to Mr. Hill since then and prior to his

24  death?

25     A      I did.  I remember making him aware of

1    the bankruptcy in the Command litigation, because

2    that's when I stopped making payments.  I remember

3    having a discussion with him.  I don't remember all

4    the discussion.

5        But it would have been right around the

6    time of the bankruptcy filing.

7    Q    And then not again until he passed away?

8    A    I may have talked to him, but again, I

9    don't recall specific dates or conversations.

10   Q    Did he make demands over the phone for

11   the payment of the debt?

12   A    I honestly don't remember the

13   conversations with him, exactly what he said or

14   asked for.

15   Q    Okay.  So, to your knowledge, did

16   Mr. Hill own Hill Property?

17   A    No.  My understanding was he was an agent

18   for the company that did business as Hill Property.

19       He may have had some ownership in it.  I

20   don't know.

21   Q    But you don't know the name of that

22   company that does business as Hill Property?

23   A    I don't, no.

24   Q    And you don't know if they are engaged in

25   the business of mortgage services?

1      A      I don't know that.

2      Q      Obviously, Hill Property, or whatever

3  entity did business as Hill Property, acquired the

4  mortgage loan from Cottonwood Financial; is that

5  correct?

6      A      That's my understanding.  That's my

7  recollection of the documentation that I signed with

8  them.

9      Q      How did that come about?

10     A      Cottonwood had numerous mortgages and

11 they were shutting their operations down, and they

12 notified me that they were shutting their operations

13 down and they would be selling the mortgages off.

14 And I don't know what they did with the others,

15 other people that had mortgages, but they gave me

16 the option of, "If you know anybody that would want

17 to buy your mortgage," you know, "refer them to us."

18           And I knew who Ron was, so I made that

19 reference and they did a transaction with him.

20     Q      You provided to us a copy of, I think,

21 the documents that relate to that transaction.

22     A      I did?

23     Q      You did.

24     A      Okay.

25     Q      And I am going to show it to you.  I

1    think it's highly confusing, and perhaps you can

2    help clarify it.

3            MR. MOTES:  Would you please mark this

4    one as an exhibit.

5            (Exhibit 2 marked.)

6        Q    (BY MR. MOTES)  We are calling this T.

7    Evanson 2.

8            Mr. Evanson, you might take a moment to

9    become familiar with the document, and give

10   Mr. Weinman an opportunity to become familiar with

11   it.

12           Mr. Evanson, you might not be familiar

13   with this terminology, and I do not intend to ask

14   you to explain something you don't know.  But let me

15   ask you some probably more simple questions.

16           This assignment and transfer in

17   cancellation of obligation has initials in the lower

18   right-hand corner.  Does that contain your initials

19   and Mrs. Evanson's initials?

20       A    It does, yes.

21       Q    And similarly, the last page is signed by

22   you and by Mrs. Evanson; correct?

23       A    That is correct, yes.

24       Q    Because you are authorizing this

25   assignment?

1      A      Yes.

2      Q      Okay.  I want to go through some of these

3  "whereas" clauses, and maybe you can help me

4  understand, if you know.  It references Cottonwood

5  as being an expired Utah limited liability company.

6  The third "whereas" down says that "Brent Metcalf

7  was the manager of Cottonwood."

8            Was Dennis Evanson a manager of

9  Cottonwood?

10     A      No.

11     Q      It was always Brent Metcalf, to your

12  knowledge?

13     A      When I first started borrowing money from

14  Cottonwood was in 1995, I believe.  I think that's

15  when I first entered into an arrangement with them,

16  and it was a home equity line of credit.

17           At that point in time, I believe that

18  Dennis Evanson, my brother, was involved in that

19  company, but I think he was taken out -- I think he

20  sold his interest -- I don't know what happened in

21  the transaction between him and Brent Metcalf.

22           But Brent Metcalf came in, and my

23  understanding is that he was the guy that took over

24  and owns the company, sometime in the mid to late

25  Nineties.

1    Q    Brent Metcalf took over the company in

2  the mid to late Nineties?

3    A    That's my understanding.

4    Q    And then at that point, your brother was

5  no longer involved in the company?

6    A    That's my understanding.

7    Q    Okay.  I am going to ask you about the

8  fourth "whereas" clause.  "Cottonwood shows

9  obligations to Medcap Management Ltd., a Grand

10 Cayman based Limited Company."

11       Have you heard of Medcap Management Ltd.

12 before?

13   A    I mean, the name is -- I don't -- I mean,

14 I can't say that I haven't ever heard it, but it

15 doesn't ring any bells.  I have never been involved

16 with them or had any direct dealings with them at

17 all.

18   Q    It says, "Cottonwood shows obligations to

19 Metcalf Management Ltd., including an obligation

20 known as the Terry and Lynette Evanson home

21 mortgage."

22       If you know, is this saying that

23 Cottonwood was indebted to Medcap Management in some

24 way relating to your mortgage?

25   A    My understanding is that Cottonwood had

1  borrowed money from some other entity, which I

2  assume is this Medcap Management -- that's an

3  assumption, but it makes sense -- that they had

4  borrowed money that they owed to them that they had

5  lent out and that my mortgage was one of those debts

6  that they had borrowed money on from Medcap.

7      Q      Perhaps Cottonwood borrowed from Medcap

8  in order to make a mortgage loan to you?

9      A      That could be.  I don't know where they

10 got their money from.

11             MR. WEINMAN:  It sounds like they are a

12 warehouse lender actually for Cottonwood.

13     Q      (BY MR. MOTES)  I am going to go down two

14 paragraphs:  "Whereas, it is the desire of Evanson

15 and Cottonwood to satisfy the Evanson obligation to

16 Cottonwood on a dollar-for-dollar basis using the

17 Evanson loan values shown on the books of Cottonwood

18 at the end of 2008, by transfer of the Cottonwood

19 corresponding Evanson mortgage asset of Evanson to

20 Ronald Hill, d/b/a Hill Property."

21             Do you know what that means?

22     A      I think it means that Cottonwood was just

23 transferring the mortgage from them to Hill

24 Property.  That's what I -- that's what my

25 interpretation of that is.

*Agren Blando Court Reporting & Video, Inc.*

1 Q This specifies that the transfer would be

2 to Ronald Hill d/b/a Hill Property; correct?

3 A Yes.

4 Q So it wasn't transferred to some other

5 entity.

6 A My -- at this particular point in time, I

7 don't think it was, but I think that there was a

8 transition that was taking place into that other

9 entity right around this same year, same time frame.

10 But I don't know -- I don't have a copy

11 of that document because we weren't party to it.

12 Q After Ron Hill transferred his interest

13 in this entity or transferred your mortgage to a new

14 entity doing business as Hill Property, did Ronald

15 Hill continue to work for Hill Property with respect

16 to your mortgage loan?

17 A He was a contact for me. What his

18 relationship and work was, I don't know, but he was

19 a contact with me, yes.

20 Q If you would please turn to the second

21 page. The paragraph numbered 2 says, "Cottonwood

22 hereby agrees to release their existing deed of

23 trust on said property as registered with Douglas

24 County."

25 A Uh-hum.

1      Q     To your knowledge, did Cottonwood release

2   their deed of trust, or do you know?

3      A     I honestly don't know.

4      Q     It goes on to say that "Hill agrees to

5   register by a deed of trust against the asset

6   described in the recitals listed above."

7            To your knowledge, did Hill or Hill

8   Property file a deed of trust with Douglas County?

9      A     I thought that's what this was.

10           Isn't that what this is?

11     Q     Well, are you aware of Hill or Hill

12  Property filing a separate deed of trust with

13  Douglas County?

14     A     I thought there was something filed, but

15  I don't --

16     Q     You don't know?

17     A     -- know for sure.  I mean, I can go find

18  out.

19     Q     That's okay.

20     A     I mean, I see this, and my assumption was

21  that this is what they filed.  That's what I

22  assumed.

23     Q     Let me take you back to the first page,

24  when you say, "This is what they filed."  If you

25  look at the very first page, this appears to be some

1    kind of cover sheet or receipt issued by the Clerk

2    and Recorder for Douglas County.  The transaction is

3    dated December 11, 2012.

4            Do you see that, towards the top?

5        A    Uh-hum.

6        Q    It shows the customer as being Hill

7    Property LLC with your address on South Oneida; that

8    is that correct?

9        A    Yes, it does.

10       Q    Why would it list Hill Property as having

11   your address?

12       A    I don't know.

13       Q    It shows that the -- this instrument was

14   recorded over the counter.  I gather that means

15   somebody took it there and filed it.

16           Did you take this assignment document to

17   Douglas County to file it?

18       A    Uh-uh.

19       Q    I'm sorry, can you answer yes or no?

20       A    No.

21       Q    To your knowledge, somebody else besides

22   you filed this document with the Clerk and Recorder?

23       A    That would be what I would assume, yes.

24       Q    And you don't know why your address is

25   listed as the address for Hill Property?

1      A      I do not.

2      Q      This assignment occurred in 2012,

3  obviously.  You filed bankruptcy in 2013.

4             Did you make payments on this loan

5  between the assignment and the time you filed for

6  bankruptcy?

7      A      Yes, I did.

8      Q      Okay.  Did you make payments between 2008

9  and 2012, when this was assigned?

10     A      I did not.

11     Q      When is the last time you made a payment

12  to Cottonwood Financial?

13     A      I believe it was 2007, I believe.  But

14  I'm -- I don't remember exactly when it was.

15     Q      And you obviously made some payments to

16  Cottonwood from the inception of the loan up through

17  2007?

18     A      Yes.

19     Q      So you made -- was the loan taken out in

20  1995?

21     A      The original loan was taken out in 1995.

22  It was a home equity line of credit.

23             In around 2001 or 2002, sometime around

24  that time frame, the first mortgage that I had on my

25  house was paid off by Cottonwood, and they -- they

1    paid the payment on the mortgage and assumed that

2    debt, I guess, or I -- it was a debt that we then

3    had with Cottonwood for the first mortgage on the

4    house.

5        Q    Did you request that Cottonwood do that?

6        A    Yes, actually I did.

7        Q    Why is that?

8        A    I don't remember.

9        Q    Let me back up.

10            Who was the first mortgage holder?

11       A    Oh, gee.

12       Q    Was it a commercial lender, like

13   Washington Mutual or Bank of America?

14       A    Washington Mutual.

15       Q    Was that it?

16       A    That's the name I recall.  I think

17   there's a document that shows the letter from

18   Washington Mutual that -- I thought I gave you a

19   copy of that.

20       Q    We do have it as something.

21       A    Yes.

22       Q    Do you recall what the interest rate was

23   under the Washington Mutual loan?

24       A    No, I do not.

25       Q    Were you in default of that obligation?

1      A      I was not.

2      Q      The interest rate, I think, under the

3   Cottonwood Financial loan was 11 percent; is that

4   correct?

5      A      I believe that was the original home

6   equity line note, but I don't know that that was the

7   same note that was in place at the time of the

8   mortgage payoff.

9      Q      Okay.  So there was the home equity line

10  note, and then you might have had a loan -- a note

11  that replaced that one?

12     A      I believe there was a different note that

13  was put in place at this point in time, and I

14  thought --

15     Q      At the time that the Washington Mutual

16  loan was taken out?

17     A      Yes, around that time.  I thought that it

18  was recorded and that I gave you a copy of that.

19     Q      I didn't see that.

20            Okay.  So you had a loan with Cottonwood

21  Financial -- it was a home equity line of credit --

22  since 1995, and then in 2001 or 2002, you took out a

23  new loan with Cottonwood Financial?

24     A      I believe we signed a different note with

25  them at that point in time.

*Agren Blando Court Reporting & Video, Inc.*

1   Q      Did it pay off that home equity line of

2   credit as well?

3   A      Yes.

4   Q      So there was just a new obligation

5   altogether?

6   A      That's correct, yes.

7          Well, that's my understanding, was that

8   it was a brand-new note or deed or whatever you want

9   to call it.

10   Q      Okay.  A new promissory note?

11   A      I believe we signed a new promissory

12   note.  I thought you had a copy of that, that I had

13   given that to you.

14   Q      I think I might have one from '95.  We

15   will get to that.  I will show you what we have.

16          Let's do this.  Let's go to the -- before

17   I do, let me recap.

18          You had the home equity line of credit in

19   1995?

20   A      Yes.

21   Q      That then you took out probably a new

22   obligation in 2001 or 2002, possibly with a new

23   promissory note, again only to Cottonwood Financial?

24   A      Yes.

25   Q      And from 1995 to 2007, you made some

1    payments on those loans?

2         A    Yes, I did, and the -- there were

3    interest -- whatever -- whatever the document is

4    that they provide for interest, home interest

5    deductions, we received all through that time frame

6    and all the way through the -- even the audit time

7    from 1999 to 2006, when the IRS went through on that

8    currency issue that's being litigated, they left

9    those interest deductions in place on the tax

10   returns, and the interest that was on the tax

11   returns was because of the Cottonwood note or

12   mortgage that they held on the house.

13        Q    Okay.  So you are saying the IRS agreed

14   that you made payments on your loan?

15        A    Yeah.

16        Q    And claims home mortgage interest

17   deductions for that?

18        A    Oh, yeah.

19        Q    Between 2007 and 2012, you did not make

20   any payments on the Cottonwood loan?

21        A    Did not.

22        Q    And why is that?

23        A    Cottonwood was basically shut down by the

24   Government because of the court case involving the

25   currency transactions and my brother, Dennis

1  Evanson; and Brent Medcap was the bookkeeper that

2  did the books for that, and he was involved in that.

3         And they basically shut down and said,

4  "We can't" -- "will not take interest payments or

5  anything.  Keep the taxes paid, keep the house up,

6  keep the insurance paid on the house, and when this

7  is all resolved, then we are going to come back and

8  revisit this and you will owe us the money."

9     Q     In the beginning of 2012 -- well, I

10  suppose December or so 2012 when the loan was

11  assigned to Hill or Hill Property, you began making

12  payments again?

13     A     Uh-hum.

14     Q     But when you filed your bankruptcy case

15  in 2013, you stopped making payments?

16     A     That's right.

17     Q     You haven't made a payment since then?

18     A     No, have not.

19         MR. MOTES:  Would you please mark this

20  one as an exhibit.

21         (Exhibit 3 marked.)

22     Q     (BY MR. MOTES)  Take a moment to look

23  through this.  It is the statement of financial

24  affairs and the schedules filed in your bankruptcy

25  case, Docket 21.

1        A      Yes.

2        Q      Do you recognize that?

3        A      Yeah.

4        Q      I asked you about this at the Section 341

5    meeting in this case, but you provided the

6    information that was given to Mr. Weinman to prepare

7    these documents?

8        A      Yeah, yes.

9        Q      And did you review these documents before

10   they were filed with the court?

11       A      Yeah, I believe I did.

12       Q      Did you sign the documents?

13              If it helps, I will point to the very

14   last page.

15       A      Yeah, it looks like it -- it's not a hard

16   signature that I see, but I --

17              MR. WEINMAN:   I think we would have had

18   that in a file as opposed to actually filing it with

19   the hard signature.

20       Q      (BY MR. MOTES)  So you believe you did --

21       A      I believe I did sign, yes.

22       Q      Did you understand that you signed these

23   documents under penalty of perjury?

24       A      I'm not sure I understand fully what that

25   means, but yeah.

*Agren Blando Court Reporting & Video, Inc.*

1    Q    Okay.  If you will please turn to -- in

2    the upper right corner -- well, it's just the second

3    page of the document, page 2 out of 32.

4    A    Uh-hum.

5    Q    This says --

6         MR. WEINMAN:  I'm sorry, what page?

7         MR. MOTES:  2.

8    Q    (BY MR. MOTES)  This, towards the first

9    third of the page, is asking you to list payments to

10   creditors that exceeded a certain amount made within

11   90 days prior to the bankruptcy filing.

12   A    Uh-hum.

13   Q    And you show payments made in January,

14   February, and March of 2013 to Hill Property.

15        Do you see that?

16   A    Yes.

17   Q    Are those home mortgage payments?

18   A    Yes.

19   Q    And the total amount was 9,138.

20        Do you see that?

21   A    Yes.

22   Q    Did you make three payments that were

23   approximately a third of that, about $3,000 each, or

24   do you recall?

25   A    I don't recall.

1      Q      Did you make those payments via check or
2    via wire transfer or some other way?

3      A      I don't recall.

4      Q      Do you recall how you came to conclude
5    that you should make payments in that particular
6    amount?

7      A      I'm sorry, I don't recall that, either.

8      Q      You didn't receive a statement from Hill
9    Property telling you you should pay a certain
10   amount, did you?

11     A      Not that I have been able to find.  I
12   haven't found any statements from back then.

13     Q      Would you have paid an arbitrary amount
14   to Hill Property?

15     A      It may have been based on that, but
16   again, I don't remember for sure.

17     Q      You don't recall whether you wrote a
18   check?

19     A      I do not.

20     Q      Why did you stop making payments to Hill
21   Property?

22     A      Because of the bankruptcy.

23     Q      Were you not -- could you not afford to
24   make payments to Hill Property?

25     A      Not really, not through that time frame

**Agren Blando Court Reporting & Video, Inc.**

1    we couldn't.

2        Q    Did you conclude you didn't need to make

3    payments to Hill Property?

4        A    I wouldn't say that.  I would say I

5    probably concluded that, with the bankruptcy, that

6    that would all be kind of pushed into the bankruptcy

7    and would be resolved somehow through the

8    bankruptcy.

9        Q    It was your understanding that, because

10   of the bankruptcy filing, you no longer had to make

11   monthly mortgage payments to Hill Property?

12       A    Yeah.  I thought that, once I declared

13   bankruptcy, that anybody that I showed as a creditor

14   or owing money to, that we didn't have to make

15   payments, period, until everything was resolved

16   through the bankruptcy.

17       Q    Did Mr. Hill agree with that?

18       A    I don't recall what he said about that,

19   but -- I don't know.

20       Q    Would you please turn to page 10 of 32.

21   This is Schedule A filed in your bankruptcy case,

22   and it lists your residence located at 10175 South

23   Oneida, which is still your residence to today.

24       A    Uh-hum, yes.

25       Q    And it shows in the second column from

1    the right, "Current value of debtor's interest in

2    property," it shows that as $957,000.

3              Do you see that?

4    A    Yes.

5    Q    How did you arrive at that figure?

6    A    Probably just a wild guess.  I might have

7    talked to a couple of realtors about their idea of

8    what the value would be.

9    Q    That was in 2013, and the market has

10   improved since then.

11             Do you think the property is worth more

12   than 957 today?

13   A    I do not.

14   Q    You don't think it's worth more?

15   A    No, I don't.  I had an appraiser come out

16   and look at the value, and he figured that it

17   probably would max out at $900,000.

18             And I have talked to a couple of realtors

19   about being able to sell it, and both of them feel

20   that, with the age of the property and the things

21   that need to be done, plus bringing -- somebody

22   would want to bring it more up to date, more

23   modernized, that it wouldn't bring -- probably

24   wouldn't bring even $900,000.

25   Q    Are you contemplating selling the

1    property?

2        A    I was afraid we might be forced to

3    somehow or it might have to be liquidated somehow,

4    but the mortgage company, they decided they were

5    going to try to do something.

6        Q    Let's go to Schedule B.  I am going to

7    ask you specifically about page 12 of 32.

8        A    Uh-hum.

9        Q    I am going to ask you about item 13, and

10   it shows entities in which either you or

11   Mrs. Evanson had an interest.

12       A    Uh-hum.

13       Q    We talked about Advantedge Business Group

14   LLC earlier.  You are not an owner of that entity, I

15   think is what you said, but you were doing some

16   sales work for them?

17       A    It's more bookkeeping.  I really wasn't

18   doing sales.  I was doing bookkeeping work,

19   reconciling data, bank statements, that kind of

20   thing.

21       Q    How did Mrs. Evanson come to be a 10

22   percent equity owner of that entity?

23       A    Advantedge Business Group was started

24   back in around 1999, I believe, sometime in that

25   time frame, and she was the owner of the company.

1    It was a payroll and staffing company.

2            It was purchased by an individual, I

3    think around 2002, named Steve Garland. He was

4    going to buy a hundred percent of all three of those

5    entities, Advantedge, Advantedge, and Masters. All

6    three of them really worked out of the same office

7    and performed basically the same types of functions,

8    only one would do payroll and the other would do

9    staffing and PEO. So he was going to buy the

10   company.

11           There was a note that my wife had

12   guaranteed at that point in time with U.S. Bank -- I

13   believe it's in here -- and one of the creditors for

14   a hundred thousand dollars. When the transaction

15   took place originally, it was all sold to Steve, but

16   then the bank come back and said, "No. If Lynette

17   is not involved, we are calling the line of credit."

18   It was a line of credit.

19           And so Steve came back and said, "I don't

20   want the business. I can't afford" -- "I can't get

21   a line of credit, so no deal unless Lynette stays

22   involved."

23           So we put her on as 10 percent owner in

24   the companies at that point in time because of that

25   line of credit, and he took over the ownership and

1    operations of the rest of it.

2         Q      That was back in 2002, approximately?

3         A      Yes, sometime around there.

4         Q      That line of credit was in existence as

5    of 2002?

6         A      Yes, it was.

7         Q      And has it been paid down since then?

8         A      Has not.

9         Q      It's the same balance today as it was

10   before, plus interest?

11        A      I believe so, yes.  I don't know exactly

12   what the amount is, but it's still up there.

13        Q      The obligors on that line of credit are

14   Advantedge Business, Advantedge Insurance, and

15   Masters Business?

16        A      Advantedge Insurance Group is defunct and

17   gone and hasn't done anything for probably seven or

18   eight years.

19               Advantedge Business Group and Masters

20   Business Essentials are -- I don't -- I don't think

21   both of them are obligors.  I think maybe just

22   Advantedge Business Group was the one that actually

23   had the bank account and the line of credit with

24   U.S. Bank.  I believe.

25        Q      Advantedge Business Group is still in

1    business?

2        A      Yes.

3        Q      Is Masters Business Essentials still in

4    business?

5        A      They are essentially, but they are being

6    wound down and shut down.

7        Q      Both of them are being wound down?

8        A      Well, Masters is.  Advantedge is still

9    going on, but Masters is basically being shut down.

10             But I don't think they are the ones that

11   are on the line of credit.  I think it's Advantedge.

12       Q      So has Mrs. Evanson not been involved in

13   the companies since 2002?

14       A      She has not.

15       Q      Has she ever looked into selling her 10

16   percent interest in either Advantedge Business Group

17   or Masters Business Essentials?

18       A      That probably -- I think Masters Business

19   Essentials is just going to be shut down, period,

20   and there would be no value or any operations there.

21             But Advantedge -- Steve Garland, I

22   believe, is continuing that, and there was

23   discussion about Lynette being taken out of that

24   totally, so there would be zero ownership position

25   in it.

*Agren Blando Court Reporting & Video, Inc.*

1    Q     And what was the purchase price that was

2    discussed, approximately, for the acquisition of

3    that 10 percent interest?

4    A     "You give us $10, and we're gone, we're

5    out of it."

6    Q     To --

7    A     It has no value.  The company has no real

8    value.  They virtually have no clients, they have no

9    employees.  Steve Garland has some operations that

10   he does personally.

11         But as far as anything else, there's

12   nothing left there anymore.

13   Q     To your knowledge, that 10 percent

14   interest is essentially worthless?

15   A     Yes, it is.

16   Q     You have a -- at least when you filed for

17   bankruptcy three years ago, you had a 20 percent

18   interest in Moreton Insurance of Colorado LLC.

19   A     That's correct, yes.

20   Q     Do you still have that 20 percent

21   interest?

22   A     I have never been notified that I don't

23   have -- well, I have never received any official

24   notification that I do not have that interest, but I

25   have been told that Moreton Insurance of Colorado

1    has basically been shut down, that it is worth

2    nothing, and --

3         Q    Who told you that?

4         A    Bill Moreton and his attorney.  It was

5    one of the areas that I had actually hoped I might

6    be able to get funds from.

7         Q    To your knowledge, based on what

8    Mr. Moreton told you, Moreton Insurance of Colorado

9    is no longer in business?

10        A    That's what I understand.

11        Q    Do you have any indication as to whether

12   your 20 percent interest has any value?

13        A    I have been told emphatically by him and

14   his attorney that it's not worth anything.

15        Q    Who is his attorney?

16        A    Oh, Mike Kerrigan from Holland -- I

17   believe it's Holland & Hart.

18             MR. WEINMAN:  Soon to be D.A.

19        Q    (BY MR. MOTES)  The next entity that's

20   listed is Netco, LLC, with Mrs. Evanson being the

21   hundred percent owner.

22             What was Netco?

23        A    It was a flow-through -- in actuality,

24   this document -- Netco is really the one that took

25   any income from Advantedge through to Netco and then

1    from Netco to the tax return.

2            Does that make sense?

3        Q    Prior to 2002?

4        A    No, I believe it was after 2002 that that

5    took place.

6        Q    Okay.  Income flowed from Advantedge --

7        A    It might have been before.  I honestly

8    don't remember the timeline.

9        Q    To your knowledge, income flowed from

10   Advantedge through Netco and then on to your

11   personal tax return?

12       A    Yes.

13       Q    Yours and Mrs. --

14       A    Lynette's, yes.

15       Q    That was because Lynette is the hundred

16   percent owner of Netco because she was involved in

17   Advantedge Business Group?

18       A    I honestly can't say that that's the

19   reason behind why it was set up that way.  I mean,

20   it's so long ago, I don't remember the reasoning why

21   we did it.

22       Q    Did you do currency trading through

23   Netco?

24       A    Did not -- Netco did do a currency trade

25   with Omega Forex, which I believe is the name of the

1   company that did the currency trades.

2       Q    So did you invest money into -- when I

3   say "you," I mean you and Mrs. Evanson -- did you

4   invest money into Netco for currency trading

5   purposes?

6       A    No, we did not.  But I believe there was

7   a note that was signed with Omega Forex for that

8   currency transaction.

9           MR. WEINMAN:  By whom?

10          THE DEPONENT:  I honestly -- I don't

11  remember.  I don't have copies of any of that.

12      Q    (BY MR. MOTES)  Netco borrowed from Omega

13  Forex Group; is that correct?

14      A    You know, the exact legal nature of the

15  transaction that took place, I am a little bit

16  hesitant to say that this is the way it happened

17  because I honestly don't remember, but it seems to

18  me there was some kind of a partnership note or some

19  kind of a note that was involved between Netco and

20  Omega Forex to guarantee the funds for the currency

21  transaction that took place.

22      Q    Okay.  And obviously, it's Netco's

23  claimed currency losses and Omega Forex's claimed

24  currency losses that are the subject of an IRS

25  dispute?

1      A      That's correct, the 1999-2000 IRS

2    dispute, the one that's being litigated in Utah

3    right now.

4      Q      But you didn't, to your knowledge, fund

5    Netco for the purposes of currency trading; it

6    borrowed funds for the purposes of currency trading?

7      A      I am pretty certain that there was no

8    cash input, that it was a -- it was a loan document

9    or promissory note or something that was put in

10   place for that, yes.

11     Q      I assume that the hundred percent

12   interest in Netco, LLC today is worthless?

13     A      Yeah, there's nothing there.

14     Q      What about TL Holdings?

15     A      TL Holdings was a company that we set up

16   to be able to get a -- what do they call it? -- a

17   sales tax license so that Lynette could buy her

18   flowers wholesale.

19     Q      And again, I am assuming that you believe

20   that the hundred percent interest in TL Holdings is

21   worthless?

22     A      Well, no, I wouldn't say that it was

23   totally worthless because, I mean, there's some

24   rental equipment; there's some, you know, tools and

25   that that she uses for her flower business and that

1  that -- whether or not they would be owned by TL

2  Holdings or whether or not they would be owned by

3  her, I don't know.

4        But there's some maybe few thousand

5  dollars' worth of value in that equipment that is

6  used for her in rentals and flowers and -- flowers

7  for weddings and any banquets or anything that she

8  does.

9        Q    Okay.  Less than $10,000?

10       A    Oh, yeah.  I would be surprised if we

11  could get 1,500, $2,500.  I would be surprised if

12  all of that rental stuff was worth any more than

13  that.

14       Q    What would be the most valuable piece of

15  equipment, as an example?  Are we talking about like

16  shears to cut flowers?

17       A    There's a lot of hand tools in that.

18  There's glass vases that they use to put flowers in.

19  There's other decorative items.  There's some

20  canopy -- some of these metal canopy pop-up tents

21  that they use for -- outside for receptions.

22       What else?  Just some lights that are

23  used for decorations for ceilings and -- those kinds

24  of things.

25       Q    And those things are either owned by TL

1    Holdings or by Mrs. Evanson?

2        A    At this point in time, to be honest with

3    you, it would be very -- almost impossible to say

4    that they were TL Holdings' or Mrs. Evanson's.  You

5    know, to go back and say -- I mean, TL Holdings

6    doesn't even have a bank account, never really used

7    a bank account.  We would just take checks in to

8    Wells Fargo and they would have TL Holdings, and she

9    would show them something, and they would put them

10   in our personal checking account.

11       Q    TRST LLC -- I will read what the schedule

12   says.  "Terry Evanson has an ownership position in

13   this company.  Percentage of ownership is unknown.

14   It is a very minor amount.  Terry Evanson's

15   ownership position is owned through his IRA."

16       A    Yes.

17       Q    Minor not -- being like less than 1

18   percent?

19       A    I think that -- I think it originally

20   started out as 3 percent, but there was some kind of

21   litigation going on and they diluted the ownership

22   position.  I think it's somewhere between 1 and

23   2 percent at this point in time.

24       Q    Did you or did your IRA receive

25   distributions from TRST?

1    A    There have been no distributions at all,
2  that I am aware of.  I know I never got any checks
3  from them.

4    Q    And if you tried to sell that 1 or
5  2 percent interest, do you know what you could get
6  for it?

7    A    I don't know who -- how you would sell it
8  or who would even buy it, unless you went back to
9  one of the other partners, and I don't know what
10  kind of valuation is on it.

11    Q    When did you acquire that?

12    A    I think -- I hate to give an exact date
13  because --

14    Q    Nineties, 2000s?

15    A    No.  It was like maybe 2008, 2010.  Maybe
16  sometime around that time frame.

17    Q    How did you become aware of that
18  opportunity?

19    A    I had a note from another company -- and
20  I'm sorry, I can't remember the name of the
21  company -- that owed me money through my IRA, and
22  what they did was, in -- because the company had --
23  did not have the ability to pay the note, what they
24  did was, they gave me their ownership shares in TRST
25  for payment of that promissory note.

1    I don't remember the name of what the

2    company was that did that, but that's how I ended up

3    with the TRST.

4    Q    Would you please turn to the next page.

5    I am going to ask you about these claims, and it

6    looks like many of them are -- well, some of them

7    are perhaps related.  We can just go through these

8    one by one.

9    There's a claim against Alan Greenberg

10    for violating HIPAA laws, forging documents,

11    et cetera.  Can you explain what that is?

12    A    Alan Greenberg works with Alpine Credit.

13    Alpine Credit -- I had a debt that I was

14    disputing -- it was a medical debt -- a debt, and

15    the company that owned that debt -- and I don't

16    remember the name again, I'm sorry -- but the

17    company that did the services, had the debt I was

18    disputing with, they just turned it over to

19    collections, and so we set up a time to go to court

20    to dispute that.

21    And a couple of days before court, Alan

22    Greenberg's assistant got ahold of me and said, "We

23    are changing the court date.  We will let you know."

24    They changed the court date.  They did

25    not ever let me know that they had changed it, and

*Agren Blando Court Reporting & Video, Inc.*

1    they went in and I wasn't there.  And so they got a

2    judgment against me.

3         Q     Alpine Credit got a judgment?

4         A     Alpine Credit got a judgment.

5         Q     What is the approximate time frame of

6    that?

7         A     I'm sorry, I don't remember.

8         Q     Okay.  More than ten years ago?

9         A     Oh, no, no.  This was in the last five

10   years.

11        Q     Okay.

12        A     And it's not even that big an amount of

13   money.  I think it was like -- it might have been

14   upwards of a thousand, $1,500.  I don't even

15   remember the amount now.

16              Anyway, I just filed in the Small Claims

17   Court against them and went in to the judge to say,

18   "Hey, they changed the date.  They never notified

19   me.  I didn't have the opportunity to dispute this,

20   and I do dispute it."

21              And the judge basically said, "Too bad."

22        Q     So that explains why Alpine Credit was --

23   became a creditor or acquired a judgment.

24              You have claims against Alan Greenberg

25   for violating HIPAA laws, forging documents.  I

1    understand the failure to notify of court date.

2        A    Well, but part of my argument was, they

3    actually disclosed personal information that they

4    did not have our permission, my permission, to be

5    able to disclose that information, and which is a

6    violation of HIPAA.

7            That charge was one of the charges that,

8    in my mind, I was trying to use as leverage to try

9    to get some negotiating power on what I believed I

10   really owed on the debt, and the judge just threw it

11   out.

12           Forging documents, the same thing.  They

13   had a document that they had presented that was not

14   a true document, and one of their people had made

15   some changes to it and presented it to the court,

16   and it wasn't -- anyway --

17       Q    Okay.  You brought these claims to the --

18   of yours against Alpine and its representatives?

19       A    And Alan Greenberg, yes.

20       Q    You brought those claims to the Small

21   Claims Court's attention?

22       A    Yes.

23       Q    And you didn't get any retraction with

24   that?

25       A    No.  They just threw it out.

1    Q    Command Center, that was litigation that

2    was resolved in your favor; correct?

3    A    Yes, yes.

4    Q    Does Command Center have a claim against

5    you anymore?

6    A    No, that was all finalized with --

7    sometime last summer.

8    Q    Do you have a claim against Command

9    Center?

10   A    No, that was all -- the claims against

11   each other were all resolved in the settlement.

12   After they lost the court case, they were going to

13   appeal it, and rather than appeal it, Command ended

14   up paying, I think, $160,000 or something like that

15   into the kitty, which was disbursed then to the

16   attorneys and the different fees that were still

17   owed.

18          And in that agreement, they agreed that

19   they wouldn't come after any of us, and we agreed

20   that we wouldn't go after them, as a result of that

21   settlement.

22   Q    Did you personally get any money out of

23   that settlement?

24   A    No, I did not.

25   Q    And you no longer have any claims against

*Agren Blando Court Reporting & Video, Inc.*

1    Command Center?

2    A    That's correct, I do not.

3         Now, personally -- I mean, my attorney

4    got some money out of it that I would have had to

5    pay.

6    Q    Sure.

7    A    But I did not get any -- I might have

8    signed the check that went to the attorney, but I

9    didn't have any money that went into my bank

10   account.

11   Q    And neither did Mrs. Evanson?

12   A    Neither did Mrs. Evanson.

13   Q    And then neither one of you are owed any

14   money by Command Center today?

15   A    That's correct, yes.

16   Q    Fred A. Moreton & Company, it says,

17   "Unenforceable noncompete."

18        What does that mean?  Do you have a claim

19   against Moreton & Company?

20   A    Fred A. Moreton & Company was the company

21   that owns Moreton Insurance of Colorado.  They were

22   the majority owner, and they had a noncompete

23   against -- that I had signed that I could not

24   compete against them, and I never ever violated that

25   noncompete.

1       So there was no action that could have
2   taken place on either side of the fence.

3       Q    This isn't the claim by you; this is a
4   claim that could have been asserted by Moreton that
5   there was a noncompete.

6       But you think it would be unenforceable?
7       A    Well, I never violated it, so it couldn't
8   be enforced.  It was a claim that I talked about
9   with the attorneys at the time, and they said it's
10  an unenforceable claim that couldn't come back if I
11  didn't violate it, and I never did.

12      Q    There's -- the next item is Glen Welstad?
13      A    He was the CEO of Command Center, and he
14  went away, too, with the Command Center litigation.

15      Q    That was resolved in that settlement?
16      A    Yeah.

17      Q    Was Greenberg & Sada, P.C. the attorneys
18  for Alpine Credit?

19      A    Yes, they were.  I believe that's who
20  they were.

21      Q    Was Invision Sally Jobe --
22      A    They were the people that did the actual
23  work that I believe double-charged me.

24      Q    Is that a collection agency?
25      A    No.  It's like a --

1              MR. WEINMAN:  Sally Jobe, it's a breast

2      center.

3              THE DEPONENT:  They do these --

4      Q      (BY MR. MOTES)  Oh, I see.  It was that

5      information --

6      A      X-rays and -- they do x-rays and MRIs,

7      that kind of stuff.

8              MR. WEINMAN:  Imaging?

9              THE DEPONENT:  Imaging, yeah.

10     Q      (BY MR. MOTES)  Sally Jobe provided

11     information to Alpine Credit?

12     A      Yes.

13     Q      In violation of HIPAA?

14     A      Yes.

15             MR. WEINMAN:  They are all part of that

16     Greenberg, Alpine Credit --

17             MR. MOTES:  Right.

18     Q      (BY MR. MOTES)  Did you ever assert a

19     claim against Invision Sally Jobe?

20     A      I did not, no.  When it got thrown out of

21     court, it was like, you know, why bother.

22             Actually, I think I did write a letter to

23     the government authority, and I think they just come

24     back and said, "Oh, sorry."

25     Q      Jodie Quint, is that a representative of

1   Alpine Credit?

2       A     Yes, it was.

3       Q     Was Medical Imaging of Colorado another

4   entity that provided information to Alpine Credit?

5       A     Yes, yes.

6       Q     And again, you didn't assert a claim

7   against them?

8       A     That's correct, yes.

9       Q     There's a claim against Moreton Insurance

10  of Colorado, failure to pay earned, vested and

11  determinable wages.

12      A     Yes.

13      Q     Are you owed anything from Moreton

14  Insurance?

15      A     That is the one place where I feel like

16  that I am owed something.

17            When I -- when this happened, Bill

18  Moreton called up and fired me on the 11th of

19  November.  My employment agreement had an income

20  compensation built into it that on the 1st of

21  December they could not have gotten out of.  I mean,

22  at that point in time, it was just locked in.

23            And when they went through that

24  dissociation or firing, whatever you want to call

25  it, they paid me through the end of October, but

*Agren Blando Court Reporting & Video, Inc.*

1    they never paid me for my work for the first 11 days

2    of November, and they didn't settle up with any

3    commissions or anything that were owed for that time

4    frame.  And then I lost the opportunity of that

5    three years' worth of income that would have been

6    paid to me.

7           And so in -- it was my perception -- and

8    the attorney at the time was backing me up on it --

9    that I had an action against Moreton for my loss of

10   income for that three-year time frame and that it

11   could be pursued.

12       Q    Who was your attorney at the time?

13       A    It was Vellone & Allen, I believe.

14       Q    Was a lawsuit brought against Moreton

15   Insurance for that?

16       A    There was not.

17       Q    Why not?

18       A    Because Moreton Insurance was tied in

19   with the Command Center litigation.  Command Center

20   contacted Bill Moreton and made allegations that we

21   had taken money from Moreton, and Bill, based upon

22   those allegations, just fired us.

23          So we were looking at litigating with

24   them at that point in time, but the Command Center

25   trial was -- action was going on.  It hadn't gone to

1    trial, but it was going on.

2           And Moreton came back after the fact and

3    they said, "We cannot fight the Command Center

4    because you are the one that has all the knowledge

5    and understanding, all the facts and information

6    that we need to have to be able to show that Command

7    Center is lying and does not have a legitimate

8    claim."

9           So they entered into -- they wanted to do

10   a tolling agreement, and we entered into a tolling

11   agreement, and exactly what that means, I'm not

12   totally sure.  But my understanding was that, from

13   that point in time, that neither one of us would

14   file any action against the other until the Command

15   Center litigation was totally finalized, and at that

16   point in time, then we would have whatever the

17   statute of limitations was to be able to do an

18   action if we wanted to do or felt we had reason for

19   an action.

20      Q      Then since that Command Center litigation

21   was resolved, did you bring an action against

22   Moreton?

23      A      No, I haven't brought an action against

24   him yet.

25           MR. WEINMAN:  But your attorneys were --

1          THE DEPONENT:  Allen & Vellone -- well,
2    that was --

3          MR. WEINMAN:  I understand, but they did.
4    So you have attorneys that --

5          THE DEPONENT:  I didn't have an attorney
6    to actually be able to go after them.  I would have
7    to find an attorney that would be willing to do it
8    on a contingency basis.

9        Q    (BY MR. MOTES)  What do you believe
10   Moreton owes you?

11       A    Oh, I believe that they owe somewhere
12   between 250 to $300,000 over three years.  That's
13   lost income, replacement for --

14       Q    Was Ron Junck associated with Moreton as
15   well?

16       A    Command Center.  He is the inhouse
17   counsel.

18       Q    And so any claim against him was resolved
19   in the Command Center settlement?

20       A    Yes.

21       Q    Thomas Romola was a representative of
22   Alpine Credit?

23       A    I believe so.

24       Q    The last one, Wells Fargo Bank, there's
25   an action against it for accepting a forged

**Agren Blando Court Reporting & Video, Inc.**

1    document.

2         A    Yes.   The -- this goes back to Alpine,

3    too.   It was the check -- Alpine -- I don't know how

4    they did it, but they did some kind of a check

5    document that they put through the bank, and the

6    bank paid the money.

7              And we went to the bank, and I complained

8    about it, said, "They don't have the right to do

9    this.   We didn't know about this.   This is

10   fraudulent."

11             And the bank just basically said, "Hmm.

12   Well, let's see what the court has to say."

13        Q    Okay.

14        A    So when Alpine went away, it basically

15   went away, too.

16        Q    You never brought an action against Wells

17   Fargo Bank?

18        A    No.

19        Q    Did you ever send them a demand, a

20   written demand?

21        A    I don't remember.

22             MR. WEINMAN:   I think that might hook up

23   with a garnishment here somewhere.

24             Yeah.   I am trying to remember the old

25   schedules.   4(b).   See where it says that Alpine

1    Credit took garnishment of 970 for bank charges from

2    Lynette's Wells Fargo bank account?

3              THE DEPONENT:   Yes.

4              MR. WEINMAN:   That relates to what you

5    just described.

6              THE DEPONENT:   Yes, that's what that is.

7         Q    (BY MR. MOTES)   And that garnishment was

8    based upon a forged document, was your belief?

9         A    That's -- yeah.  I don't remember the

10   details behind why I felt that way at the time or

11   what the document looked like or anything, but

12   that's --

13        Q    Okay.

14        A    -- what my -- there was something there

15   that made me feel about it that way.

16        Q    I am moving on to page 17.  This shows

17   your secured creditors, and the first one is Hill

18   Property having the mortgage on your residence.  The

19   amount of the claim is listed at $1,433.000.

20             Do you see that?

21        A    Yes.

22        Q    How did you come up with that number?

23        A    I think it was a number that the IRS had

24   out on the table for some reason that they were

25   showing as the outstanding loan amount for

1    Cottonwood.

2              MR. WEINMAN: Did we amend this?

3              MR. MOTES: Yes, you did. You filed an

4    amendment. We will get to that.

5              MR. WEINMAN: Okay. Because I think it

6    incorporates the IRS lien.

7              THE DEPONENT: It does for that amount of

8    money. It does incorporate the IRS lien into it.

9              MR. WEINMAN: Right.

10        Q    (BY MR. MOTES) You didn't have any

11   independent document from either Cottonwood or Hill

12   Property concerning the mortgage amounts?

13        A    No, I didn't.

14        Q    So you used a figure based upon what you

15   believe the IRS was telling you?

16        A    Yes.

17        Q    That's what you understood the IRS

18   thought your mortgage amount was?

19        A    Yes, that's what I understood they

20   thought that the loan amounts were against the

21   property, yes.

22        Q    Okay. Let's do go to that amended

23   schedule that Mr. Weinman just referenced.

24              MR. WEINMAN: That is our first

25   amendment?

1          MR. MOTES:  It is.

2          MR. WEINMAN:  Are we done with this for

3   now?

4          MR. MOTES:  We are.  Let's take a break.

5          (Recess taken from 10:25 a.m. to

6   10:30 a.m.)

7          (Exhibit 4 marked.)

8      Q    (BY MR. MOTES)  So what has been marked

9   as T. Evanson 4 is the amended schedules.  Let me

10   see if I can find my copy.

11          Well, that's okay.  I think I know what

12   it says -- oh, here it is.  And I think I am just

13   going to ask you about the very first page.

14          The first item listed is Hill Property,

15   and you will see now the mortgage amount listed is

16   $891,175.58.  Do you see that?

17      A    Uh-hum, yes.

18      Q    How did you arrive at that specific

19   figure?

20      A    I believe it was taking the 1.4 million,

21   whatever it was, away from what I thought the tax

22   amount that was filed for that 2008 year, whatever

23   it originally was.  Just taking the 1 million 4

24   something and taking that tax amount off and coming

25   up with the number.

1    Q    You subtracted the IRS' tax claim?

2    A    I believe that's how I came up with it.

3    Q    You took the $1.4 million --

4    A    When did they actually do this?

5    Q    If you look at the top, it says that this

6    document was filed in February of 2014.

7    A    That's probably what I would have done at

8    the time, yeah.

9    Q    You took that $1.4 million figure that

10   came from the IRS?

11   A    Yes.

12   Q    And you subtracted a tax claim from that?

13   A    Yes.  There was some other documents that

14   showed the tax amount that they had filed for, and I

15   believe I took that amount away from the 1 million 4

16   and came up with the other number.

17        MR. WEINMAN:  There are essentially two

18   separate tax issues.  One is about 650 grand, and

19   the other is about 250 grand.  So if you add the 650

20   to the 890, you are now close to that 1 million 440.

21        I am pretty sure that's how it was

22   deconstructed from 1 million 440.

23        MR. MOTES:  Okay.

24        THE DEPONENT:  That's what I recall, too.

25        MR. WEINMAN:  Yes.  That's how I came up

1   with it.

2        Q       (BY MR. MOTES)  And you didn't get the

3   891,175 figure from Hill Property?

4        A       No.

5        Q       Why is that?

6        A       At the time, I just was taking that

7   number from the IRS and --

8        Q       Why not just ask Hill Property what they

9   are owed?

10       A       I don't know.  I don't know if I did or

11  why I didn't.

12       Q       Please turn to Schedule F, which is on

13  page 4.  It's a few pages, four pages.  You can

14  briefly look through it, but there's some credit

15  cards -- American Express, Bank of America, Chase on

16  the next page -- some other creditors.  On the third

17  page is the big creditor, Command Center, with what

18  it asserts to be a $1.5 million claim.

19             You are not obligated on that claim;

20  correct?

21       A       No.

22       Q       It was resolved through settlement?

23       A       Yes.

24             MR. WEINMAN:  Did you say page 4?

25             MR. MOTES:  Oh, no.  I'm sorry.  I don't

1    know why I said -- page 6 of 8 at the upper right

2    corner.

3              MR. WEINMAN:  Okay.

4        A    Yes, I am not obligated to that.

5        Q    (BY MR. MOTES)  Okay.  On the page

6    prior -- actually, just a few items down, there's an

7    IRS claim of $636,000.

8              Do you see that?

9        A    Yes.

10       Q    That might be the claim that Mr. Weinman

11   was referring to, in that magnitude?

12       A    It could be, yes.

13             Now, that number varies depending upon

14   which document you have.  I mean, they add interest

15   and that, so -- but that -- if you take that away,

16   that could be the number, or similar-type number

17   that I used, yes.

18       Q    So for all these creditors on Schedule

19   F -- obviously, the Command Center claim has been

20   resolved and eliminated.

21       A    Uh-hum.

22       Q    Have you made payments on any of these

23   other claims since you filed for bankruptcy?

24       A    There was a Discover Card.  I think it

25   might have been 3,538, but it was -- or maybe it was

1   the 3,598. I don't know. But one of those.

2          They came back and made an offering and

3   compromise on it. I did make payments on that,

4   and -- 240 -- $240, $250 a month, something like

5   that, but paid that off.

6      Q    Oh, okay. You paid off one of the

7   Discover cards?

8      A    Paid off one of the Discover cards, yes.

9      Q    So the Command Center was eliminated,

10  that claim; one of the Discover cards was paid off.

11     A    Yes. I think it might have been the

12  $12,000 one.

13     Q    Aside from that Discover card, have you

14  made a payment on any of these other claims on the

15  schedule since the bankruptcy filing date?

16     A    No, I have not. Now, we wouldn't -- let

17  me back up on that.

18          On page 8 of 8 where it says U.S. Bank,

19  the hundred thousand dollars where she was the

20  guarantor on the line of credit, we never ever --

21  she nor I ever, ever made payments on that. That

22  was Advantedge that would have made any payments on

23  that.

24          I have no idea where that note stands at

25  this point in time.

1     Q    It could be more than a hundred thousand

2  dollars, for all you know?

3     A    It could be, but also, because of the

4  time frame of when she originally signed and the

5  change in ownership on that, she may not -- they may

6  not be able to collect that, is what I have been

7  told.  It's disputable at this point in time.

8          And Westcore Pyramid LP, at the very end,

9  the office lease, she was a co-signer on that, but

10  that office lease was renewed and she is not a

11  co-signer anymore.  So that one, it's unknown that

12  that one has gone away.

13     Q    Perhaps nothing is owed to Westcore

14  Pyramid?

15     A    There is nothing owed to Westcore, for

16  sure, I know that, because the office lease was up

17  and she did not get involved in the new office that

18  they went to.

19     Q    I am just going to ask you to walk

20  through your most recent monthly operating report,

21  briefly.

22          MR. MOTES:  Would you please mark this

23  one as Exhibit 5.

24          (Exhibit 5 marked.)

25     Q    (BY MR. MOTES)  So you began your new

*Agren Blando Court Reporting & Video, Inc.*

1    employment with Lighthouse, and I think you said you

2    went to full time sometime in June?

3         A    Yes.

4         Q    And were you working for Lighthouse in

5    May?

6         A    Yes.

7         Q    So --

8         A    Yes, I got a paycheck from them in May,

9    too.

10        Q    So let me just make sure I know where the

11   numbers are coming from.

12             What does BHA stand for?

13        A    Benefit Health Advisors.  That's the new

14   company that I am working with.

15        Q    Social Security I understand.  That's

16   probably Mrs. Evanson's payment?

17        A    It is, it is.

18        Q    What is business, 9,869?

19        A    That's any other income that comes in

20   from Lynette and her operations:  Rentals, banquets,

21   flowers, consulting on weddings, all that sort of

22   sort.

23        Q    So if I see business in a monthly

24   operating report, is that referring to

25   Mrs. Evanson's income?

1       A     Yes.  I mean, I help her and work with

2    her in the business, so both of it -- both of us,

3    you know, help generate that income.  But it all

4    comes from those activities.

5       Q     So this was an extraordinary month, May

6    of 2016?

7       A     Yes.

8       Q     Is that because of weddings and

9    graduations or something like that?

10      A     Yes.

11      Q     Would it be more typical, I think from my

12   experience of looking at monthly operating

13   reports -- maybe it's more typical for the flower

14   and catering business to be more in like the

15   1, 2, $3,000 magnitude?

16      A     It just varies so much, depending upon

17   the month.  Like in January, there might be some,

18   but February and March, a lot of times there's

19   virtually nothing; April -- I mean, there's just

20   different months during the year when weddings or

21   banquets or activities are taking place when the

22   revenue is generated.

23      Q     Similarly, on the second page, the very

24   last item on disbursements, it shows disbursement

25   total, I think, for business of 3,688.

*Agren Blando Court Reporting & Video, Inc.*

1        A        Yes.

2        Q        Are those expenses related to the flower

3    and catering business?

4        A        They are.  We don't apply like gas

5    against that and we don't apply mileage against this

6    number for use of the vehicle, the van that's

7    involved in it.

8                 But that 3,688 is like food or flowers or

9    different materials that are utilized in the actual

10   banquet or wedding.

11       Q        Other than your mortgage, are you current

12   on your obligations for utilities since you filed

13   for bankruptcy?

14       A        Yes, yes.

15       Q        Okay.  Are you current on property taxes?

16       A        Yes.

17       Q        Other than your mortgage, are you

18   generally current on your post-petition obligations?

19       A        Oh, yes, yes.

20       Q        The reason we are here is, you have

21   requested dismissal of your case, and the U.S.

22   Trustee has also requested dismissal of your case,

23   but the U.S. Trustee takes the position that

24   conversion of your case would be in the best

25   interests of creditors.

1        Do you believe dismissal of your case

2   would be in the best interests of creditors?

3        A     Yes, I do.

4        Q     Why is that?

5        A     Well, they -- the court case that's going

6   on in Utah is with the IRS, and how that ends up

7   being determined would determine how much the IRS --

8   whether or not they would get -- actually be able to

9   get part of their claims against me.

10        And same thing with the 2008 IRS issue.

11   If -- I mean, you look at it, and I have -- we have

12   no potential asset except the house, and the

13   mortgage that Cottonwood had on it and the mortgage

14   with Hill is significant enough that there's no

15   value in the home.

16        And so if there's no value in the home

17   and the IRS -- even if there is value, the IRS is

18   going to get it.  Then none of the other creditors

19   are going to get any money.

20        Q     The litigation that is pending with the

21   IRS concerning Omega Forex and concerning the other

22   issues the IRS has raised, the crux of that

23   litigation is determining your tax liability;

24   correct?  In part, as it relates to you.

25        A     Yes, that's correct.  Me and my wife,

1   yes.

2          Well, there are other people who are

3   involved that have an interest in that case, but

4   just specifically for me and my wife, that

5   particular case does involve claims that the IRS has

6   against us for monies they say are owed for that

7   particular year, and however that court case turns

8   out would determine whether or not the IRS actually

9   does have a claim or whether they have no claim.

10     Q     Or somewhere in between, the amount of

11  the claim; correct?

12     A     Yes, or somewhere in between, whatever.

13     Q     From your perspective today, you don't

14  know how much, if anything, you owe the IRS?

15     A     That's correct.  I mean, from my

16  perspective --

17          MR. WEINMAN:  On that claim.  Remember,

18  we are talking about two completely different claims

19  here.

20          THE DEPONENT:  Yes.

21     Q     (BY MR. MOTES)  Okay.  So there's the one

22  in the $650,000 magnitude.  That's currently a

23  disputed claim?

24     A     That's -- yes.  They are both disputed.

25  Both of them are being disputed.

1      Q       The other one is a $250,000 magnitude

2   claim?

3      A       Yes.   That's being disputed, too.

4      Q       And one potential outcome is you don't

5   owe anything to the IRS?

6      A       That's correct.

7      Q       And one potential outcome is you owe 650

8   and 250 to the IRS?

9      A       That's correct.

10     Q       Okay.

11             MR. WEINMAN:   I don't think he is right

12  about that, by the way, but --

13             THE DEPONENT:   What do you mean?

14             MR. WEINMAN:   My understanding is, on the

15  forgiveness, you can dispute it all you want, but

16  you don't have any legal action pending, and I don't

17  think there's any way to deal with that at this

18  point.

19             THE DEPONENT:   Oh, that's right.   I don't

20  have any legal action pending against that.

21             MR. MOTES:   You don't need to make legal

22  opinions on the record.

23             MR. WEINMAN:   But I just want you to

24  understand.   I am not doing it to interfere.   I am

25  doing it so that you have a clear understanding of

*Agren Blando Court Reporting & Video, Inc.*

1    what he is saying, and particularly if he is wrong.

2            One of those IRS claims doesn't stick, no

3    matter what.

4            MR. MOTES:  Okay.

5        Q    (BY MR. MOTES)  So let's say the case is

6    dismissed.  How are creditors going to be paid?

7        A    If the case is dismissed?

8        Q    Yes.

9        A    Well, I think with my new job and that I

10   am in a position to be able to negotiate terms and

11   conditions with the creditors, if they -- the U.S.

12   Bank issue is not something that they can actually

13   hold against my wife, and the rest of them, I think

14   we can negotiate and pay them off.

15       Q    If the case is dismissed, are you going

16   to begin making mortgage payments to Hill Property?

17       A    Yes.  Well, my understanding right now

18   was -- when they failed to contact me, was that "We

19   are not waiting for your bankruptcy anymore.  We are

20   getting an attorney, and we are going to foreclose

21   on the property."

22           Hopefully, we would be able to negotiate

23   some kind of a deal with them if they actually do

24   proceed.  They have threatened they are doing it, so

25   if they proceed, we would hopefully be able to

1    negotiate some kind of a situation.  We would be

2    able to stay there for, you know, hopefully, a

3    period of time.

4             And with the new job that I have, yes, we

5    are in a position to be able to go to the creditors

6    and cut some kind of a deal with them and start

7    making payments.

8        Q    Okay.  Back in 2014, you recall that you

9    filed the amended Schedule D that shows -- now, that

10   was over two years ago -- that showed that the debt

11   to Hill Property was $891,000; correct?

12       A    That's the number that I believe we got

13   from the IRS figures.

14       Q    That's a figure you used as the amount of

15   the claim, under penalty of perjury.

16            Do you think that you owe Hill Property

17   $891,000 or more?

18       A    I don't know exactly what it would be,

19   honestly.

20       Q    And would you agree, if it was $891,000

21   two years ago and you haven't made any payments on

22   it, the debt would be greater now?

23       A    I would expect that interest would

24   probably -- penalties or whatever would be accruing,

25   yes.

1    Q    Do you intend to challenge the validity

2    of Hill Property's claim?

3             MR. WEINMAN:  In what context?

4             MR. MOTES:  In any context.

5    A    Well, if they -- if they want to try to

6    foreclose, I guess I would try to challenge

7    something to see if we couldn't work something out,

8    at least for a couple of years, to -- without that

9    property, we can't run my wife's business.

10   Q    (BY MR. MOTES)  Do you believe that Hill

11   Property has a bona fide claim against you?

12   A    Well, I believed that Cottonwood did and

13   Cottonwood transferred it, so yes.  I would have to

14   say yes, I do believe that they have a bona fide

15   claim against the property.

16             But who knows what the courts say?

17   Q    Bottom line, if the case were dismissed,

18   you are probably going to have to start paying

19   something to Hill Property?

20   A    Yes.

21   Q    And you don't know what the magnitude of

22   that monthly obligation would be?

23   A    Probably 2,000-something a month.

24   Q    Is that just a guess?

25   A    That's just a guess.

1       Q      Okay.

2       A      I have no idea.

3       Q      Okay.  Were you directly a participant or

4   a partner in Omega Forex Group?

5              MR. WEINMAN:  You mean directly?  You

6   mean personally as opposed to through an entity?

7              MR. MOTES:  Yes.

8       Q      (BY MR. MOTES)  Were you a partner or a

9   member of that entity?

10      A      There's some kind of an agreement that I

11  know we -- I think we signed, the IRS says we

12  signed.  I don't have a copy of the documents at all

13  of what my relationship is there.

14             But the IRS has purported that we signed

15  some kind of a note or agreement which made us a

16  partner of Omega Forex, which they say committed

17  false currency transactions which they say we took

18  on our tax return.

19             That's my understanding of it.  I don't

20  have any of those documents.

21      Q      To your recollection, did you ever pay

22  any money to Omega Forex?

23      A      Yeah, I -- I don't know how much, but I

24  paid something to them, initially I believe, and I

25  believe that there was even some positive currency

1    transaction that was involved in those trades, but I

2    don't remember what it was.

3        Q    Do you know what kind of currency Omega

4    Forex Group traded?

5        A    I have no idea.

6        Q    Was that its sole purpose, to your

7    knowledge, just trading currencies?

8        A    I don't know.

9        Q    You weren't involved in the management of

10   Omega Forex?

11       A    No, never was.

12       Q    Okay.

13       A    But that's the specific issue that's

14   being litigated in the Utah case right now.

15       Q    Right.  We talked about Cottonwood

16   Financial.  It was the original mortgage lender.  It

17   had a home equity line of credit in 1995 and perhaps

18   a new loan in 2001 or 2002 in connection with taking

19   out the Washington Mutual memo.

20       A    Okay.  Yeah.

21       Q    How did you locate Cottonwood Financial

22   as a lender?

23       A    When Cottonwood first started -- my

24   brother was the one that set it up, and I don't know

25   the extent of his involvement, but we either

*Agren Blando Court Reporting & Video, Inc.*

1    replaced the home equity line of credit through

2    Cottonwood or took out a new one.  And I don't

3    remember --

4        Q     Why did you take out a loan from

5    Cottonwood as opposed to any other lender?

6        A     It was easy.  I don't remember why.

7        Q     Easy because you were dealing with your

8    brother?

9        A     Yeah.  We still had to go through forms

10   and that, and I thought I provided whatever

11   documents we had to go through, but --

12       Q     You borrowed funds from Cottonwood under

13   the home equity line?

14       A     Yes.

15       Q     And then subsequently under this other

16   loan that took out your Washington Mutual mortgage?

17       A     Yes.

18       Q     What was the purpose of the -- what did

19   you do with the funds you borrowed?

20       A     Well, the home equity line?

21       Q     Right.

22       A     I don't know.  I mean, there's many

23   things we did back then.  We had construction

24   additions we did on the home.

25             I honestly don't remember all of the

1    reasons why I borrowed money from them through that

2    home equity line.

3          Q     Did you ever pay money to Cottonwood

4    Financial other than mortgage payments?

5          A     No, no.

6          Q     Were you involved in any other financial

7    transactions with Cottonwood Financial, other than a

8    mortgage lender --

9          A     No.

10         Q     -- relationship?

11         A     No.   Just the lender relationship.

12         Q     Did you ever purchase professional

13   liability insurance from Cottonwood Financial?

14         A     Not from Cottonwood, I don't believe.   I

15   purchased professional insurance, but Cottonwood is

16   not the name that I ever remember it coming from.

17         Q     Did you purchase professional liability

18   insurance from another entity in which your brother

19   was affiliated?

20         A     I don't believe my brother was affiliated

21   with that entity.

22         Q     Which entity was that?

23         A     The one that I purchased the professional

24   from?

25         Q     Sure.

```
 1        A     I don't remember the name.  I may have
 2   paid for it through Cottonwood, whatever the premium
 3   was.
 4              But I don't believe my brother had any
 5   involvement whatsoever in that company.
 6        Q     And you don't remember the name of that
 7   company?
 8        A     I do not.  That's like going back into
 9   the mid-Nineties.
10        Q     Okay.  Have you ever paid a premium in
11   excess of $50,000?
12        A     Have I?
13        Q     Yes.
14        A     I don't remember what amount could have
15   been paid.
16              MR. WEINMAN:  A single premium?
17              MR. MOTES:  Yes.
18              MR. WEINMAN:  Or collective?
19        Q     (BY MR. MOTES)  Have you ever on a single
20   occasion paid more than $50,000 for professional
21   liability insurance?
22        A     I don't remember.  I haven't purchased
23   professional liability insurance since the
24   mid-Nineties.
25        Q     That would be a significant payment for
```

1    professional liability insurance for a single

2    premium, but you don't recall --

3         A    It depends.  I have seen professional

4    policies in the hundreds of thousands of dollars,

5    but I don't remember the name of the company or the

6    amount.

7              But I do remember I had professional

8    insurance back through that time frame.

9         Q    And in the Nineties?

10        A    Back in the Nineties.

11        Q    But you don't think your brother was

12   involved in that entity?

13        A    I don't believe he was, but again, I

14   don't know what his involvement was.

15        Q    Were you involved -- there was obviously

16   Omega Forex; Cottonwood Financial we talked about.

17             Were you involved in business

18   transactions with other entities associated with

19   Dennis Evanson?

20        A    Other entities?  I don't know what other

21   entities.  I don't recall other entities.  I am not

22   recalling anything.

23        Q    Okay.  That's fine.

24             What I would like to do at this point --

25   I think we can do this pretty quickly -- I want to

*Agren Blando Court Reporting & Video, Inc.*

1    go through some of the documents you provided to

2    make sure I understand what they are.

3         MR. MOTES:  Would you please mark this

4    one.

5         (Exhibit 6 marked.)

6    Q    (BY MR. MOTES)  You might want to take a

7    second to look this over and just let me know when

8    you are available.

9    A    Okay.  I mean --

10   Q    Do you recognize this document?

11   A    It looks familiar.

12   Q    Is it something you would have received

13   from the IRS?

14   A    I would assume so, because it's got their

15   name on it and our name and address, so yeah.

16   Q    It says 10175 Valley Road.  Is that your

17   address?

18   A    Oh.  Valley Road was the original name of

19   the road for the property we are on, and the county

20   changed that to South Oneida, so it's 10175 South

21   Oneida.  But originally, when we first moved out

22   there, it was Valley Road.

23        I don't know why -- what's the date of

24   this?  2010?  I don't know why they would show

25   Valley Road because it hasn't been Valley Road since

*Agren Blando Court Reporting & Video, Inc.*

1    the early Nineties.

2        Q       Okay.  This is a document that the IRS

3    sent you to request documentation in connection with

4    this investigation; correct?

5        A       Uh-hum.

6        Q       Can you answer yes or no?

7        A       Yes.  I'm sorry.

8        Q       Thank you.

9        A       It looks like it, yes.

10       Q       Okay.  Towards the bottom of the first

11   page, it identifies an issue, outstanding loan with

12   Cottonwood Financial.  Do you see that?

13       A       Oh, yes.

14       Q       And then if you carry over to the next

15   page, the IRS is requesting a variety of

16   documentation from you concerning your loan with

17   Cottonwood Financial.

18       A       Yes.

19       Q       Did you provide the documentation

20   requested?

21       A       No, I have never provided them anything.

22       Q       Why is that?

23       A       Because I gave it to the tax attorneys

24   that I use.  I gave them this information, basically

25   let them take care of it.

1       Q       Is that Mr. Planegger?  Is that --

2       A       Yes, Kevin Planegger and Ted Merriam,

3    yes.

4       Q       M-e-r-r-i-a-m.  Is that correct?

5       A       I believe so.

6       Q       You would have turned this document over

7    to your attorneys and let them handle it?

8       A       Yes, yes.

9       Q       You don't know what they would have

10   provided to the IRS?

11      A       I do not, no.

12      Q       This one I just thought was perhaps a --

13   it was just something I wasn't familiar with, so I

14   wanted to ask you about it.

15              MR. MOTES:  Can you mark this next.

16              (Exhibit 7 marked.)

17      Q       (BY MR. MOTES).  Again, you might want to

18   just look through it and become reacquainted with

19   it.

20      A       Yes, I remember this one.

21      Q       Okay.  What has been marked as Exhibit T.

22   Evanson 7 is a cover letter from the IRS from March

23   of 2013 as well as a form of a closing agreement as

24   to final determination covering specific matters; is

25   that correct?

*Agren Blando Court Reporting & Video, Inc.*

1    A    Yes, that's correct.

2    Q    Okay.  Did you receive this from the IRS?

3    A    Yes.

4    Q    And is this something that you would have

5    provided to Mr. Planegger as well?

6    A    Yes.

7    Q    The document that's attached, the closing

8    agreement as to final determination covering

9    specific matters, contains blanks for your

10   signature.

11        Did you sign it?

12   A    Did not.  Refused to sign it.

13   Q    Did Mrs. Evanson sign it?

14   A    She did not.

15   Q    Do you know what the purpose of this

16   letter was?

17   A    What they wanted us to do was to accept

18   the 2008 audit, and by doing so they would take the

19   1999 and 2000 audit, which are two separate things,

20   and they would dismiss that because we signed this

21   document here.  But I couldn't sign this document.

22   Q    The document contains like highlighting

23   and even some question marks on the second page.

24   A    Yes.

25   Q    Do you see that?

```
1      A      Yes.

2      Q      Is that your handwriting?

3      A      That was me that did that, yes.

4      Q      Okay.  And you disagree with some of the

5    conclusions that the IRS reached in this document?

6      A      Yes.  When I got this, I went through it

7    and made markings on it and then sent a copy to

8    Kevin, and that's when we talked about --

9      Q      Let me ask you to turn to page 3.

10     A      Okay.

11     Q      The second "whereas" clause from the top

12   says, "Whereas, in February 2008, Dennis Evanson,

13   following a trial in the United States District

14   Court, was found guilty of fraudulent tax related

15   offenses related to the activities of Omega Forex

16   Group LC, Fishpaw Currency Group, Capital West LC

17   and Cottonwood Financial Services, LC."

18            Is that a true statement?

19     A      I do not believe it is.

20     Q      Was Mr. Evanson --

21     A      He was found guilty of certain things,

22   but through this whole document, what -- they want

23   to expand further than what I believe the truth was.

24   And that statement right there I don't believe is

25   factually totally true because I don't believe that
```

```
 1    Cottonwood -- I don't know for sure, but I didn't
 2    believe that Cottonwood Financial was involved in
 3    that and I'm not sure that Capital West was.
 4              I don't know about -- I know the Omega
 5    Forex Group and Fishpaw were because those were the
 6    companies that the IRS says did the fraudulent
 7    currency transactions.
 8        Q     Now, Mr. Evanson was sentenced; correct?
 9        A     Yes, he was.
10        Q     To ten years in prison?
11        A     Yes.
12        Q     When he was involved in the criminal
13    proceeding, did you follow that proceeding?
14        A     No.  I never went to the trial or what
15    was taking place.
16        Q     Did you read the indictment?
17        A     I believe I did originally, but that's so
18    long ago, I don't remember much of anything about
19    it.
20        Q     Do you recall whether Mr. Evanson was
21    accused of creating fraudulent mortgages through
22    Cottonwood Financial?
23        A     No, I don't recall that.
24        Q     You don't recall that?
25        A     No.
```

1    Q    In fact, you don't recall whether his

2   involvement with Cottonwood Financial was the

3   subject of his criminal proceeding?

4    A    I didn't think it was.  My perception was

5   that it was just totally involved based upon

6   currency transactions with Omega.

7    Q    Do you know, if Mr. Evanson were accused

8   of creating fraudulent mortgages, then

9   notwithstanding that, you would still believe that

10  your current mortgage that was generated through

11  Cottonwood Financial is a valid obligation?

12   A    Well, interesting question, because I

13  never gave him money.  He gave me money and it came

14  through a mortgage.

15          I know I got funds through the documents

16  that I signed.  I know it came through Cottonwood.

17  I mean, we did construction on our home.  We did

18  additions and we did many different things, and that

19  money was real.  It came from somewhere.  I don't

20  know where it would have come from, but it did come

21  through Cottonwood.

22          So my perception always has been that it

23  was legitimate funds that came through a legitimate

24  lending company that had a legitimate loan against

25  the house.

*Agren Blando Court Reporting & Video, Inc.*

1  Q  And you never provided Mr. Evanson funds,

2 directly or indirectly, that he used to fund your

3 mortgage loan?

4  A  No, no.

5  Q  You didn't pay him or some entity

6 associated with him professional liability insurance

7 premiums that were then --

8  A  Paid him?

9  Q  Yes.

10  A  I don't recall ever paying Dennis

11 anything.  I may have given him some money, but I

12 wasn't in the business of giving him money to

13 back-door around to me.

14    I didn't do that, if that's what you are

15 asking.

16  Q  It is.  That's what I am asking.

17  A  I didn't do that.

18  Q  But neither you nor Netco actually came

19 out of pocket to pay for currency trading

20 transactions?

21  A  You know, I may have given him some money

22 for currency transactions.  I mean, there were -- my

23 recollection is that it wasn't just the currency

24 transactions.  I thought there were some other

25 transactions that I might have invested in from my

*Agren Blando Court Reporting & Video, Inc.*

1    perspective, an investment where I got some kind of

2    return on them.   The currency transactions are the

3    only ones that I ever recall where there was

4    significant losses.

5         But I believe it was some other

6    investment like buying shares in companies.   I

7    recall something like that, but I don't remember

8    exactly what it was or the timing or amounts.

9         Q    It would have been back in the Nineties,

10   perhaps?

11        A    Oh, yes.   It was way before these

12   currency transactions took place.

13        Q    You might have invested in entities?

14        A    I don't -- I don't remember doing any

15   investment in any of the entities.   I just -- I

16   remember doing some trading of shares, but I don't

17   remember an investment in any entity.   I don't

18   believe I -- well --

19        Q    You purchased shares back in the Nineties

20   that somehow involved your brother?

21        A    I did trading -- like trading on the

22   Stock Exchange or whatever that is.   I don't know

23   how to do it, and I think Dennis did some trades for

24   me during the early Nineties.

25        Q    You might have provided him with funds to

*Agren Blando Court Reporting & Video, Inc.*

1    invest for you?

2        A    Yes.

3        Q    Back in the Nineties?

4        A    Yeah, but it wasn't significant amounts

5    of money.

6        Q    More than a hundred thousand dollars?

7        A    Oh, no, no.

8        Q    Okay.

9        A    Maybe, you know, 10,000 or 20,000 or

10   something like that, but no.

11       Q    Would you have paid more or Netco paid

12   more than a hundred thousand dollars out of pocket

13   for currency trading transactions?

14       A    No.

15       Q    Or for an investment in Omega Forex?

16       A    No.

17       Q    Not more than a hundred thousand dollars?

18       A    No, not anywhere near that.

19       Q    I am going to ask you to go down to the

20   third "whereas" clause from the bottom.  It says,

21   "Whereas, the parties now agree that, for purposes

22   of federal" -- now, I understand you didn't --

23            MR. WEINMAN:  Still on page 2, or are you

24   on page 3 now?

25            MR. MOTES:  Page 3.  Same page we were on

1    before.

2              MR. WEINMAN:  All right.

3         Q    (BY MR. MOTES)  I know you didn't sign

4    this document.  I am just reading what it says.

5    "Whereas, the parties now agree that, for purposes

6    of federal income taxes, the amounts claimed as

7    loans received from Cottonwood Financial Services,

8    LC, if in fact loans, were discharged in 2008 when

9    Cottonwood Financial ceased to exist and conduct

10   business."

11             I know you disagree with that and, in

12   fact, you wrote "False" in the margin; correct?

13        A    Yes.

14        Q    Is it your understanding that the IRS'

15   position is that the loan from Cottonwood Financial

16   secured by your house has been discharged?

17        A    That is the position that they have

18   taken, that it was -- well, I wouldn't say

19   discharged.  I'm not sure what you mean by

20   "discharged."

21             But the position they have taken is that

22   it was debt forgiveness and, therefore, they have

23   applied all those taxes, you know.

24        Q    For the debt forgiveness income?

25        A    The debt forgiveness income, yes.

*Agren Blando Court Reporting & Video, Inc.*

1    Q     It's your understanding that the IRS

2    believes you don't owe anything on that mortgage?

3    A     That's what my understanding is of the

4    position that they have taken, that the debt was

5    forgiven and, because it was forgiven -- I don't

6    know.  I don't understand their position and what

7    they are trying to do.

8          But I guess, yes, they take the position

9    that the debt was forgiven.

10   Q     The mortgage debt on your property?

11   A     Well, yeah, because it was tied up by

12   Cottonwood on --

13         MR. MOTES:  Would you please mark this

14   one.

15         (Exhibit 8 marked.)

16   Q     (BY MR. MOTES)  This is in the order we

17   received it.  We received a PDF document from

18   Mr. Weinman's office, and that's the order that this

19   is in.  It might be slightly out of order.  I don't

20   know.

21         Do you want to take a moment to look

22   through this?

23   A     It's okay.

24   Q     What has been marked as T. Evanson 8 is a

25   series of pages that begins with a Form 4089 notice

*Agren Blando Court Reporting & Video, Inc.*

1    of deficiency-waiver from the IRS; is that correct?

2        A     Yes.

3        Q     Okay.  This is made out to you.  The

4    address is, again, using Valley Road.

5              Is that your Social, Mr. Evanson?

6        A     Yes, it is.

7        Q     Okay.  I believe that this is a document

8    by which the IRS is telling you that you owe

9    additional tax of $470,000 because of that alleged

10   forgiveness of indebtedness income; is that correct?

11       A     Yes.

12       Q     And, in fact, you owe a penalty on that

13   as well in the amount of 94,000, is what the IRS is

14   saying; correct?

15       A     Yes, yes.

16       Q     The second page, I think, tries to

17   explain -- my understanding is that the second page

18   tries to explain how the IRS reached its conclusion,

19   and it talks about the loan history and balances.

20             I had a request I wanted to make.  If you

21   look at the bottom, the bullet point says,

22   "Cottonwood Financial carried this note on their

23   books," and then it gives some years, I think, and

24   balances.

25             Do you see that?

*Agren Blando Court Reporting & Video, Inc.*

1      A      Yes.

2      Q      Then the next page begins with, lower

3   case, "income from the discharge of this debt."

4           I believe that a page is missing, and I

5   think it's an important page because it would

6   explain how the IRS is reaching its conclusion.

7      A      Oh, yeah.

8           MR. WEINMAN:   Where do you think -- are

9   these your numbers on the top right?

10          MR. MOTES:   On the top right, they are

11   our numbers, yes.

12     Q      (BY MR. MOTES)   But my request is if you,

13   Mr. Evanson, can go back and -- maybe this didn't

14   scan in completely.   I think it would be extremely

15   helpful to have that middle page, because the

16   beginning of the page that's page 58 in the upper

17   right-hand corner, that begins with the conclusion

18   that the debt was discharged, according to the IRS,

19   and what we are missing is the explanation from the

20   IRS, how they reached that conclusion.

21     A      Yes, I will go back and try to -- go back

22   and pull this back out again.

23     Q      Okay.   I appreciate that.

24          The bottom line, though, when you look at

25   that total figure on page 58 --

*Agren Blando Court Reporting & Video, Inc.*

1        A        Yes.    The million 433?

2        Q        Is that the number you took to include on

3    the original Schedule D for Hill Property's claim?

4        A        I believe it -- it was a number like that

5    amount that -- I don't know if it was from this

6    document or if it was a different document, but it

7    was around that amount of money that --

8        Q        Okay.    Then if you will turn to page 59,

9    please, this is a -- it's a Form 5278 from the IRS.

10   This seems to show, again, line 7(a) -- again, it

11   seems to show the IRS attributing $1.433 million

12   to -- as income to you; correct?

13       A        Cancellation of debt, yes.

14       Q        Okay.    And because they were attributing

15   that income to you for whatever tax period this is,

16   that affected the way that your return would be

17   calculated in terms of whether deductions would be

18   phased out and exemptions phased out, et cetera?

19       A        Yes.

20       Q        Okay.

21       A        But the thing that's interesting to note

22   on this is that they still did not take away the

23   interest deduction for the home mortgage.    Of

24   course, there wasn't any in 2008, anyways, so -- you

25   know, there wasn't any in 2008.

1    Q    This one will be brief, I think.

2         MR. MOTES:  Would you please mark this.

3         (Exhibit 9 marked.)

4    Q    (BY MR. MOTES)  This document is a loan

5    application and personal financial statement dated

6    August 1st of 1995.  Do you see that?

7    A    Yes.

8    Q    It doesn't actually have any lender's

9    name on it, but was this the application you used to

10   apply for the Cottonwood Financial loan?

11   A    Yes, it was.

12   Q    The home equity line?

13   A    Yes.

14   Q    Okay.  Over on the right-hand side,

15   there's a category "Total Current Liabilities."  Do

16   you see that?

17   A    Yes.

18   Q    Actually, just below that, it says,

19   "Mortgage debt, $175,000."  Do you see that?

20   A    Yes.

21   Q    Was that the amount of your Washington

22   Mutual mortgage in 1995?

23   A    I don't recall if Washington Mutual was

24   the mortgage company at the time.  I don't -- I

25   looked for those old documents, and I couldn't find

1    anything about that mortgage, when it was done or

2    anything.  But whatever the mortgage was on the

3    house at the time would have been that $175,000, but

4    whoever it was with.

5            I think I took out an original mortgage

6    when we bought the house in '87, and then I think we

7    took out a different mortgage after that.  But I

8    don't remember timing.  Sorry, I just don't.

9        Q    Is that your signature on the second

10   page?

11       A    Yes.

12       Q    And you would have provided this to your

13   brother?

14       A    Yes.

15           MR. MOTES:  Would you please mark this

16   next.

17           (Exhibit 10 marked.)

18       Q    (BY MR. MOTES)  What has been marked as

19   Exhibit 10 is a letter from Cottonwood Financial to

20   you dated that same date, August 1, 1995, from

21   Dennis Evanson.  Do you see that?

22       A    Yes.

23       Q    And was this the letter that he sent to

24   you to notify you that your loan has been approved?

25       A    Yes.

1       Q      It says that -- the first line says that

2   it's a secured line of credit.

3              Obviously, we are talking about the line

4   of credit secured by your house?

5       A      Yes.  I believe you have a copy of the

6   document that goes with this that provides some

7   security within it.  I don't remember, again, what

8   it was, but --

9       Q      Okay.  I think we do.  Let's go to that.

10             MR. MOTES:  Would you please mark this

11  next.

12             (Exhibit 11 marked.)

13      Q      (BY MR. MOTES)  What has been marked as

14  Exhibit 11 is a home equity line, revolving credit

15  agreement, note and disclosure statement.

16             Do you recognize this to be your home

17  equity line note that was referenced -- I think you

18  just referenced signing a note that goes along with

19  Mr. Evanson's letter?

20      A      Yes, this is the note.

21      Q      This is obviously the home equity line

22  from 1995?

23      A      Yes, it is.

24      Q      And it shows it's 11 percent interest?

25      A      Yes.

*Agren Blando Court Reporting & Video, Inc.*

1    Q    With a 4 percent origination fee?

2    A    Yes.

3    Q    Is it your belief that this note was

4  canceled when the subsequent loan was made in 2001

5  or 2002?

6    A    It's my belief that it was rolled into a

7  new note, and I thought I provided copies of that,

8  but I would have to look at that note just to see if

9  it was addressed in there or not.  I don't remember.

10    Q    I don't think we received what you are

11  referring to, the promissory note.

12    A    It would have been attached to the deed

13  of trust that was filed by Cottonwood --

14    Q    We will check.

15    A    -- at that point in time.

16    Q    To your knowledge, this home equity line

17  agreement is no longer applicable and doesn't govern

18  your relationship with Hill Property?

19    A    Yes -- well, I don't think so.

20    Q    Okay.  There's some different instrument

21  that governs your relationship with Hill Property?

22    A    Boy, I don't know how to answer that.  I

23  don't know if these would still apply or not.  I

24  don't know what is --

25    Q    That's okay.  If you don't know, you

**Agren Blando Court Reporting & Video, Inc.**

1    don't know.  That's fine.

2              MR. MOTES:  Would you please mark this

3    one.

4              (Exhibit 12 marked.)

5         Q    (BY MR. MOTES)  I asked Sherri to pull

6    all of these documents because they are related, and

7    maybe you could take a moment to leaf through it and

8    become acquainted with it.

9         A    Yes, I know what these are.

10        Q    Can you explain what they are?

11        A    The pages that show dollar amounts on

12   them are loan amounts that would have been balances

13   effective of that month, and it doesn't necessarily

14   show the year and date, but the first one obviously

15   would be with the beginning of the home equity line

16   of credit.

17        Q    And you obviously received these

18   statements from Dennis Evanson?

19        A    Well, I believe.

20        Q    Perhaps not.  You would have received

21   them from Cottonwood Financial?

22        A    From Cottonwood Financial.  I'm not sure

23   they would come from Dennis.  I mean, most of these

24   have Brent Metcalf's name on them.

25        Q    Some of these statements are provided

*Agren Blando Court Reporting & Video, Inc.*

1   with a cover letter, and some of them perhaps --

2   this is what was available to you when you responded

3   to our request?

4        A        This is what I was able to find, yes.

5        Q        Okay.  As far as I can tell in looking at

6   these -- at these ledgers, the most recent one I

7   think is the last one for November 2001.  It's page

8   100.

9        A        Yes.

10        Q        To your knowledge, do you have any

11   statement from Cottonwood Financial subsequent to

12   November 2001 showing balances?

13        A        Not that I could find.

14        Q        Okay.  This shows the balance obviously

15   as of November 2001 in the -- almost -- close to

16   $700,000.  $689,000.

17        A        Yes.

18                 MR. MOTES:  The only other document that

19   we have showing a balance owing on that loan, other

20   than the IRS' information, is a statement from Hill

21   Property that Mr. Weinman's office provided, and I

22   am going to ask that that be marked.

23                 (Exhibit 13 marked.)

24        Q        (BY MR. MOTES)  Mr. Evanson, what has

25   been marked as Exhibit 13 is a statement from Hill

*Agren Blando Court Reporting & Video, Inc.*

1    Property.  I think it's called an annual mortgage

2    statement, and it identifies the loan balance as

3    being $824,060.14; correct?

4         A    Yes.

5         Q    Did you request this statement?

6         A    I don't remember why or how I got this

7    statement.  I don't remember if I requested it or

8    not, honestly.

9         Q    Okay.  Just to make sure, the last

10   statement we have from Cottonwood Financial was from

11   November of 2001, and then there's this statement

12   from December of 2015.

13        Do you have any statement from any lender

14   or servicer or holder of the mortgage between 2001

15   and -- between November of 2001 and December of 2015

16   showing the account balance?

17        A    No.  I looked for that, because I was

18   hoping to have something more like in 2007, but I

19   couldn't find anything.  And I did ask Brent Metcalf

20   if he had any of that documentation that he could

21   provide me.  He said the IRS took it.  He doesn't

22   have access to it.

23        But there were payments that were made on

24   my tax returns for mortgage interest throughout all

25   that timeframe, so I know there was activity there.

1    I just don't know what the activity was or --

2        Q    In some years there was mortgage

3    interest, there were mortgage interest payments, but

4    not between, say, 2007 and 2012.

5        A    Yeah.  I think 2006 was -- well, I don't

6    remember about 2007, but I know from 2008 to 2012

7    there is no mortgage interest deductions.

8        Q    I am looking at the deed of trust that

9    Cottonwood Financial provided.  You indicated that

10   the promissory note might be included with that.

11       A    Well, I looked for a copy of a promissory

12   note, and I don't have anything, and the only thing

13   I was able to find was that recorded deed of trust.

14       Q    That's all we have.

15            So what I was looking for was the 2001 or

16   2002 promissory note with Cottonwood Financial.

17       A    I thought that's what it was.

18       Q    I can show you.

19            MR. MOTES:  Would you please mark this.

20            (Exhibit 14 marked.)

21       Q    (BY MR. MOTES)  So what has been marked

22   as Exhibit 14 is a deed of trust that was recorded

23   with the Douglas County Clerk and Recorder on

24   April 22, 2002.

25            And you referenced earlier that you

1    entered into a new loan with Cottonwood Financial in

2    approximately that time frame.

3         A    Yes.

4         Q    The beneficiary of this deed of trust is

5    Cottonwood Financial Services, LC, and it would have

6    been to secure an obligation to Cottonwood Financial

7    Services by you, correct, owing by you?

8         A    Yes.

9         Q    The reason I am giving this to you is

10   because you thought that perhaps the note was

11   included, and I just wanted you to see that the note

12   is not included with this deed of trust.

13        A    I guess my assumption on this, that this

14   was the note --

15        Q    Okay.

16        A    -- that was --

17        Q    You just misunderstood what it was?

18        A    I misunderstood what it was, because I

19   thought that this was actually the note that we

20   exercised at that point in time.  It was rolled

21   together.

22        Q    Okay.

23        A    My misunderstanding, I guess.

24        Q    If you don't know the answer to this

25   question or you feel like it's a legal question and

1    you can't answer it, that's fine.

2            But let me ask you, whatever promissory

3    note is secured by this deed of trust or whatever

4    instrument is secured by this deed of trust, is that

5    the same instrument that governs your obligation to

6    Hill Property today?

7       A    I mean, I honestly don't know how to

8    answer that.

9       Q    Did you enter into any new promissory

10   note with Hill Property?

11      A    You know, we signed a bunch of documents,

12   and I haven't got copies of those from them.  I have

13   requested -- I asked them to give me copies of

14   whatever they had, and they said they would provide

15   it to their attorney.  Is that the attorney down

16   here?

17           So I don't know exactly --

18      Q    Are you talking about like a very recent

19   conversation you had with them?

20      A    Yes, yes, when they called me and said,

21   "Oh, we're going to move forward and get an

22   attorney."

23           "Okay.  Well, I don't know if I have

24   copies of all the documents.  Can you provide them?"

25           "Well, we will do that through the

**Agren Blando Court Reporting & Video, Inc.**

1   attorney."

2       Q       One final document I wanted to ask you

3   about.

4               MR. MOTES:  Would you please mark this.

5               (Exhibit 15 marked.)

6       Q       (BY MR. MOTES)  Exhibit 15 is an advice

7   of wire transfer, and I believe that you provided

8   this to us to show a payment having been made on the

9   Cottonwood Financial loan; is that correct?

10      A       Yes.

11      Q       This wire transfer was dated December 30,

12  1999, and the amount was $13,708.14; correct?

13      A       Yes.

14      Q       Do you know why you would have made a

15  payment precisely in that amount?

16      A       I don't know why the amount, but I am

17  sure that I wire transferred it because of the date.

18      Q       Okay.  Why wire transfer rather than

19  write a check?

20      A       To make sure that the interest deductions

21  come in the tax year.

22      Q       Oh, I see.

23      A       That's why I -- I am sure why I would

24  have done that, but I don't remember why that exact

25  amount.

*Agren Blando Court Reporting & Video, Inc.*

```
 1        Q      Okay.

 2               MR. MOTES:  Mr. Weinman, do you have any

 3     follow-up?

 4               MR. WEINMAN:  No.

 5               MR. MOTES:  Well, I thank you very much.

 6     I don't have any other questions, and I certainly

 7     appreciate you coming down.

 8               MR. WEINMAN:  You still want to talk to

 9     Lynette?

10               MR. MOTES:  Off the record.

11               (Discussion off the record.)

12               (The reading and signing of the within

13                deposition was waived.)

14               (The deposition concluded at 11:34 a.m.,

15                June 30, 2016.)

16

17

18

19

20

21

22

23

24

25
```

```
 1              I, TERRY LEE EVANSON, do hereby certify that
 2   I have read the foregoing transcript and that the
 3   same and accompanying amendment sheets, if any,
 4   constitute a true and complete record of my
 5   testimony.
 6
 7                      _____
 8                      Signature of Deponent
 9                      ( ) No amendments
                        ( ) Amendments attached
10
11              Acknowledged before me this _____ day
12   of _____, 20____.
13
14
                        Notary Public: _____
15
                        My Commission Expires:  _____
16
                        Seal:
17
18
19
20
21
22
23
24
25
```

1    STATE OF COLORADO)

2                    ) ss.        REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4         I, Ellen Leifer, do hereby certify that I

5    am a Professional Reporter and Notary Public within

6    and for the State of Colorado; that previous to the

7    commencement of the examination, the deponent was

8    duly sworn to testify to the truth.

9         I further certify that this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14        I further certify that I am not related

15   to, employed by, nor of counsel for any of the

16   parties or attorneys herein, nor otherwise

17   interested in the result of the within action.

18        In witness whereof, I have affixed my

19   signature this 12th day of July, 2016.

20        My commission expires November 27, 2018.

21

22        _____
          Ellen Leifer
23        216 - 16th Street, Suite 600
          Denver, Colorado  80202
24

25

```
 1    AGREN BLANDO COURT REPORTING & VIDEO, INC.
      216 - 16th Street, Suite 600
 2    Denver, Colorado  80202
      4450 Arapahoe Avenue, Suite 100
 3    Boulder, Colorado  80303

 4    July 12, 2016

 5    Terry Lee Evanson
      c/o Jeffrey A. Weinman, Esq.
 6    730 17th Street, Suite 240
      Denver, Colorado 80202
 7
      Re:  Deposition of TERRY LEE EVANSON
 8         In re Terry Lee Evanson
           Case No. 13-19032 MER
 9
      The aforementioned deposition is ready for
10    reading and signing.  Please attend to this
      matter by following BOTH of the items indicated
11    below:

12    _XXX_ Call 303-296-0017 and arrange with us
            to read and sign the deposition in our
13          office

14    _____ Have the deponent read your copy and sign
             the signature page and amendment sheets, if
15           applicable; the signature page is attached

16    _____ Read the enclosed copy of the deposition
             and sign the signature page and amendment
17           sheets, if applicable; the signature page
             is attached
18
      _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
19
      _____ By _____ due to a trial date of_____
20
      Please be sure the original signature page and
21    amendment sheets, if any, are SIGNED BEFORE A
      NOTARY PUBLIC and returned to Agren Blando for
22    filing with the original deposition.  A copy of
      these changes should also be forwarded to counsel
23    of record.  Thank you.

24    AGREN BLANDO COURT REPORTING & VIDEO, INC.

25    cc:  All Counsel
```

*Agren Blando Court Reporting & Video, Inc.*

```
 1    AGREN BLANDO COURT REPORTING & VIDEO, INC.
      216 - 16th Street, Suite 600
 2    Denver, Colorado  80202
      4450 Arapahoe Avenue, Suite 100
 3    Boulder, Colorado  80303

 4

 5
                     TERRY LEE EVANSON
 6                    June 30, 2016
                 In re Terry Lee Evanson
 7                Case No. 13-19032 MER

 8

 9    The original deposition was filed with

10    Alan K. Motes, Esq., on approximately

11    the 12th day of July, 2016.

12    _____ Signature waived

13    _____ Unsigned; signed signature page and
             amendment sheets, if any, to be filed at
14           trial

15    _____ Reading and signing not requested pursuant
             to C.R.C.P. Rule 30(e)
16
      _XXX_ Unsigned; original amendment sheets and/or
17           signature pages should be forwarded to
             Agren Blando to be filed in the envelope
18           attached to the sealed original.

19

20    Thank you.

21    AGREN BLANDO COURT REPORTING & VIDEO, INC.

22    cc:  All Counsel

23

24

25
```

```
                      - AMENDMENT SHEET -

              Deposition of TERRY LEE EVANSON
                       June 30, 2016
                 In re Terry Lee Evanson
                  Case No. 13-19032 MER
```

The deponent wishes to make the following changes
in the testimony as originally given:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Signature of Deponent: _____

Acknowledged before me this _____ day of _____,
20____.

(seal)        Notary's signature _____

              My commission expires_____

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | ) |
| | ) |
| Terry Lee Evanson | ) Case No. 13-19032 MER |
| SSN / ITIN: xxx-xx-9483 | ) Chapter 11 |
| Lynette Pearce Evanson | ) |
| SSN / ITIN: xxx-xx-5531 | ) |
| | ) |
| Debtors. | ) |

## UNITED STATES TRUSTEE'S REQUEST FOR PRODUCTION OF DOCUMENTS

The United States Trustee ("UST"), through his undersigned counsel, hereby submits the following Request for Production of Documents to the Debtors pursuant to Fed. R. Bankr. P. 7034 (incorporating Fed. R. Civ. P. 34) in connection with (i) the UST's Motion to Dismiss or Convert Chapter 11 Case and the Debtors' Objection thereto and (ii) the Debtors' Motion to Dismiss Chapter 11 Bankruptcy Case and the UST's Objection thereto. Production of documents is to be made at the Office of the United States Trustee, 1961 Stout Street, Suite 12-200, Denver, Colorado 80294 on or before 5:00 p.m. on the date which is 33 days from the date in the Certificate of Service for this Request for Production of Documents.

### DEFINITIONS

1.      "You" or "Yours" refers to Terry Lee Evanson and Lynette Pearce Evanson,

2.      Terry Lee Evanson and Lynette Pearce Evanson may also be referred to each as a "Debtor," and together, the "Debtors,"

3.      "Document" shall mean every writing or record of every type and description that is or has been in your possession, control, or custody, or of which you have knowledge, including, but not limited to videotapes, computer records or disks, photographs, notes, letters, memoranda, books, magazines, resumes, notebooks, diaries, papers, agreements, contracts, statements, invoices, analysis, transcripts, correspondence, telegrams, telefax, drafts, data processing disks or tapes and computer-produced interpretations thereof, instructions, announcements. "Document" also means all copies which are not identical to the original, such as those bearing marginal comments, alterations, or other notations not present on the original document as originally written, typed or otherwise prepared.

4.      "Mortgage Debt" means any debt secured by the Debtors' Residence. In their Schedules, the Debtors have asserted that they owe a Mortgage Debt to Hill Property.

5.      "Petition date" shall mean May 28, 2013.


Government
Exhibit 13

Evanson, Case No. 13-19032
UST's Request for Production of Documents

6.     "Residence" shall mean the Debtors' residence located at 10175 S. Oneida St., Littleton, CO 80124.

## INSTRUCTIONS

1.     For any document that no longer exists or is no longer in your actual or constructive possession, custody or control, state:

> a. What disposition was made of it;
>
> b. When said disposition took place;
>
> c. The reason for such disposition;
>
> d. The identity of the person(s) who ordered or authorized the disposition;
>
> e. The date of the document;
>
> f. The type of document;
>
> g. The author of the document;
>
> h. The signer of the document;
>
> I. The recipient or addressee of the document;
>
> j. The subject matter of the document; and
>
> k. The relationship of the author and recipient/addressee to each other.

2.     If you consider any document or communication to be privileged, then with regard to each such document or communication, describe the document or communication generally, explain fully the basis for the claimed privilege, identify the author of the document or person making the communication and signatories to the document and identify the custodian of the original and all copies of the document.

3.     The obligation to produce the documents requested herein is intended to be of a continuing nature. If at any time after initial compliance with the document request you acquire or learn of possession, custody or control of any additional responsive documents, you must provide such additional responsive documents as soon as practicable.

4.     You must produce documents as they are kept in the usual course of business or you must organize and label them to correspond to the categories in the request.

5.     Please provide copies of the following requested documents, do not provide originals.

Evanson, Case No. 13-19032
UST's Request for Production of Documents

## DOCUMENTS REQUESTED

1.   Provide copies of all promissory notes relating to any Mortgage Debt.

2.   Produce copies of any other evidence of indebtedness relating to any Mortgage Debt.

3.   Produce any mortgage document or deed of trust securing any Mortgage Debt.

4.   For any mortgage loans that were outstanding as of the Petition Date, produce the closing documents and any settlement statements relating to the closing of such loans.

5.   Produce any documents, including correspondence, referencing the assignment of the Debtors' Mortgage Debt from one creditor to another (including any Documents referencing the assignment of Mortgage Debt to Hill Property).

6.   Paragraph 3 of the Debtors' Objection to the UST's Motion to Dismiss or Convert states that this bankruptcy filing was precipitated in part by litigation with the IRS. Produce all complaints, motions, briefs, demands, notices, correspondence, and any other Documents received from the IRS in connection with that litigation.

7.   Produce any Documents received from the IRS in any way referencing any Mortgage Debt or the Debtors' residence. Included in this Request are any Documents referencing the position of the IRS that Mortgage Debt has been forgiven.

8.   Produce all Documents received by either of the Debtors from Hill Property since the Petition Date, including emails, statements, Form 1099s, and any other tax-related documents.

9.   Produce all Documents received by either of the Debtors from Ron Hill since the Petition Date, including emails, statements, Form 1099s, and any other tax-related documents.

10.   Produce any Documents, including bank statements, receipts, mortgage statements, and account histories, showing any mortgage payments made by anyone on the Mortgage Debt since the Petition Date.

11.   On Debtors' Schedule D filed June 11, 2013, Debtors listed Hill Property as having a mortgage claim in the amount of $1,433,000.00. Produce all Documents utilized by the Debtors in arriving at that figure.



12.   On Debtors' Schedule J filed June 11, 2013, Debtors listed a monthly home mortgage payment of $1,828.00. Produce all Documents utilized by the Debtors in arriving at that figure.

Evanson, Case No. 13-19032
UST's Request for Production of Documents

13.     · On Debtors' Amended Schedule D filed February 11, 2014, Debtors listed Hill
Property as having a mortgage claim in the amount of $891,175.58.  Produce all Documents
utilized by the Debtors in arriving at that figure.

14.     The Debtors' Form 1040 U.S. Individual Tax Returns for 2012, 2013, 2014, and
2015, including all supporting schedules, W-2, 1098, 1099, 1099 MISC and K-1 forms, and any
amendments.  If the 2015 return(s) has/have not been prepared as of the date of Debtors'
response to this request, please provide copies of all W-2, 1098, 1099, and K-1 forms for 2015.

Dated: April 29, 2016                         Respectfully submitted,

                                              PATRICK S. LAYNG
                                              UNITED STATES TRUSTEE

                                              /s/
                                              By: Alan K. Motes, #33997
                                              Trial Attorney for the U.S. Trustee
                                              1961 Stout Street, Suite 12-200
                                              Denver, Colorado 80294
                                              (303) 312-7999 telephone
                                              (303) 312-7259 facsimile
                                              Alan.Motes@usdoj.gov

Evanson, Case No. 13-19032
UST's Request for Production of Documents

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I have placed a true and correct copy of the UNITED STATES TRUSTEE'S REQUEST FOR PRODUCTION OF DOCUMENTS in the United States mail, proper postage prepaid, addressed to the following:

Dated:  April 2 1, 2016

Terry Lee Evanson
10175 S Oneida St
Littleton, CO 80124-9608

Lynette Pearce Evanson
10175 S Oneida St
Littleton, CO 80124-9608

Jeffrey Weinman
730 17th St.
Ste. 240
Denver, CO 80202

Ted H. Merriam
Kevin A. Planegger
1625 Broadway
Suite 770
Denver, CO 80202

_____
Office of the United States Trustee

Page 5

DEBTOR: *TERRY LYNETTE EVANSON*          MONTHLY OPERATING REPORT
                                                                              CHAPTER 11
CASE NUMBER: *13 - 19032 MER* .

### Form 2-A
### COVER SHEET

For Period Ending   *8 - 31 - 16* .

**Accounting Method:**   ☐ Accrual Basis   ☒ Cash Basis

*THIS REPORT IS DUE 21 DAYS AFTER THE END OF THE MONTH*

Mark One Box for Each
Required Document:

Debtor must attach each of the following reports/documents unless the U. S. Trustee
has waived the requirement in writing. File the original with the Clerk of Court.
Submit a duplicate, with original signature, to the U. S. Trustee.

| Report/Document Attached | Previously Waived | REQUIRED REPORTS/DOCUMENTS |
|---|---|---|
| ☒ | ☐ | 1. Cash Receipts and Disbursements Statement (Form 2-B) |
| ☒ | ☐ | 2. Balance Sheet (Form 2-C) |
| ☒ | ☐ | 3. Profit and Loss Statement (Form 2-D) |
| ☒ | ☐ | 4. Supporting Schedules (Form 2-E) |
| ☒ | ☐ | 5. Quarterly Fee Summary (Form 2-F) |
| ☒ | ☐ | 6. Narrative (Form 2-G) |
| ☒ | ☐ | 7. Bank Statements for All Bank Accounts IMPORTANT: Redact account numbers and remove check images |
| ☒ | ☐ | 8. Bank Statement Reconciliations for all Bank Accounts |

                                                   *WELLS FARGO + RED ROCKS*

*I declare under penalty of perjury that the following Monthly Operating Report, and any
attachments thereto are true, accurate and correct to the best of my knowledge and belief.*

Executed on: *8/24/16* .   Print Name: *TERRY EVANSON*

Signature: _____

Title: _____

Rev. 12/10/2009



DEBTOR: _Terry + Lynette Evanson_     CASE NO: _13-19032mer_

## Form 2-B
### CASH RECEIPTS AND DISBURSEMENTS STATEMENT
For Period: _8/1/16_ to _8/31/16_ .

**CASH RECEIPTS DETAIL**     Account No: _3576_
(attach additional sheets as necessary)

| Date | Payer | Description | Amount |
|------|-------|-------------|--------|

Social Security                          $795.00
Income - Business .                       14363.92
Interest .                                49.74
Returns                                   3.68

Total Cash Receipts     $ _15212.34_ (1)

(1) Total for all accounts should agree with total cash receipts listed on Form 2-B, page 1

DEBTOR: _Terry & Lynette Evanson_                     CASE NO: _13-19032 MER._

## Form 2-B
## CASH RECEIPTS AND DISBURSEMENTS STATEMENT
For Period: _8/1/16_ to _8/31/16_

**CASH DISBURSEMENTS DETAIL**
*(attach additional sheets as necessary)*

Account No: _3576._

| Date | Check No. | Payee | Description (Purpose) | Amount |
|------|-----------|-------|----------------------|--------|
| | | Life Insurance | | $263.82 |
| | | Gas | | 207.16 |
| | | Medical | | 240.00 |
| | | Health Ins. | | 161.92 |
| | | House Ins. | | 342.75 |
| | | Internet | | 333.98 |
| | | Trustee | | 650.00 |
| | | Personal. | | 699.26 |
| | | Total. | | 2898.84 |
| | | Business Expenses | | 8734.24 |

Total Cash Disbursements     $_11633.08_(1)

DEBTOR: *TERRY + LYNETTE EVANSON*        CASE NO:        *13 - 19032 MER.*

### Form 2-B
### CASH RECEIPTS AND DISBURSEMENTS STATEMENT
For Period: *8/1/16* to *8/31/16.*

| CASH FLOW SUMMARY | Current Month | | Accumulated | |
|---|---|---|---|---|
| 1. Beginning Cash Balance | $ *7191.08* | (1) | $ | (1) |
| 2. Cash Receipts | | | | |
| Operations | *14363.92* | | | |
| Sale of Assets | | | | |
| Loans/advances | | | | |
| Other | *848.47* | | | |
| Total Cash Receipts | $ *15212.39* | $ | | |
| 3. Cash Disbursements | | | | |
| Operations | *8734.24* | | | |
| Debt Service/Secured loan payment | | | | |
| Professional fees/U.S. Trustee fees | *2898.84* | | | |
| Other | | | | |
| Total Cash Disbursements | $ *11633.08* | $ | | |
| 4. Net Cash Flow (Total Cash Receipts less Total Cash Disbursements) | *3579.31* | | | |
| 5 Ending Cash Balance (to Form 2-C) | $ *10,770.39* | (2) | $ | (2) |

| CASH BALANCE SUMMARY | Financial Institution | Book Balance | |
|---|---|---|---|
| Petty Cash | | $ *10770.39* | |
| DIP Operating Account | *# 3576.* | | |
| DIP State Tax Account | | | |
| DIP Payroll Account | | | |
| Other Operating Account | | | |
| Other Interest-bearing Account | | | |
| TOTAL (must agree with Ending Cash Balance above) | | $ *10770.39* | (2) |

(1) Accumulated beginning cash balance is the cash available at the commencement of the case.
   Current month beginning cash balance should equal the previous month's ending balance.
(2) All cash balances should be the same.

Page 1 of 3
Rev. 12/10/2009

DEBTOR: _TERRY-LYNETTE EVANSON_      CASE NO: _13-19032 MER._

Form 2-C
COMPARATIVE BALANCE SHEET
For Period Ended: _8/30/16_

|  | Current Month | Petition Date (1) |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash (from Form 2-B, line 5) | $ | $ |
| Accounts Receivable (from Form 2-E) | | |
| Receivable from Officers, Employees, Affiliates | | |
| Inventory | | |
| Other Current Assets :(List) | | |
| | | |
| Total Current Assets | $ | $ |
| Fixed Assets: | | |
| Land | $ | $ |
| Building | | |
| Equipment, Furniture and Fixtures | | |
| Total Fixed Assets | | |
| Less: Accumulated Depreciation | ( ) | ( ) |
| Net Fixed Assets | $ | $ |
| Other Assets (List): | | |
| | | |
| **TOTAL ASSETS** | $ 0 | $ 0 |
| **LIABILITIES** | | |
| Post-petition Accounts Payable (from Form 2-E) | $ | $ |
| Post-petition Accrued Profesional Fees (from Form 2-E) | | |
| Post-petition Taxes Payable (from Form 2-E) | | |
| Post-petition Notes Payable | | |
| Other Post-petition Payable(List): | | |
| | | |
| Total Post Petition Liabilities | $ | $ |
| Pre Petition Liabilities: | | |
| Secured Debt | | |
| Priority Debt | | |
| Unsecured Debt | | |
| Total Pre Petition Liabilities | $ | $ |
| **TOTAL LIABILITIES** | $ 0 | $ 0 |
| **OWNERS' EQUITY** | | |
| Owner's/Stockholder's Equity | $ | $ |
| Retained Earnings - Prepetition | | |
| Retained Earnings - Post-petition | | |
| **TOTAL OWNERS' EQUITY** | $ 0 | $ 0 |
| **TOTAL LIABILITIES AND OWNERS' EQUITY** | $ 0 | $ 0 |

(1)  Petition date values are taken from the Debtor's balance sheet as of the petition date or are the values
listed on the Debtor's schedules.

Page 1 of 1
Rev. 12/10/2009

DEBTOR: _Terry & Lynette Evanson_          CASE NO: _13-19032 MER._

## Form 2-D
### PROFIT AND LOSS STATEMENT
For Period _8/1/16_ to _8/30/16_

|  | Current Month | Accumulated Total (1) |
|---|---|---|
| Gross Operating Revenue | $ _14363. 92_ | $ |
| Less: Discounts, Returns and Allowances | ( ) | ( ) |
| Net Operating Revenue | $ _14363 92_ | $ |
| Cost of Goods Sold | _8734.24_ | |
| Gross Profit | $ _5629.68_ | $ |
| Operating Expenses | $ | $ |
| Officer Compensation | | |
| Selling, General and Administrative | | |
| Rents and Leases | | |
| Depreciation, Depletion and Amortization | | |
| Other (list): | | |
| Total Operating Expenses | $ | $ |
| Operating Income (Loss) | $ _5629.68_ | $ |
| Non-Operating Income and Expenses | $ | $ |
| Other Non-Operating Expenses | | |
| Gains (Losses) on Sale of Assets | | |
| Interest Income | | |
| Interest Expense | | |
| Other Non-Operating Income | | |
| Net Non-Operating Income or (Expenses) | $ | $ |
| Reorganization Expenses | | |
| Legal and Professional Fees | $ | $ |
| Other Reorganization Expense | | |
| Total Reorganization Expenses | $ | $ |
| Net Income (Loss) Before Income Taxes | $ _5629.68_ | $ |
| Federal and State Income Tax Expense (Benefit) | | |
| NET INCOME (LOSS) | $ _5629.68_ | $ |

_(1) Accumulated Totals include all revenue and expenses since the petition date._

Page 1 of 1
Rev. 12/10/2009

DEBTOR: _Terry + Lynette Enavson_    CASE NO: _13-19032 MER._

Form 2-E
SUPPORTING SCHEDULES
For Period: _8/1/16_ to _8/31/16_.

### POST PETITION TAXES PAYABLE SCHEDULE

|  | Beginning Balance (1) | Amount Accrued | Amount Paid | Date Paid | Check Number | Ending Balance |
|---|---|---|---|---|---|---|
| Income Tax Withheld: |  |  |  |  |  |  |
| Federal | $ | $ | $ |  |  | $ |
| State |  |  |  |  |  |  |
| FICA Tax Withheld |  |  |  |  |  |  |
| Employer's FICA Tax |  |  |  |  |  |  |
| Unemployment Tax |  |  |  |  |  |  |
| Federal |  |  |  |  |  |  |
| State |  |  |  |  |  |  |
| Sales, Use & Excise Taxes |  |  |  |  |  |  |
| Property Taxes |  |  |  |  |  |  |
| Accrued Income Tax: |  |  |  |  |  |  |
| Federal |  |  |  |  |  |  |
| State |  |  |  |  |  |  |
| Other:_____ |  |  |  |  |  |  |
| TOTALS | $ | $ | $ |  |  | $ |

(1) For first report, Beginning Balance will be $0; thereafter, Beginning Balance will be Ending Balance from prior report.

### INSURANCE SCHEDULE

|  | Carrier | Amount of Coverage | Expiration Date | Premium Paid Through |
|---|---|---|---|---|
| Workers' Compensation |  | $ |  | $ |
| General Liability | Safeco Farmers | $ same | 2/17 | $ 2/17 |
| Property (Fire, Theft) |  | $ same | 10/16 | $ 10/16. |
| Vehicle |  |  |  | $ |
| Other (list): |  | $ |  | $ |
|  |  | $ |  | $ |

Page 1 of 2
Rev. 12/10/2009

DEBTOR: *Terry + Lynette Evanson*   CASE NO: *13-19032-MER.*

### Form 2-E
### SUPPORTING SCHEDULES

For Period: _8/1/16_ to _8/30/16_

## ACCOUNTS RECEIVABLE AND POST PETITION PAYABLE AGING

| Due | Accounts Receivable | Post Petition Accounts Payable |
|---|---|---|
| | $ | $ |
| Under 30 days | | |
| 30 to 60 days | | |
| 61 to 90 days | | |
| 91 to 120 days | | |
| Over 120 days | | |
| Total Post Petition | | |
| Pre Petition Amounts | | |
| Total Accounts Receivable | $ | |
| Less: Bad Debt Reserve | $ | |
| Net Accounts Receivable (to Form 2-C) | $ | |
| Total Post Petition Accounts Payable | | $ -0- |

→ Attach a detail listing of accounts receivable and post-petition accounts payable

## SCHEDULE OF PAYMENTS TO ATTORNEYS AND OTHER PROFESSIONALS

| | Month-end Retainer Balance | Current Month's Accrual | Paid In Current Month | Date of Court Approval | Month-end Balance Due * |
|---|---|---|---|---|---|
| Debtor's Counsel | $ | $ | $ | | $ |
| Counsel for Unsecured Creditors' Committee | | | | | |
| Trustee's Counsel | | | | | |
| Accountant | | | | | |
| Other: | | | | | |
| Total | $ | $ | $ | | $ -0- |

*Balance due to include fees and expenses incurred but not yet paid.

## SCHEDULE OF PAYMENTS AND TRANSFERS TO PRINCIPALS/EXECUTIVES**

| Payee Name | Position | Nature of Payment | Amount |
|---|---|---|---|
| | | | $ -0- |
| | | | |
| | | | |

**List payments and transfers of any kind and in any form made to or for the benefit of any proprietor, owner, partner, shareholder, officer or director.

Page 2 of 2
Rev. 12/10/2009

**DEBTOR:** TERRY + LYNETTE EVANSON         **CASE NO:** 13-19032-MER.

### Form 2-F
### QUARTERLY FEE SUMMARY *
For the Month Ended: 8/30/16 .

| Month | Year | Cash Disbursements ** | Quarterly Fee Due | Check No. | Date Paid |
|-------|------|----------------------|-------------------|-----------|-----------|
| January | ____ $ | | | | |
| February | ____ | | | | |
| March | ____ | | | | |
| TOTAL 1st Quarter | $ | _____ $ | ____ | ____ | ____ |
| April | ____ $ | | | | |
| May | ____ | | | | |
| June | ____ | | | | |
| TOTAL 2nd Quarter | $ | _____ $ | ____ | ____ | ____ |
| July | 6838 $ | | | | |
| August | 1633.08 | | | | |
| September | | | | | |
| TOTAL 3rd Quarter | $ | _____ $ | ____ | ____ | ____ |
| October | ____ $ | | | | |
| November | ____ | | | | |
| December | ____ | | | | |
| TOTAL 4th Quarter | $ | _____ $ | ____ | ____ | ____ |

### FEE SCHEDULE (as of JANUARY 1, 2008)
Subject to changes that may occur to 28 U.S.C. §1930(a)(6)

| Quarterly Disbursements | Fee | Quarterly Disbursements | Fee |
|------------------------|-----|------------------------|-----|
| $0 to $14,999.................. | $325 | $1,000,000 to $1,999,999............. | $6,500 |
| $15,000 to $74,999.......... | $650 | $2,000,000 to $2,999,999............. | $9,750 |
| $75,000 to $149,999........ | $975 | $3,000,000 to $4,999,999............. | $10,400 |
| $150,000 to $224,999...... | $1,625 | $5,000,000 to $14,999,999 ........ | $13,000 |
| $225,000 to $299,999...... | $1,950 | $15,000,000 to $29,999,999.... | $20,000 |
| $300,000 to $999,999...... | $4,875 | $30,000,000 or more. | $30,000 |

\* This summary is to reflect the current calendar year's information cumulative to the end of the reporting period

\*\* Should agree with line 3, Form 2-B. Disbursements are net of transfers to other debtor in possession bank accounts

*Failure to pay the quarterly fee is cause for conversion or dismissal of the chapter 11 case. [11 U.S.C. Sec. 1112(b)(10)]*
*In addition, unpaid fees are considered a debt owed to the United States and will be assessed interest under 31 U.S.C. §3717*

Page 1 of 1
Rev. 12/10/2009

DEBTOR: TERRY + LYNETTE EVANSON          CASE NO: 13-19032 MER.

Form 2-G
NARRATIVE
For Period Ending 8/30/16

Please provide a brief description of any significant business and legal actions taken by the debtor, its creditors, or the court during the reporting period, any unusual or non-recurring accounting transactions that are reported in the financial statements, and any significant changes in the financial condition of the debtor which have occurred subsequent to the report date.

Page 1 of 1
Rev. 12/10/2009



Wells Fargo Online℠

## Account Activity

WELLS FARGO AT WORK(SM) CHECKING XXXXX3576

### Activity Summary

| | |
|---|---|
| Current Posted Balance | $11,978.07 |
| Pending Withdrawals/ Debits | -$106.00 |
| Pending Deposits/ Credits | $0.00 |
| **Available Balance** | **$11,872.07** |

The Available Balance shown above reflects the most up-to-date information available on your account. The balances shown below next to the last transaction of each day do not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when the transaction posted. If you had insufficient available funds when the transaction posted to your account, fees may have been assessed.

### Transactions

Show: for Date Range 08/01/16 to 08/31/16

| Date ↓ | Description | Deposits / Credits | Withdrawals / Debits | Ending Daily Balance |
|---|---|---|---|---|
| Pending Transactions | Note: Debit card transaction amounts may change | | | |
| No pending transactions meet your criteria above. | | | | |
| Posted Transactions | | | | |
| 08/31/16 | TRANSAMERICA INS INSPAYMENT 37LIA 0S41730069 EVANSON, TERRY AND LYN | | $107.19 | $10,770.39 |
| 08/31/16 | INTERNATIONAL PURCHASE TRANSACTION FEE | | $0.58 | |
| 08/31/16 | RECURRING PAYMENT INTL AUTHORIZED ON 08/30 UBER BV 866-576-1039 NL S086243470507468 CARD 4079 | | $19.57 | |
| 08/30/16 | PURCHASE AUTHORIZED ON 08/28 Grasshopper Sweets BOSTON MA S006241761671286 CARD 4079 | | $6.95 | $10,896.70 |
| 08/30/16 | PURCHASE AUTHORIZED ON 08/28 SOUTHWES 526250 800-435-9792 TX S166241445719921 CARD 4079 | | $40.00 | |
| 08/30/16 | PURCHASE AUTHORIZED ON 08/27 COLORADO BAGGAGE 1 LONE TREE CO S586240799568034 CARD 4079 | | $74.75 | |
| 08/29/16 | PURCHASE RETURN AUTHORIZED ON 08/27 SAMS Club LITTLETON SE CO P000000000046673469 CARD 7458 | $49.74 | | $11,018.41 |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/28 SBARRO E EAST BOSTON MA S366242051911677 CARD 4079 | | $9.39 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/28 STOP N FUEL EAST BOSTON MA S306241840217070 CARD 4079 | | $2.80 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/28 DOCK SQUARE PARKIN BOSTON MA S366241826036565 CARD 4079 | | $35.00 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/28 REVOLUTIONARY BOSTON 0 BOSTON MA P000000000554159685 CARD 4079 | | $15.95 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/27 SPROUTS FARMERS LONE TREE CO P00000000542650509 CARD 4079 | | $38.62 | |
| 08/29/16 | ATM WITHDRAWAL AUTHORIZED ON 08/27 8677 SO QUEBEC ST HIGHLANDS RAN CO 0007736 ATM ID 0638S CARD 4079 | | $200.00 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/27 KING SOOP 400 RED CEDA HIGHLANDS RAN CO P00000000144350994 CARD 7458 | | $27.09 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/27 ACE HIGHLANDS RANC HIGHLANDS RAN CO S306240765481019 CARD 7458 | | $29.96 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/27 SAMS CLUB #5634 LONE TREE CO S586240743519292 CARD 7458 | | $40.90 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/27 CORNER STORE 4051 AURORA CO S306240739647123 CARD 4079 | | $12.01 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/27 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000254980553 CARD 7458 | | $234.64 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/26 KNEADERS OF CASTLE CASTLE ROCK CO S466239956975414 CARD 4079 | | $7.55 | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/26 KIWK DRY CLEAN SUP PARKER CO S500239575450509 CARD 7458 | | $34.81 | |
| 08/29/16 | | | $128.20 | |

| Date ↓ | Description | Deposits / Credits | Withdrawals / Debits | Ending Daily Balance |
|---|---|---|---|---|
| | PURCHASE AUTHORIZED ON 08/24 TLF ASSOC WHOLESAL 303-4551234 CO S306257703313326 CARD 7458 | | | |
| 08/29/16 | eDeposit in Branch/Store 08/27/16 01:10:23 PM 9233 E LINCOLN AVE LONE TREE CO 4079 | $5,122.00 | | |
| 08/29/16 | PURCHASE AUTHORIZED ON 08/26 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000347082739 CARD 7458 | | $116.16 | $6,736.90 |
| 08/26/16 | PURCHASE AUTHORIZED ON 08/24 AMATO WHOLESALE FL DENVER CO S286257743768147 CARD 7458 | | $65.48 | |
| 08/25/16 | PURCHASE AUTHORIZED ON 08/25 WM SUPERC Wal-Mart Sup CASTLE ROCK CO P00000000145268499 CARD 7458 | | $44.85 | $6,924.54 |
| 08/25/16 | PURCHASE AUTHORIZED ON 08/25 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000646978063 CARD 4079 | | $18.01 | |
| 08/25/16 | PURCHASE AUTHORIZED ON 08/23 PEI WEI SALT LAKE CIT UT S386238813189890 CARD 4079 | | $7.70 | |
| 08/25/16 | PURCHASE AUTHORIZED ON 08/23 TAKE CARE HEALTH C HIGHLANDS RAN CO S466235593868808 CARD 7458 | | $25.00 | |
| 08/24/16 | PURCHASE AUTHORIZED ON 08/24 SPROUTS FARMERS LONE TREE CO P00000000554069705 CARD 7458 | | $15.77 | $7,020.10 |
| 08/24/16 | PURCHASE AUTHORIZED ON 08/24 WALGREENS STORE 9141 S HIGHLANDS RAN CO P00586237659565522 CARD 7458 | | $99.99 | |
| 08/24/16 | PURCHASE AUTHORIZED ON 08/22 LOCO 17 GAS FRUITA CO S466235813405046 CARD 4079 | | $23.81 | |
| 08/24/16 | PURCHASE AUTHORIZED ON 08/22 FREDDYS FROZEN CUS CASTLE ROCK CO S586235807953328 CARD 7458 | | $9.05 | |
| 08/24/16 | PURCHASE AUTHORIZED ON 08/22 ZARLINGOS AUTOMOTI GRAND JUNCTIO CO S306235781232690 CARD 4079 | | $113.72 | |
| 08/24/16 | eDeposit in Branch/Store 08/24/16 03:57:35 PM 9233 E LINCOLN AVE LONE TREE CO 3578 | $1,133.95 | | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/23 BIG 5 SPORTING GOODS 3 HIGHLANDS RAN CO P00000000043980749 CARD 7458 | | $22.03 | $6,148.26 |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/23 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000157149715 CARD 7458 | | $14.38 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/23 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000456608558 CARD 7458 | | $386.99 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/23 WM SUPERC Wal-Mart Sup HIGHLANDS RAN CO P00000000640479023 CARD 7458 | | $54.32 | |
| 08/23/16 | PURCHASE WITH CASH BACK $ 20.00 AUTHORIZED ON 08/23 WM SUPERC Wal-Mart Sup HIGHLANDS RAN CO P00000000143466497 CARD 7458 | | $76.24 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/23 WALGREENS STORE 9950 T HIGHLANDS RAN CO P00466235814350809 CARD 7458 | | $42.75 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/22 ARBYS 7214 GREEN RIVER UT S506236003699264 CARD 4079 | | $3.80 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/22 FRONTIER AI OZPLYR 720-3744389 CO S386235919825416 CARD 4079 | | $139.00 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/22 SAMS CLUB #6685 PROVO UT S156235962343920 CARD 4079 | | $20.94 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/22 SO *AUBERGINE & CO OREM UT S386235623422533 CARD 4079 | | $21.35 | |
| 08/23/16 | PURCHASE AUTHORIZED ON 08/21 QUIZNO'S FRUITA CO S986235082742737 CARD 4079 | | $7.01 | |
| 08/22/16 | HUMANA, INC. INS PYMT 160819 235174141002235 174157 | | $161.92 | $6,917.09 |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/22 SHELL Service Station GRAND JUNCTIO CO P00465235787609252 CARD 4079 | | $21.58 | |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/21 TSE 7 ELEVEN 726 HIGHLANDS RAN CO P00466234788530951 CARD 4079 | | $22.73 | |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/20 SAMSCLUB 6684 GAS LONE TREE CO S386235683270645 CARD 4079 | | $29.92 | |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/20 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000740126994 CARD 4079 | | $7.43 | |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/20 SAMS Club LITTLETON SE CO P00000000054974480 CARD 4079 | | $147.07 | |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/20 SAFEWAY STORE 1548 LITTLETON CO P00466235559392035 CARD 4079 | | $32.92 | |
| 08/22/16 | PURCHASE AUTHORIZED ON 08/19 KNEADERS PARKER CO S586232695977042 CARD 4079 | | $11.66 | |

Case:13-19032-MER Doc#:206 Filed:09/22/16 Entered:09/22/16 14:08:37 Page 13 of 15

Wells Fargo Account Activity

| Date ↓ | Description | Deposits / Credits | Withdrawals / Debits | Ending Daily Balance |
|---|---|---|---|---|
| 08/22/16 | PURCHASE AUTHORIZED ON 08/17 TLF ASSOC WHOLESAL 303-4551234 CO S586230544852877 CARD 7458 | | $266.33 | |
| 08/19/16 | PURCHASE AUTHORIZED ON 08/19 WALGREENS STORE 6850 T HIGHLANDS RAN CO P00306282841289246 CARD 4079 | | $121.29 | $7,618.85 |
| 08/19/16 | PURCHASE AUTHORIZED ON 08/19 KING SOOP 400 RED CEDA HIGHLANDS RAN CO P00000000044074750 CARD 7458 | | $55.21 | |
| 08/19/16 | PURCHASE AUTHORIZED ON 08/17 WESTSIDE TOWING IN 303-6885244 CO S386231071971059 CARD 4079 | | $126.00 | |
| 08/19/16 | PURCHASE AUTHORIZED ON 08/17 KIWK DRY CLEAN SUP PARKER CO S466230794250968 CARD 4079 | | $84.63 | |
| 08/19/16 | PURCHASE AUTHORIZED ON 08/17 AMATO WHOLESALE FL DENVER CO S086230596571224 CARD 7458 | | $387.85 | |
| 08/18/16 | INTEREST PAYMENT | $0.06 | | $8,374.03 |
| 08/18/16 | PURCHASE AUTHORIZED ON 08/17 SAMSCLUB #6634 LITTLETON SE CO S306230602009049 CARD 7458 | | $28.03 | |
| 08/17/16 | PURCHASE AUTHORIZED ON 08/17 SAM'S Club LITTLETON SE CO P000000008429748B1 CARD 7458 | | $53.21 | $8,402.01 |
| 08/17/16 | PURCHASE AUTHORIZED ON 08/16 FIRE BOWL CAFE ENGLEWOOD CO S386229631978884 CARD 4079 | | $22.04 | |
| 08/17/16 | PURCHASE AUTHORIZED ON 08/15 KNEADERS OF MERIDI ENGLEWOOD CO S306229646799956 CARD 4079 | | $13.63 | |
| 08/17/16 | SSA TREAS 310 XXSOC SEC 081715 XXXXX9483B SSA LYNETTE P EVANSON | $795.00 | | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/16 SAM'S Club LITTLETON SE CO P00000000043066773 CARD 7458 | | $276.91 | $7,695.69 |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/16 PARTY CITY 8481 S Yose Denver Park M CO P00586229677273319 CARD 7458 | | $53.55 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/16 THE HOME DEPOT #1508 LITTLETON CO P00306229657978246 CARD 7458 | | $36.62 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/18 SPROUTS FARMERS LONE TREE CO P00000000255516606 CARD 7458 | | $31.80 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/16 KING SOOP 56735. QUEBE HIGHLANDS RAN CO P00000000556773533 CARD 7458 | | $25.53 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/16 Wal-Mart Super Center HIGHLANDS RAN CO P00000000253419961 CARD 7458 | | $23.92 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/16 Wal-Mart Super Center HIGHLANDS RAN CO P00000000353003716 CARD 7458 | | $127.09 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/15 THE HOME DEPOT #1507 DENVER CO P00306229038203624 CARD 4079 | | $43.30 | |
| 08/16/16 | PURCHASE AUTHORIZED ON 08/15 SAMSCLUB #5634 LITTLETON SE CO S306228759297860 CARD 4079 | | $29.20 | |
| 08/16/16 | aDeposit in Branch/Store 06/16/16 11:25:11 AM 9233 E LINCOLN AVE LONE TREE CO 7458 | $1,090.00 | | |
| 08/15/16 | PURCHASE RETURN AUTHORIZED ON 08/15 THE HOME DEPOT #1507 DENVER CO P00306229030942168 CARD 4079 | $3.68 | | $7,283.81 |
| 08/15/16 | PURCHASE WITH CASH BACK $ 20.00 AUTHORIZED ON 08/15 THE HOME DEPOT #1508 LITTLETON CO P00306228765810157 CARD 4079 | | $26.81 | |
| 08/15/16 | ATM WITHDRAWAL AUTHORIZED ON 08/15 9233 E. LINCOLN AVE LITTLETON CO 0008655 ATM ID 9988S CARD 4079 | | $200.00 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/13 Wal-Mart Super Center HIGHLANDS RAN CO P00000000845149525 CARD 7458 | | $50.41 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/13 KIWK DRY CLEAN SUP PARKER CO S386226801243969 CARD 7458 | | $79.93 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/13 HOB-LOB #92 10901 S Pa Parker CO P00306225791205814 CARD 7458 | | $39.91 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/13 THE HOME DEPOT #1508 LITTLETON CO P00585226751022537 CARD 7458 | | $112.91 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/13 OUTBACK 0526 CASTLE ROCK CO S466226038508555 CARD 4079 | | $36.91 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/12 TLF ASSOC WHOLESAL 303-4551234 CO S585225727771058 CARD 7458 | | $175.69 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/12 TMG049 DENVER, CO GREENWOOD VIL CO S466225676245660 CARD 4079 | | $15.44 | |
| 08/15/16 | PURCHASE AUTHORIZED ON 08/12 Andrew P Hummell D Centennial CO S006226631066950 CARD 7458 | | $50.00 | |

| Date ↓ | Description | Deposits / Credits | Withdrawals / Debits | Ending Daily Balance |
|---|---|---|---|---|
| 08/12/16 | PURCHASE AUTHORIZED ON 08/11 SAMSCLUB 6634 GAS LONE TREE CO S465224686596321 CARD 7458 | | $34.03 | $8,060.24 |
| 08/12/16 | PURCHASE AUTHORIZED ON 08/11 BLACK EYED PEA CASTLE ROCK CO S466224018545596 CARD 4079 | | $23.94 | |
| 08/11/16 | PURCHASE AUTHORIZED ON 08/11 SAM'S Club LITTLETON SE CO P00000000953903485 CARD 7458 | | $123.83 | $8,108.21 |
| 08/10/16 | TRANSAMERICA INS INSPAYMENT 37LA 0842083752 EVANSON, LYNETTE DR TER | | $49.44 | $8,232.14 |
| 08/10/16 | PURCHASE AUTHORIZED ON 08/10 HOB-LOB #117 8181 S. Q. Centennial CO P00306223885993129 CARD 7458 | | $50.10 | |
| 08/10/16 | PURCHASE AUTHORIZED ON 08/10 THE HOME DEPOT #1506 LITTLETON CO P00398223810613903 CARD 7458 | | $11.19 | |
| 08/10/16 | PURCHASE AUTHORIZED ON 08/09 YA YA E FAVORMART 826-667-2238 CA S586222534907588 CARD 7458 | | $257.54 | |
| 08/10/16 | eDeposit in Branch/Store 08/10/16 04:37:54 PM 8677 S QUEBEC ST HIGHLANDS RANCH CO 4079 | $2,698.50 | | |
| 08/09/16 | PURCHASE AUTHORIZED ON 08/08 SAMSCLUB 6634 GAS LONE TREE CO S306221777300990 CARD 4079 | | $27.97 | $5,701.91 |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 TIRES PLUS 267039 LITTLETON CO P00466221774315054 CARD 4079 | | $125.90 | $5,729.88 |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/08 SAM'S Club LITTLETON SE CO P00000000050497109 CARD 7458 | | $332.16 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/08 SAFEWAY STORE 1548 LITTLETON CO P00306220171050699 CARD 7458 | | $39.76 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 KING SOOP 100 FOUNDERS CASTLE ROCK CO P00000000151593543 CARD 4079 | | $47.22 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 ACE HIGHLANDS RANCH HIGHLANDS RAN CO P00466219506656034 CARD 4079 | | $37.53 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 KING SOOP 5673S. QUEBE HIGHLANDS RAN CO P00000000160148961 CARD 4079 | | $86.79 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 SAMS CLUB SAM'S Club LITTLETON SE CO P00000000642647162 CARD 4079 | | $124.26 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 THE HOME DEPOT #1506 LITTLETON CO P00466219570990249 CARD 4079 | | $6.16 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/06 SPROUTS FARMERS LONE TREE CO P00000000545385810 CARD 4079 | | $17.94 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/05 IKEA CENTENNIAL CENTENNIAL CO S386218540862630 CARD 7458 | | $71.92 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/05 SAM'S CLUB #6634 LONE TREE CO S09621651079658B CARD 7458 | | $26.78 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/05 SKY RIDGE MEDICAL 615-344-2404 CO S306218584102994 CARD 4079 | | $95.00 | |
| 08/08/16 | PURCHASE AUTHORIZED ON 08/04 TLF ASSOC WHOLESAL 303-4551234 CO S306217567281049 CARD 7458 | | $228.78 | |
| 08/08/16 | eDeposit in Branch/Store 08/08/16 12:35:15 PM 9233 E LINCOLN AVE LONE TREE CO 3578 | $1,133.98 | | |
| 08/05/16 | SAFECO INSURANCE INS PREM 081016 71077376790 TERRY EVANSON | | $342.75 | $5,606.12 |
| 08/05/16 | WITHDRAWAL MADE IN A BRANCH/STORE | | $300.00 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/05 SPROUTS FARMERS LONE TREE CO P00000000541251676 CARD 7458 | | $49.06 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/05 SAFEWAY STORE 1548 LITTLETON CO P00566219012975460 CARD 7458 | | $70.73 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/05 SAFEWAY STORE 1548 LITTLETON CO P00466218750459653 CARD 4079 | | $3.45 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/05 RESTAURANT DEPOT GREENWOOD VIL CO P00498218579600154 CARD 7458 | | $126.83 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/05 SAM'S Club LITTLETON SE CO P00000000144806376 CARD 7458 | | $214.47 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/04 AMATO WHOLESALE FL DENVER CO S166217654961506 CARD 7458 | | $269.05 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/03 KNEADERS OF CASTLE CASTLE ROCK CO S586217014968626 CARD 4079 | | $9.16 | |
| 08/05/16 | PURCHASE AUTHORIZED ON 08/04 CV LINENS LINE 512-821-1176 TX S486216637795661 CARD 7458 | | $168.72 | |

Wells Fargo Account Activity

| Date | Description | Deposits / Credits | Withdrawals / Debits | Ending Daily Balance |
|---|---|---|---|---|
| 08/04/16 | CHECK # 152 | | $650.00 | $7,362.35 |
| 08/04/16 | PURCHASE AUTHORIZED ON 08/04 BEDBATH&BEYOND# 11435 PARKER CO P00366216017649353 CARD 7458 | | $34.55 | |
| 08/04/16 | eDeposit in Branch/Store 08/04/16 01:12:53 PM 8677 S QUEBEC ST HIGHLANDS RANCH CO 4079 | $2,965.50 | | |
| 08/03/16 | PURCHASE AUTHORIZED ON 08/03 SAM'S Club LITTLETON SE CO P00000000550170194 CARD 7458 | | $446.46 | $5,061.41 |
| 08/03/16 | PURCHASE AUTHORIZED ON 08/02 SAMSCLUB 6634 GAS LONE TREE CO S586215776052587 CARD 4079 | | $29.75 | |
| 08/03/16 | PURCHASE AUTHORIZED ON 08/02 YA YA E FAVORMART 626-667-2258 CA S306215691920285 CARD 7458 | | $109.97 | |
| 08/03/16 | PURCHASE AUTHORIZED ON 08/02 PHILLIPS 66 - TSE CASTLE PINES CO S586215565135522 CARD 4079 | | $3.45 | |
| 08/03/16 | PURCHASE AUTHORIZED ON 08/01 UROLOGY ASSOCIATES 303-733-8848 CO S586214712077300 CARD 4079 | | $50.00 | |
| 08/02/16 | CTL 8002441111 WEB 3037923202414 terryevanson@gmail.com | | $202.31 | $5,701.04 |
| 08/02/16 | PURCHASE AUTHORIZED ON 08/02 SAM'S Club LITTLETON SE CO P00000000246304685 CARD 7458 | | $236.54 | |
| 08/01/16 | DISH NETWORK DISH NTWRK 072816 9060370845 SPA EVANSON,TERRY | | $131.67 | $6,139.89 |
| 08/01/16 | TRANSAMERICA INS INSPAYMENT 37L/A 0941730069 EVANSON, TERRY AND LYN | | $137.19 | |
| 08/01/16 | Cash eWithdrawal in Branch/Store 08/01/2016 2:26 PM 9233 E LINCOLN AVE LONE TREE CO 4079 | | $360.00 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/31 HACIENDA COLORADO ENGLEWOOD CO S486213040042577 CARD 4079 | | $15.00 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/29 SAMS CLUB #6634 LONE TREE CO S206211656984645 CARD 7458 | | $34.18 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/29 LOAF N JUG #0011 CASTLE ROCK CO S00G211762891476 CARD 7458 | | $6.00 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/29 PSV*Strategic Inve 888-8982227 MD S306211708217609 CARD 4079 | | $97.00 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/28 KNEADERS OF MERIDI ENGLEWOOD CO S486210724697340 CARD 4079 | | $7.34 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/28 TLF ASSOC WHOLESAL 303-4551234 CO S486210632462510 CARD 7458 | | $198.72 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/28 COLORADO FABRICS LITTLETON CO S486210800108952 CARD 7458 | | $22.08 | |
| 08/01/16 | PURCHASE AUTHORIZED ON 07/28 JOSEPH A HUMMELL D Centennial CO S196216562886501 CARD 7458 | | $50.00 | |
| Totals | | $16,212.39 | $11,633.06 | |

Deposit products offered by Wells Fargo Bank, N.A. Member FDIC. Wells Fargo Bank, N.A. is a banking affiliate of Wells Fargo & Company.

⌂ Equal Housing Lender
© 1995 – 2016 Wells Fargo. All rights reserved.

## U.S. Bankruptcy Court
### District of Colorado (Denver)
### Bankruptcy Petition #: 13-19032-MER

*Date filed:* 05/28/2013
*Deadline for objecting to discharge:* 09/06/2013

*Assigned to:* Michael E. Romero
Chapter 11
Voluntary
Asset

**Debtor**
**Terry Lee Evanson**
10175 S Oneida St
Littleton, CO 80124-9608
DOUGLAS-CO
SSN / ITIN: xxx-xx-9483

represented by **Kevin D. Allen**
1600 Stout St.
Ste. 1100
Denver, CO 80202
( ) 303-534-4499
Email: kallen@allen-vellone.com
*TERMINATED: 06/18/2015*

**Mark A. Larson**
1600 Stout Street
Ste. 1100
Denver, CO 80202
303-534-4499
Fax : 303-893-8332
Email: mlarson@allen-
vellone.com
*TERMINATED: 06/18/2015*

**Ted H. Merriam**
1625 Broadway
Suite 770
Denver, CO 80202
303-592-5404
Fax : 303-592-5439

**Kevin A. Planegger**
Merriam Law Firm, P.C.
1625 Broadway
Suite 770
Denver, CO 80202
303-592-5404
Fax : 303-592-5439

**Tatiana G. Popacondria**
1600 Stout St.
Ste. 1100
Denver, CO 80202

303-534-4499
Fax : 303-893-8332
Email: tpopacondria@allen-
vellone.com
*TERMINATED: 06/18/2015*

**Jennifer Schlatter**
1600 Stout St., Ste. 1100
Denver, CO 80202
303-534-4499
Fax : 303-893-8332
Email: jschlatter@allen-
vellone.com
*TERMINATED: 06/18/2015*

**Patrick D. Vellone**
1600 Stout St.
Suite 1100
Denver, CO 80202
303-534-4499
Email: pvellone@allen-
vellone.com
*TERMINATED: 06/18/2015*

**David Wadsworth**
1660 Lincoln St.
Ste. 2200
Denver, CO 80264
303-296-1999
Fax : 303-296-7600
Email: dvw@sendwass.com

**Jeffrey Weinman**
730 17th St.
Ste. 240
Denver, CO 80202
( ) 303-572-1010
Email: jweinman@epitrustee.com

***Debtor***
**Lynette Pearce Evanson**
10175 S Oneida St
Littleton, CO 80124-9608
DOUGLAS-CO
SSN / ITIN: xxx-xx-5531

represented by **Kevin D. Allen**
(See above for address)
*TERMINATED: 06/18/2015*

**Mark A. Larson**
(See above for address)
*TERMINATED: 06/18/2015*

**Ted H. Merriam**
(See above for address)

Government
Exhibit 15

**Kevin A. Planegger**
(See above for address)

**Tatiana G. Popacondria**
(See above for address)
*TERMINATED: 06/18/2015*

**Jennifer Schlatter**
(See above for address)
*TERMINATED: 06/18/2015*

**Patrick D. Vellone**
(See above for address)
*TERMINATED: 06/18/2015*

**David Wadsworth**
(See above for address)

**Jeffrey Weinman**
(See above for address)

*U.S. Trustee*
**US Trustee, 11**
Byron G. Rogers Federal Building
1961 Stout St.
Ste. 12-200
Denver, CO 80294
303-312-7230

represented by **Alan K. Motes**
Byron G. Rogers Federal
Building
1961 Stout St.
Ste. 12-200
Denver, CO 80294
303-312-7999
Email: Alan.Motes@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 10/29/2016 | 219 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)218 Order on Application to Employ and Approve Retainer). No. of Notices: 4. Notice Date 10/29/2016. (Admin.) (Entered: 10/29/2016) |
| 10/26/2016 | 218 (1 pg) | Order Granting Application to Employ Sender Wasserman Wadsworth, P.C. as Special Counsel And Approve Retainer in the Amount of $ 5000.00. (related document(s):210 Application to Employ and Approve Retainer). (rxc) (Entered: 10/27/2016) |
| 10/25/2016 | 217 (2 pgs) | Certificate of Non-Contested Matter Filed by David Wadsworth on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):210 |

| | | |
|---|---|---|
| | | Application to Employ and Approve Retainer). (Wadsworth, David) (Entered: 10/25/2016) |
| 10/08/2016 | 216 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)215 Order on Motion to Continue/Reschedule Hearing). No. of Notices: 4. Notice Date 10/08/2016. (Admin.) (Entered: 10/08/2016) |
| 10/06/2016 | 215 (1 pg) | Order Granting Motion To Continue/Reschedule Hearing (related document(s):158 Motion to Dismiss Case, 180 Motion to Dismiss Case). Evidentiary Hearing to be held on 11/21/2016 at 01:30 PM for 158 and for 180, . (rxc) (Entered: 10/06/2016) |
| 10/04/2016 | 214 (2 pgs) | Statement regarding Uncontested Facts Filed by Alan K. Motes on behalf of US Trustee 11 (related document(s):207 Order Setting Hearing). (Motes, Alan) (Entered: 10/04/2016) |
| 10/04/2016 | 213 (5 pgs) | List of Witnesses and Exhibits Filed by Alan K. Motes on behalf of US Trustee 11 (related document (s):207 Order Setting Hearing). (Motes, Alan) (Entered: 10/04/2016) |
| 10/03/2016 | 212 (5 pgs) | Certificate of Service Filed by David Wadsworth on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):210 Application to Employ and Approve Retainer, 211 9013-1.1 Notice). (Wadsworth, David) (Entered: 10/03/2016) |
| 10/03/2016 | 211 (1 pg) | 9013-1.1 Notice Filed by David Wadsworth on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):210 Application to Employ and Approve Retainer).. 9013 Objections due by 10/24/2016 for 210,. (Wadsworth, David) (Entered: 10/03/2016) |
| 10/03/2016 | 210 (5 pgs; 3 docs) | Application to Employ Sender Wasserman Wadsworth, P.C. as Special Counsel for the Debtors-in-Possession and Approve Retainer in the Amount of $ $5,000.00. Filed by David Wadsworth on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Exhibit 1 # 2 Proposed/Unsigned Order) (Wadsworth, David) (Entered: 10/03/2016) |
| 09/30/2016 | 209 (4 pgs; 2 docs) | Unopposed Motion to Continue Hearing Filed by David Wadsworth on behalf of Lynette Pearce |

| | | |
|---|---|---|
| | | Evanson, Terry Lee Evanson (related document(s) 207 Order Setting Hearing). (Attachments: # 1 Proposed/Unsigned Order) (Wadsworth, David) (Entered: 09/30/2016) |
| 09/29/2016 | 208 (4 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)207 Order Setting Hearing). No. of Notices: 4. Notice Date 09/29/2016. (Admin.) (Entered: 09/29/2016) |
| 09/27/2016 | 207 (3 pgs) | Order Setting Hearing RE: ORDER AND NOTICE OF EVIDENTIARY HEARING (related document (s)158 Motion to Dismiss Case, 180 Motion to Dismiss Case, 204 Minutes of Proceedings/Minute Order). Notice Of Evidentiary Hearing to be held on 10/18/2016 at 09:00 AM Courtroom C for 204 and for 158 and for 180, . Witnesses and Exhibits due by 10/4/2016 for 204 and for 158 and for 180, (cag) (Entered: 09/27/2016) |
| 09/22/2016 | 206 (15 pgs) | Report of Operations From 8/1/16 To 8/31/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 09/22/2016) |
| 09/16/2016 | 205 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)204 Minutes of Proceedings/Minute Order). No. of Notices: 3. Notice Date 09/16/2016. (Admin.) (Entered: 09/16/2016) |
| 09/13/2016 | 204 (1 pg) | Minutes of Proceedings: This matter is set for hearing on Tuesday, October 18, 2016, at 9:00 a.m. A separate notice of hearing and scheduling order will enter.(related document(s)158 Motion to Dismiss Case, 180 Motion to Dismiss Case). (cag) (Entered: 09/14/2016) |
| 08/15/2016 | 203 (3 pgs) | Joint Status Report Filed by Alan K. Motes on behalf of US Trustee 11 (related document(s):189 7016 Scheduling Order). (Motes, Alan) (Entered: 08/15/2016) |
| 07/30/2016 | 202 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)201 Notice of Hearing). No. of Notices: 3. Notice Date 07/30/2016. (Admin.) (Entered: 07/30/2016) |
| | | |

| | | |
|---|---|---|
| 07/28/2016 | <u>201</u><br>(1 pg) | Notice of Continued Hearing RE: (related document (s)<u>158</u> Motion to Dismiss Case, <u>180</u> Motion to Dismiss Case). Status and Scheduling conference Hearing to be held on 9/13/2016 at 10:30 AM Courtroom C for <u>158</u> and for <u>180</u>, . (cag) (Entered: 07/28/2016) |
| 07/22/2016 | <u>200</u><br>(13 pgs) | Report of Operations From 6/1/16 To 6/30/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 07/22/2016) |
| 07/17/2016 | <u>199</u><br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>198</u> Notice of Hearing). No. of Notices: 1. Notice Date 07/17/2016. (Admin.) (Entered: 07/17/2016) |
| 07/15/2016 | <u>198</u><br>(1 pg) | Notice of Continued Hearing RE: (related document (s)<u>158</u> Motion to Dismiss Case, <u>180</u> Motion to Dismiss Case). Status and Scheduling Conference Hearing to be held on 8/29/2016 at 01:30 PM Courtroom C for <u>158</u> and for <u>180</u>, . (cag) (Entered: 07/15/2016) |
| 06/08/2016 | <u>197</u><br>(14 pgs) | Report of Operations From 5/1/16 To 5/31/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 06/08/2016) |
| 06/07/2016 | | This is to advise you that a change of address has been received from attorney Kenneth J. Buechler on 6/6/16. In order to comply fully with Local Bankruptcy Rule 9010-1(a)(2), the attorney must file and serve a separate Notice of Change of Address in each pending case or proceeding in which the attorney has previously entered an appearance. Unless the attorney has been terminated from the case. (rjr) (Entered: 06/07/2016) |
| 06/07/2016 | <u>196</u><br>(2 pgs) | Notice to Take Deposition of Lynette Pearce Evanson Filed by Alan K. Motes on behalf of US Trustee 11... (Motes, Alan) (Entered: 06/07/2016) |
| 06/07/2016 | <u>195</u><br>(2 pgs) | Notice to Take Deposition of Terry Lee Evanson Filed by Alan K. Motes on behalf of US Trustee 11... (Motes, Alan) (Entered: 06/07/2016) |
| 05/19/2016 | | |

| | | |
|---|---|---|
| | [194](#)<br>(14 pgs) | Report of Operations From 4/1/16 To 4/30/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 05/19/2016) |
| 05/19/2016 | [193](#)<br>(13 pgs) | Report of Operations From 3/1/16 To 3/31/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 05/19/2016) |
| 05/03/2016 | [192](#)<br>(1 pg) | Certificate of Service Filed by Alan K. Motes on behalf of US Trustee 11 (related document(s):[158](#) Motion to Dismiss Case). (Motes, Alan) (Entered: 05/03/2016) |
| 04/14/2016 | [191](#)<br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)[189](#) 7016 Scheduling Order). No. of Notices: 2. Notice Date 04/14/2016. (Admin.) (Entered: 04/14/2016) |
| 04/14/2016 | [190](#)<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)[188](#) Minutes of Proceedings/Minute Order). No. of Notices: 3. Notice Date 04/14/2016. (Admin.) (Entered: 04/14/2016) |
| 04/12/2016 | [189](#)<br>(2 pgs) | 7016 Scheduling Order RE: (related document(s)[158](#) Motion to Dismiss Case, [180](#) Motion to Dismiss Case). Discovery due by 7/11/2016 for [158](#) and for [180](#), Pre-Trial Conference to be held on 8/22/2016 at 01:30 PM for [158](#) and for [180](#), . Status Report due by 8/15/2016 for [158](#) and for [180](#), (cag) (Entered: 04/12/2016) |
| 04/11/2016 | [188](#)<br>(1 pg) | Minutes of Proceedings: Orders:As set forth on the record, the parties requested a discovery schedule for this matter. The Court will issue a separate order scheduling the deadlines discussed on the record. (related document(s)[158](#) Motion to Dismiss Case, [180](#) Motion to Dismiss Case). (cag) (Entered: 04/12/2016) |
| 03/31/2016 | [187](#)<br>(13 pgs) | Report of Operations From 2/1/16 To 2/29/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 03/31/2016) |
| 03/23/2016 | | |

| | <u>186</u><br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>184</u> Notice of Hearing). No. of Notices: 3. Notice Date 03/23/2016. (Admin.) (Entered: 03/23/2016) |
| 03/23/2016 | <u>185</u><br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>183</u> Notice of Hearing). No. of Notices: 3. Notice Date 03/23/2016. (Admin.) (Entered: 03/23/2016) |
| 03/18/2016 | <u>184</u><br>(1 pg) | Amended Notice of Preliminary Hearing RE: (related document(s)<u>158</u> Motion to Dismiss Case, <u>177</u> Objection, <u>180</u> Motion to Dismiss Case, <u>182</u> Objection). Hearing to be held on 4/11/2016 at 01:30 PM for <u>177</u> and for <u>182</u> and for <u>158</u> and for <u>180</u>, (cag) (Entered: 03/21/2016) |
| 03/18/2016 | <u>183</u><br>(1 pg) | Notice of Preliminary Hearing RE: (related document(s)<u>158</u> Motion to Dismiss Case, <u>177</u> Objection, <u>180</u> Motion to Dismiss Case, <u>182</u> Objection). Hearing to be held on 4/11/2016 at 01:30 PM for <u>177</u> and for <u>182</u> and for <u>158</u> and for <u>180</u>, . (cag) (Entered: 03/21/2016) |
| 03/17/2016 | <u>182</u><br>(2 pgs) | Objection Filed by Alan K. Motes on behalf of US Trustee 11 (related document(s):<u>180</u> Motion to Dismiss Case). (Motes, Alan) (Entered: 03/17/2016) |
| 02/25/2016 | <u>181</u><br>(5 pgs; 2 docs) | 9013-1.1 Notice Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>180</u> Motion to Dismiss Case).. 9013 Objections due by 3/17/2016 for <u>180</u>,. (Attachments: # <u>1</u> Certificate of Service) (Weinman, Jeffrey) (Entered: 02/25/2016) |
| 02/25/2016 | <u>180</u><br>(4 pgs; 2 docs) | Motion to Dismiss Case For Other Reasons Resolved Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # <u>1</u> Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 02/25/2016) |
| 02/23/2016 | <u>179</u><br>(13 pgs) | Report of Operations From 1/1/16 To 1/31/16 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 02/23/2016) |
| 02/11/2016 | <u>178</u><br>(3 pgs) | Certificate of Contested Matter Filed by Alan K. Motes on behalf of US Trustee 11 (related document |

| | | |
|---|---|---|
| | | (s):158 Motion to Dismiss Case, 177 Objection). (Motes, Alan) (Entered: 02/11/2016) |
| 02/08/2016 | 177 (3 pgs) | Objection Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):158 Motion to Dismiss Case). (Weinman, Jeffrey) (Entered: 02/08/2016) |
| 02/04/2016 | 176 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)174 Order on Motion to Extend Time). No. of Notices: 3. Notice Date 02/04/2016. (Admin.) (Entered: 02/04/2016) |
| 02/04/2016 | 175 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)173 Other Order). No. of Notices: 3. Notice Date 02/04/2016. (Admin.) (Entered: 02/04/2016) |
| 02/02/2016 | 174 (1 pg) | Order Granting Motion to Extend Time (related document(s):172 Motion to Extend Time (Bankruptcy)). Objections to the Motion to Dismiss or ConvertChapter 11 Case due by 2/8/2016 for 172, (cag) (Entered: 02/02/2016) |
| 02/02/2016 | 173 (1 pg) | Order Denying Motion (related document(s):160 Other Motion). (cag) (Entered: 02/02/2016) |
| 02/01/2016 | 172 (4 pgs; 2 docs) | Unopposed Motion to Extend Time Due To Other Reasons To Object to Motion to Dismiss or Convert Chapter 11 Case Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s)158 Motion to Dismiss Case, 170 Order on Motion to Extend Time). (Attachments: # 1 Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 02/01/2016) |
| 01/28/2016 | 171 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)170 Order on Motion to Extend Time). No. of Notices: 1. Notice Date 01/28/2016. (Admin.) (Entered: 01/28/2016) |
| 01/26/2016 | 170 (1 pg) | Order Granting Motion to Extend Time (related document(s):158 Motion to Dismiss Case, 169 Motion to Extend Time (Bankruptcy)). Objections due by 2/1/2016 for 158, (cag) (Entered: 01/26/2016) |
| 01/25/2016 | 169 (4 pgs; 2 docs) | Unopposed Motion to Extend Time Due To Other Reasons To Object to Motion to Dismiss Or Convert |

| | | Chapter 11 Case Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s)158 Motion to Dismiss Case, 163 Motion to Extend Time (Bankruptcy), 164 Order on Motion to Extend Time). (Attachments: # 1 Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 01/25/2016) |
|---|---|---|
| 01/22/2016 | 168 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)167 Order to File). No. of Notices: 1. Notice Date 01/22/2016. (Admin.) (Entered: 01/22/2016) |
| 01/19/2016 | 167 (1 pg) | Order for Lynette Pearce Evanson , Terry Lee Evanson To File Certificate Of Service on the Motion (related document(s)160 Other Motion). Certificate Of Service due by 1/26/2016 for 160, (cag) (Entered: 01/20/2016) |
| 01/12/2016 | 166 (13 pgs) | Report of Operations From 12/1/15 To 12/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 01/12/2016) |
| 01/08/2016 | 165 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)164 Order on Motion to Extend Time). No. of Notices: 4. Notice Date 01/08/2016. (Admin.) (Entered: 01/08/2016) |
| 01/06/2016 | 164 (1 pg) | Order Granting Motion to Extend Time (related document(s):163 Motion to Extend Time (Bankruptcy)). Objections due by 1/25/2016 for 163, (cag) (Entered: 01/06/2016) |
| 01/04/2016 | 163 (4 pgs; 2 docs) | Unopposed Motion to Extend Time Due To Other Reasons To Object to United States Trustee's Motion to Dismiss or Convert Chapter 11 Case Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s) 158 Motion to Dismiss Case). (Attachments: # 1 Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 01/04/2016) |
| 12/23/2015 | 162 (12 pgs) | Report of Operations From 11/1/15 To 11/30/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 12/23/2015) |
| | | |

| 12/10/2015 | 161<br>(5 pgs) | Courts Notice and BNC Certificate of Mailing 9013-1.1 Notice Re: Dismiss/Convert 11/UST (related document(s)159 9013-1.1 Notice). No. of Notices: 33. Notice Date 12/10/2015. (Admin.) (Entered: 12/10/2015) |
| 12/08/2015 | 160<br>(7 pgs) | Motion For: Please See Attached Motion for further details. Filed by Kevin A. Planegger on behalf of Lynette Pearce Evanson , Terry Lee Evanson . (cag) (Entered: 12/09/2015) |
| 12/08/2015 | 159<br>(3 pgs) | 9013-1.1 Notice Re: Dismiss Chapter 11 Case or Convert Chapter 11 to Chapter 7 Filed by Alan K. Motes on behalf of US Trustee 11 (related document (s):158 Motion to Dismiss Case).. 9013 Objections due by 1/5/2016 for 158,. (Motes, Alan) (Entered: 12/08/2015) |
| 12/08/2015 | 158<br>(6 pgs; 2 docs) | Motion to Dismiss Case For Other Reasons Substantial and Continuing Loss and Failure to Pursue Timely Confirmation of Plan Filed by Alan K. Motes on behalf of US Trustee 11. (Attachments: # 1 Proposed/Unsigned Order) (Motes, Alan) (Entered: 12/08/2015) |
| 12/02/2015 | 157<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Kevin A. Planegger , Ted H. Merriam on behalf of Lynette Pearce Evanson , Terry Lee Evanson .. . (cag) (Entered: 12/03/2015) |
| 11/19/2015 | 156<br>(12 pgs) | Report of Operations From 10/1/15 To 10/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 11/19/2015) |
| 10/16/2015 | 155<br>(12 pgs) | Report of Operations From 9/1/15 To 9/30/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 10/16/2015) |
| 09/16/2015 | 154<br>(13 pgs) | Report of Operations From 8/1/15 To 8/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 09/16/2015) |
| 08/21/2015 | 153<br>(13 pgs) | Report of Operations From 7/1/15 To 7/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce |

| | | |
|---|---|---|
| | | Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 08/21/2015) |
| 07/20/2015 | 152 (13 pgs) | Report of Operations From 6/1/15 To 6/30/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 07/20/2015) |
| 06/20/2015 | 151 (3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)150 Order on Motion to Withdraw as Attorney). No. of Notices: 3. Notice Date 06/20/2015. (Admin.) (Entered: 06/20/2015) |
| 06/18/2015 | 150 (1 pg) | Order Granting Motion To Withdraw As Attorney (related document(s):139 Motion to Withdraw as Attorney). (jtm) (Entered: 06/18/2015) |
| 06/12/2015 | 149 (2 pgs) | Amended Certificate of Non-Contested Matter Filed by Patrick D. Vellone on behalf of Allen & Vellone, P.C. (related document(s):139 Motion to Withdraw as Attorney). (Vellone, Patrick) (Entered: 06/12/2015) |
| 06/08/2015 | 148 (13 pgs) | Report of Operations From 5/1/15 To 5/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 06/08/2015) |
| 06/06/2015 | 147 (3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)146 Order on Motion to Approve). No. of Notices: 3. Notice Date 06/06/2015. (Admin.) (Entered: 06/06/2015) |
| 06/04/2015 | 146 (1 pg) | Order Granting Motion to Approve (related document(s):137 Motion to Approve). (jtm) (Entered: 06/04/2015) |
| 06/01/2015 | 145 (2 pgs) | Certificate of Non-Contested Matter Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):137 Motion to Approve). (Weinman, Jeffrey) (Entered: 06/01/2015) |
| 05/24/2015 | 144 (3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)143 Order on Application to Employ). No. of Notices: 3. Notice Date 05/24/2015. (Admin.) (Entered: 05/24/2015) |

| 05/22/2015 | <u>143</u><br>(1 pg) | Order Granting Application to Employ Kevin A Planegger (related document(s):<u>142</u> Application to Employ). (rxc) (Entered: 05/22/2015) |
|---|---|---|
| 05/21/2015 | <u>142</u><br>(6 pgs; 3 docs) | Application to Employ Merriam Law Firm, P.C. as Special Counsel for Debtors-in-Possession Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # <u>1</u> Affidavit # <u>2</u> Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 05/21/2015) |
| 05/21/2015 | <u>141</u><br>(13 pgs) | Report of Operations From 4/1/15 To 4/30/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 05/21/2015) |
| 05/04/2015 | <u>140</u><br>(7 pgs; 2 docs) | 9013-1.1 Notice Filed by Patrick D. Vellone on behalf of Patrick D. Vellone (related document (s):<u>139</u> Motion to Withdraw as Attorney).. 9013 Objections due by 5/19/2015 for <u>139</u>,. (Attachments: # <u>1</u> Certificate of Service) (Vellone, Patrick) (Entered: 05/04/2015) |
| 05/04/2015 | <u>139</u><br>(4 pgs; 2 docs) | Motion to Withdraw as Attorney of Record Filed by Patrick D. Vellone on behalf of Patrick D. Vellone. (Attachments: # <u>1</u> Proposed/Unsigned Order) (Vellone, Patrick) (Entered: 05/04/2015) |
| 05/04/2015 | <u>138</u><br>(6 pgs; 2 docs) | 9013-1.1 Notice Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>137</u> Motion to Approve).. 9013 Objections due by 5/26/2015 for <u>137</u>,. (Attachments: # <u>1</u> Certificate of Service) (Weinman, Jeffrey) (Entered: 05/04/2015) |
| 05/04/2015 | <u>137</u><br>(17 pgs; 3 docs) | Motion to Approve Settlement Agreement and Mutual Release Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 05/04/2015) |
| 04/22/2015 | <u>136</u><br>(13 pgs) | Report of Operations From 3/1/15 To 3/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 04/22/2015) |
| 03/23/2015 | <u>135</u><br>(12 pgs) | Report of Operations From 2/1/15 To 2/28/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce |

| | | Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 03/23/2015) |
|---|---|---|
| 02/11/2015 | [134](#) (13 pgs) | Report of Operations From 1/1/15 To 1/31/15 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 02/11/2015) |
| 02/11/2015 | [133](#) (2 pgs) | Notice of Change of Address For the United States Trustee and Attorney for the United States Trustee Filed by Alan K. Motes on behalf of US Trustee 11. (Motes, Alan) (Entered: 02/11/2015) |
| 01/30/2015 | | This is to advise you that a change of address has been received from attorney Alan K. Motes on 1/30/15. In order to comply fully with Local Bankruptcy Rule 9010-1(a)(2), the attorney must file and serve a separate Notice of Change of Address in each pending case or proceeding in which the attorney has previously entered an appearance. Unless the attorney has been terminated from the case . (rjr) (Entered: 01/30/2015) |
| 01/21/2015 | [132](#) (13 pgs) | Report of Operations From 12/1/14 To 12/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 01/21/2015) |
| 01/06/2015 | | This is to advise you that a change of address has been received from attorney Douglas D. Koktavy on 1/5/15. In order to comply fully with Local Bankruptcy Rule 9010-1(a)(2), the attorney must file and serve a separate Notice of Change of Address in each pending case or proceeding in which the attorney has previously entered an appearance. Unless the attorney has been terminated from the case . (rjr) (Entered: 01/06/2015) |
| 12/22/2014 | [131](#) (13 pgs) | Report of Operations From 11/1/14 To 11/30/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 12/22/2014) |
| 11/19/2014 | [130](#) (13 pgs) | Report of Operations From 10/1/14 To 10/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 11/19/2014) |

| 11/09/2014 | 129<br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)128 Order on Motion to Approve). No. of Notices: 2. Notice Date 11/09/2014. (Admin.) (Entered: 11/09/2014) |
| 11/07/2014 | 128<br>(1 pg) | Order Granting Motion to Approve (related document(s):124 Motion to Approve). (jtm) (Entered: 11/07/2014) |
| 11/05/2014 | 127<br>(2 pgs) | Certificate of Non-Contested Matter Filed by Mark A. Larson on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):124 Motion to Approve). (Larson, Mark) (Entered: 11/05/2014) |
| 10/13/2014 | 126<br>(13 pgs) | Report of Operations From 9/1/14 To 9/30/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 10/13/2014) |
| 10/09/2014 | 125<br>(7 pgs; 2 docs) | 9013-1.1 Notice Filed by Mark A. Larson on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):124 Motion to Approve).. 9013 Objections due by 10/30/2014 for 124,. (Attachments: # 1 Certificate of Service) (Larson, Mark) (Entered: 10/09/2014) |
| 10/09/2014 | 124<br>(12 pgs; 3 docs) | Motion to Approve Joint Stipulation and Agreement for Settlement Between Discover Bank and Lynette Pearce Evanson Filed by Mark A. Larson on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Exhibit # 2 Proposed/Unsigned Order) (Larson, Mark) (Entered: 10/09/2014) |
| 09/15/2014 | 123<br>(13 pgs) | Report of Operations From 8/1/14 To 8/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 09/15/2014) |
| 09/10/2014 | 122 | Receipt of Claimant's Notice of Assignment/Transfer of Claim(13-19032-MER) [claimant,nasscl] ( 25.00) Filing Fee. Receipt number 20889043. Fee amount 25.00 (U.S. Treasury) (Entered: 09/10/2014) |
| 09/10/2014 | 121<br>(7 pgs; 3 docs) | Notice of Assignment/Transfer of Claim Number 17 With Waiver Transfer Agreement 3001 (e) 2 Transferor: US Bank (Claim No. 17) To NTL Capital, LLC. c/o Hidden Oak Group,Inc.. Fee Amount $25.. (Attachments: # 1 Exhibit Bill of Sale |

| | | |
|---|---|---|
| | | # 2 Exhibit Agreement) (Hidden Oak Group, Inc., ) (Entered: 09/10/2014) |
| 08/21/2014 | 120 (12 pgs) | Report of Operations From 7/1/14 To 7/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 08/21/2014) |
| 07/09/2014 | 119 (14 pgs) | Report of Operations From 6/1/14 To 6/30/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 07/09/2014) |
| 06/20/2014 | 118 (2 pgs) | Notice of Withdrawal of Claim Number 10. Filed by Diane A. Holbert ... . (jss) (Entered: 06/20/2014) |
| 06/17/2014 | 117 (13 pgs) | Report of Operations From 5/1/14 To 5/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 06/17/2014) |
| 05/22/2014 | | This is to advise you that a change of address has been received from attorney Douglas D. Koktavy in 5/21/2014. In order to comply fully with Local Bankruptcy Rule 9010-1(a)(2), the attorney must file and serve a separate Notice of Change of Address in each pending case or proceeding in which the attorney has previously entered an appearance. Unless the attorney has been terminated from the case . (rjr) (Entered: 05/22/2014) |
| 05/12/2014 | 116 (13 pgs) | Report of Operations From 4/1/14 To 4/30/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 05/12/2014) |
| 04/22/2014 | 115 (16 pgs) | Report of Operations From 3/1/14 To 3/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 04/22/2014) |
| 03/20/2014 | 114 (2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)113 Order on Application for Compensation). No. of Notices: 2. Notice Date 03/20/2014. (Admin.) (Entered: 03/20/2014) |
| 03/18/2014 | | |

| | | |
|---|---|---|
| | [113](#)<br>(1 pg) | Order Granting Application For Compensation for Mark A. Larson, Fees awarded: $26238.50, Expenses awarded: $600.20 (related document(s)[107](#) Application for Compensation). (jtm) (Entered: 03/18/2014) |
| 03/18/2014 | [112](#)<br>(16 pgs) | Report of Operations From 2/1/14 To 2/28/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 03/18/2014) |
| 03/18/2014 | [111](#)<br>(2 pgs) | Certificate of Non-Contested Matter Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):[107](#) Application for Compensation). (Vellone, Patrick) (Entered: 03/18/2014) |
| 02/21/2014 | [110](#)<br>(8 pgs) | Exhibits A-D Filed by Mark A. Larson on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):[107](#) Application for Compensation, [108](#) 9013-1.1 Notice, [109](#) Certificate of Service). (Larson, Mark) (Entered: 02/21/2014) |
| 02/21/2014 | [109](#)<br>(5 pgs) | Certificate of Service Filed by Mark A. Larson on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):[107](#) Application for Compensation, [108](#) 9013-1.1 Notice). (Larson, Mark) (Entered: 02/21/2014) |
| 02/21/2014 | [108](#)<br>(1 pg) | 9013-1.1 Notice Filed by Mark A. Larson on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):[107](#) Application for Compensation).. 9013 Objections due by 3/14/2014 for [107](#),. (Larson, Mark) (Entered: 02/21/2014) |
| 02/21/2014 | [107](#)<br>(9 pgs; 3 docs) | First Application for Compensation for Mark A. Larson, Special Counsel, Period: 5/28/2013 to 1/31/2014, Fees Requested: $26,238.50, Expenses Requested: $600.20. Filed by Mark A. Larson. (Attachments: # [1](#) Other Cover Sheet) (Larson, Mark) Additional attachment(s) Proposed Order added on 2/21/2014 (cc). **Modified on 2/21/2014 (cc).** (Entered: 02/21/2014) |
| 02/17/2014 | [106](#)<br>(13 pgs) | Report of Operations From 1/1/14 To 1/31/14 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 02/17/2014) |

| | | |
|---|---|---|
| 02/11/2014 | <u>105</u><br>(9 pgs) | Amended Schedules G, H, I and J Pursuant to Request of U.S. Trustee. Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>21</u> Statement of Financial Affairs and Schedules). (Weinman, Jeffrey) (Entered: 02/11/2014) |
| 02/11/2014 | 104 | Receipt of Amended Schedules D, E or F and Amended List of Creditors-Fee Required(13-19032-MER) [misc,amdschfe] ( 30.00) Filing Fee. Receipt number 19830784. Fee amount 30.00 (U.S. Treasury) (Entered: 02/11/2014) |
| 02/11/2014 | <u>103</u><br>(8 pgs) | Amended Schedules D, E and F Pursuant to Request of U.S. Trustee And Amendment to List of Creditors. Total Number of Creditors Added:0. Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document (s):<u>21</u> Statement of Financial Affairs and Schedules). (Weinman, Jeffrey) (Entered: 02/11/2014) |
| 02/11/2014 | <u>102</u><br>(2 pgs) | Amended Schedules C to Amend Exemptions and Amounts. Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>21</u> Statement of Financial Affairs and Schedules). (Weinman, Jeffrey) (Entered: 02/11/2014) |
| 02/11/2014 | <u>101</u><br>(4 pgs) | Amended Schedules B to Amend Values of Personal Property. Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>21</u> Statement of Financial Affairs and Schedules). (Weinman, Jeffrey) (Entered: 02/11/2014) |
| 02/11/2014 | <u>100</u><br>(7 pgs) | Amended Statement of Financial Affairs Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document (s):<u>21</u> Statement of Financial Affairs and Schedules). (Weinman, Jeffrey) (Entered: 02/11/2014) |
| 01/20/2014 | <u>99</u><br>(14 pgs) | Report of Operations From 12/1/13 To 12/31/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 01/20/2014) |
| 01/02/2014 | | |

| | | |
|---|---|---|
| | 98<br>(10 pgs; 2 docs) | Notice Re: Continuance of Civil Trial. Filed by Heather S. Cleary on behalf of Command Center, Inc.... (Attachments: # 1 Exhibit Notice of Jury Trial) (Cleary, Heather) (Entered: 01/02/2014) |
| 12/19/2013 | 97<br>(13 pgs) | Report of Operations From 11/1/13 To 11/30/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 12/19/2013) |
| 11/19/2013 | 96<br>(13 pgs) | Amended Report of Operations From 10/1/13 To 10/31/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 11/19/2013) |
| 11/12/2013 | 95<br>(10 pgs) | Report of Operations From 10/1/13 To 10/31/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 11/12/2013) |
| 10/28/2013 | 94<br>(14 pgs) | Report of Operations From 9/1/13 To 9/30/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 10/28/2013) |
| 10/19/2013 | 93<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)92 Order on Motion to Extend Time). No. of Notices: 2. Notice Date 10/19/2013. (Admin.) (Entered: 10/19/2013) |
| 10/17/2013 | 92<br>(1 pg) | Order Granting Motion to Extend Time (related document(s):75 Motion to Extend Time (Bankruptcy)). Chapter 11 Plan due by 1/23/2014 for 75, (cc) (Entered: 10/17/2013) |
| 10/14/2013 | 91<br>(2 pgs) | Certificate of Non-Contested Matter Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):75 Motion to Extend Time (Bankruptcy)). (Weinman, Jeffrey) (Entered: 10/14/2013) |
| 10/13/2013 | 90<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)88 Minutes of Proceedings/Minute Order). No. of Notices: 2. Notice Date 10/13/2013. (Admin.) (Entered: 10/13/2013) |
| 10/12/2013 | | |

| | 89<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)87 Order on Motion For Relief From Stay). No. of Notices: 2. Notice Date 10/12/2013. (Admin.) (Entered: 10/12/2013) |
|---|---|---|
| 10/11/2013 | 88<br>(1 pg) | Minute Order : As set forth on the Record, the Court granted the Debtors Motion for Protective Order (Docket No. 85) prohibiting Command Center from conducting the Rule 2004 examinations of the Debtors until after March 31, 2014. The Court sua sponte entered a protective order against the Debtors from conducting the Rule 2004 examination of Command Center until after March 31,2014 as well. These three 2004 examinations may not proceed until after conclusion of trial (or final resolution) in the state court action pending before the Denver County District Court, Case No. 2010CV4135. (related document(s)60 Motion for Examination, 85 Motion for Protective Order). (cc) (Entered: 10/11/2013) |
| 10/10/2013 | 87<br>(1 pg) | Order Granting Motion For Relief From Stay (related document(s):63 Motion for Relief From Stay and 4001-1.1 Notice). (cc) (Entered: 10/10/2013) |
| 10/09/2013 | 86<br>(2 pgs) | Certificate of Non-Contested Matter Filed by Douglas D. Koktavy on behalf of Santander Consumer USA, Inc. (related document(s):63 Motion for Relief From Stay and 4001-1.1 Notice). (Koktavy, Douglas) (Entered: 10/09/2013) |
| 10/07/2013 | 85<br>(17 pgs; 3 docs) | Motion for Protective Order On Motion to Conduct 2004 Examinations of Debtors Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Exhibit A # 2 Proposed/Unsigned Order) (Vellone, Patrick) (Entered: 10/07/2013) |
| 10/05/2013 | 84<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)83 Order on Motion to Extend Time). No. of Notices: 2. Notice Date 10/05/2013. (Admin.) (Entered: 10/05/2013) |
| 10/03/2013 | 83<br>(1 pg) | Order Granting Motion to Extend Time (related document(s):70 Motion to Extend Time (Bankruptcy)). (jtm) (Entered: 10/03/2013) |
| 10/02/2013 | | |

| | 82<br>(6 pgs; 2 docs) | 9013-1.1 Notice Filed by Kenneth J. Buechler on behalf of Command Center, Inc. (related document(s):81 Motion to Extend Time (Bankruptcy)).. 9013 Objections due by 10/16/2013 for 81,. (Attachments: # 1 Certificate of Service) (Buechler, Kenneth) (Entered: 10/02/2013) |
| 10/02/2013 | 81<br>(7 pgs; 3 docs) | Second Motion to Extend Time Due To Other Reasons To to file Complaint objecting to the Debtors' dischargeability of debts Filed by Kenneth J. Buechler on behalf of Command Center, Inc. (related document(s)75 Motion to Extend Time (Bankruptcy)). (Attachments: # 1 Proposed/Unsigned Order # 2 Certificate of Service) (Buechler, Kenneth) (Entered: 10/02/2013) |
| 10/02/2013 | 80<br>(13 pgs) | Report of Operations From 8/1/13 To 8/31/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 10/02/2013) |
| 10/01/2013 | 79<br>(2 pgs) | Certificate of Non-Contested Matter Filed by Kenneth J. Buechler on behalf of Command Center, Inc. (related document(s):70 Motion to Extend Time (Bankruptcy)). (Buechler, Kenneth) (Entered: 10/01/2013) |
| 09/29/2013 | 78<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)77 Notice of Hearing). No. of Notices: 2. Notice Date 09/29/2013. (Admin.) (Entered: 09/29/2013) |
| 09/27/2013 | 77<br>(1 pg) | Notice of Continued Hearing RE: (related document(s)60 Motion for Examination). Hearing to be held on 10/11/2013 at 10:00 AM BRCH Courtroom C502 for 60, . (jtm) (Entered: 09/27/2013) |
| 09/25/2013 | 76<br>(6 pgs; 2 docs) | 9013-1.1 Notice Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):75 Motion to Extend Time (Bankruptcy)).. 9013 Objections due by 10/9/2013 for 75,. (Attachments: # 1 Certificate of Service) (Weinman, Jeffrey) (Entered: 09/25/2013) |
| 09/25/2013 | 75<br>(4 pgs; 2 docs) | Motion to Extend Time To Extend the Exclusivity Period Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Proposed/Unsigned Order) |

| | | |
|---|---|---|
| | | (Weinman, Jeffrey). Related document(s) 1 Voluntary Petition- Chapter 11 filed by Debtor Terry Lee Evanson, Debtor Lynette Pearce Evanson. **Modified created linkage to doc# 1 on 9/25/2013 (cc).** (Entered: 09/25/2013) |
| 09/08/2013 | 74<br>(8 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)69 Order on Motion For Relief From Stay). No. of Notices: 2. Notice Date 09/08/2013. (Admin.) (Entered: 09/08/2013) |
| 09/06/2013 | 73<br>(2 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)67 Order on Motion to Continue/Reschedule Hearing). No. of Notices: 2. Notice Date 09/06/2013. (Admin.) (Entered: 09/06/2013) |
| 09/06/2013 | 72<br>(4 pgs) | Adversary case 13-01501. Complaint by Discover Bank against Lynette Pearce Evanson. Fee Paid.. Adversary Status Deadline 01/6/2014 (62 (Dischargeability - 523(a)(2), false pretenses, false representation, actual fraud)) (Davidson, Alexis) (Entered: 09/06/2013) |
| 09/06/2013 | 71<br>(6 pgs; 2 docs) | 9013-1.1 Notice Filed by Kenneth J. Buechler on behalf of Command Center, Inc. (related document (s):70 Motion to Extend Time (Bankruptcy)).. 9013 Objections due by 9/27/2013 for 70,. (Attachments: # 1 Certificate of Service) (Buechler, Kenneth) (Entered: 09/06/2013) |
| 09/06/2013 | 70<br>(7 pgs; 3 docs) | Motion to Extend Time Due To Other Reasons To to File Complaint Objecting to Debtors' Dischargeability of Debts Filed by Kenneth J. Buechler on behalf of Command Center, Inc.. (Attachments: # 1 Proposed/Unsigned Order # 2 Certificate of Service) (Buechler, Kenneth) (Entered: 09/06/2013) |
| 09/06/2013 | 69<br>(7 pgs) | Order Granting Motion For Relief From Stay (related document(s):38 Motion for Relief From Stay and 4001-1.1 Notice). (rxc) (Entered: 09/06/2013) |
| 09/05/2013 | 68<br>(4 pgs) | Objection Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):58 Motion to Extend Time (Bankruptcy)). (Weinman, Jeffrey) (Entered: 09/05/2013) |

| | | |
|---|---|---|
| 09/04/2013 | 67<br>(1 pg) | Order Granting Motion To Continue/Reschedule Hearing (related document(s):60 Motion for Examination, 65 Motion to Continue/Reschedule Hearing). Hearing to be held on 10/1/2013 at 01:30 PM BRCH Courtroom C502 for 65 and for 60, . (jtm) (Entered: 09/04/2013) |
| 08/29/2013 | 66<br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)62 Notice of Hearing). No. of Notices: 2. Notice Date 08/29/2013. (Admin.) (Entered: 08/29/2013) |
| 08/29/2013 | 65<br>(3 pgs; 2 docs) | Motion to Continue Hearing Filed by Jennifer Schlatter on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s)60 Motion for Examination). (Attachments: # 1 Proposed/Unsigned Order) (Schlatter, Jennifer) (Entered: 08/29/2013) |
| 08/28/2013 | 64 | Receipt of Motion for Relief From Stay and 4001-1.1 Notice(13-19032-MER) [motion,mfrstr] ( 176.00) Filing Fee. Receipt number 18979014. Fee amount 176.00 (U.S. Treasury) (Entered: 08/28/2013) |
| 08/28/2013 | 63<br>(18 pgs; 2 docs) | Motion for Relief from Stay On 2010 Honda Pilot and 4001-1.1 Notice Filed by Douglas D. Koktavy on behalf of Santander Consumer USA, Inc.. Stay Hearing to be held on 9/25/2013 at 09:30 AM at BRCH Courtroom C502. (Attachments: # 1 Proposed/Unsigned Order) (Koktavy, Douglas) (Entered: 08/28/2013) |
| 08/27/2013 | 62<br>(1 pg) | Notice of Hearing RE: (related document(s)60 Motion for Examination). Hearing to be held on 9/11/2013 at 09:00 AM BRCH Courtroom C502 for 60, . (jtm) (Entered: 08/27/2013) |
| 08/22/2013 | 61<br>(4 pgs) | Response Filed by Kenneth J. Buechler on behalf of Command Center, Inc. (related document(s):60 Motion for Examination). (Buechler, Kenneth) (Entered: 08/22/2013) |
| 08/21/2013 | 60<br>(11 pgs; 2 docs) | Motion for 2004 Examination Of Command Center, Inc. Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Proposed/Unsigned Order) (Vellone, Patrick) (Entered: 08/21/2013) |

| 08/21/2013 | <u>59</u><br>(5 pgs; 2 docs) | 9013-1.1 Notice Filed by Alexis L. Davidson on behalf of Discover Bank (related document(s):<u>58</u> Motion to Extend Time (Bankruptcy)).. 9013 Objections due by 9/6/2013 for <u>58</u>,. (Attachments: # <u>1</u> Certificate of Service) (Davidson, Alexis) (Entered: 08/21/2013) |
| --- | --- | --- |
| 08/21/2013 | <u>58</u><br>(3 pgs; 2 docs) | Motion to Extend Time Due To Other Reasons To Objection to Discharge Filed by Alexis L. Davidson on behalf of Discover Bank. (Attachments: # <u>1</u> Proposed/Unsigned Order) (Davidson, Alexis) (Entered: 08/21/2013) |
| 08/20/2013 | <u>57</u><br>(16 pgs) | Report of Operations From 7/1/13 To 7/31/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 08/20/2013) |
| 08/09/2013 | <u>56</u><br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>54</u> Minutes of Proceedings/Minute Order). No. of Notices: 2. Notice Date 08/09/2013. (Admin.) (Entered: 08/09/2013) |
| 08/07/2013 | <u>55</u><br>(60 pgs; 2 docs) | Amended List of Witnesses and Exhibits Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document (s):<u>38</u> Motion for Relief From Stay and 4001-1.1 Notice, <u>52</u> Witness List and Exhibits). (Attachments: # <u>1</u> Exhibit A-E) (Vellone, Patrick) (Entered: 08/07/2013) |
| 08/07/2013 | <u>54</u><br>(1 pg) | Minutes of Proceedings : The Court takes this matter under advisement. A separate order will enter. (related document(s)<u>38</u> Motion for Relief From Stay and 4001-1.1 Notice). (rxc) (Entered: 08/07/2013) |
| 08/06/2013 | <u>53</u><br>(3 pgs) | Status Report Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>46</u> Order to File). (Weinman, Jeffrey) (Entered: 08/06/2013) |
| 08/02/2013 | <u>52</u><br>(28 pgs; 4 docs) | List of Witnesses and Exhibits Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>38</u> Motion for Relief From Stay and 4001-1.1 Notice). (Attachments: # <u>1</u> Other Attachmnt 1 # <u>2</u> Exhibit A # |

| | | |
|---|---|---|
| | | <u>3</u> Exhibit B) (Vellone, Patrick) (Entered: 08/02/2013) |
| 08/02/2013 | <u>51</u><br>(4 pgs) | List of Witnesses and Exhibits Filed by Kenneth J. Buechler on behalf of Command Center, Inc. (related document(s):<u>38</u> Motion for Relief From Stay and 4001-1.1 Notice. (Buechler, Kenneth) (Entered: 08/02/2013) |
| 07/31/2013 | <u>50</u><br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>48</u> Order on Motion for Examination). No. of Notices: 2. Notice Date 07/31/2013. (Admin.) (Entered: 07/31/2013) |
| 07/31/2013 | <u>49</u><br>(26 pgs; 2 docs) | Objection to Motion for Relief From Stay Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document (s):<u>38</u> Motion for Relief From Stay and 4001-1.1 Notice. (Attachments: # <u>1</u> Exhibit A) (Vellone, Patrick) **Modified on 8/1/2013 (rxc).** edit txt per caption. (Entered: 07/31/2013) |
| 07/29/2013 | <u>48</u><br>(1 pg) | Order Granting Motion for 2004 Examination of Terry Lee Evanson, and Lynette Pearce Evanson (related document(s):<u>45</u> Motion for Examination). (jtm) **Modified on 7/29/2013 (jtm).**Modified docket text. (Entered: 07/29/2013) |
| 07/26/2013 | <u>47</u><br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>46</u> Order to File). No. of Notices: 2. Notice Date 07/26/2013. (Admin.) (Entered: 07/26/2013) |
| 07/24/2013 | <u>46</u><br>(1 pg) | Order for Debtors To File Status Report . Status Report due by 8/6/2013 (rxc) (Entered: 07/24/2013) |
| 07/22/2013 | <u>45</u><br>(13 pgs; 4 docs) | Motion for 2004 Examination Of Terry Lee Evanson and Lynette Pearce Evanson Filed by Kenneth J. Buechler on behalf of Command Center, Inc.. (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Proposed/Unsigned Order) (Buechler, Kenneth) Additional attachment(s) Corrected Proposed Order added on 7/23/2013 (rxc). **Modified on 7/23/2013 (rxc).** (Entered: 07/22/2013) |
| 07/22/2013 | <u>44</u><br>(11 pgs) | Report of Operations From 5/28/13 To 6/30/13 Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 07/22/2013) |

| | | |
|---|---|---|
| 07/19/2013 | 43 (3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)41 Order on Application to Employ). No. of Notices: 2. Notice Date 07/19/2013. (Admin.) (Entered: 07/19/2013) |
| 07/17/2013 | 42 (2 pgs) | Statement of United States Trustee Regarding Creditor's Committee: There were too few unsecured creditors willing to serve on a Creditor's Committee (Motes, Alan) (Entered: 07/17/2013) |
| 07/17/2013 | 41 (1 pg) | Order Granting Application to Employ Allen& Vellone, P.C. as Special Counsel (related document (s):25 Application to Employ). (rxc) (Entered: 07/17/2013) |
| 07/15/2013 | 40 (4 pgs; 2 docs) | Certificate of Non-Contested Matter Filed by Tatiana G. Popacondria on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document (s):25 Application to Employ). (Attachments: # 1 Proposed/Unsigned Order) (Popacondria, Tatiana) (Entered: 07/15/2013) |
| 07/11/2013 | 39 | Receipt of Motion for Relief From Stay and 4001-1.1 Notice(13-19032-MER) [motion,mfrstr] ( 176.00) Filing Fee. Receipt number 18695956. Fee amount 176.00 (U.S. Treasury) (Entered: 07/11/2013) |
| 07/11/2013 | 38 (56 pgs; 3 docs) | Motion for Relief from Stay On to proceed with state court action to liquidate the claims by Command Center against Mr. Terry Lee Evanson and Ms. Lynette Pearce Evanson and 4001-1.1 Notice Filed by Kenneth J. Buechler on behalf of Command Center, Inc.. Stay Hearing to be held on 8/7/2013 at 09:30 AM at BRCH Courtroom C502. (Attachments: # 1 Proposed/Unsigned Order # 2 Certificate of Service) (Buechler, Kenneth) (Entered: 07/11/2013) |
| 07/10/2013 | 37 (2 pgs) | Notice of Appearance and Request for Notice. Filed by Diane A. Holbert. (jss) (Entered: 07/10/2013) |
| 07/03/2013 | 36 (2 pgs) | Notice of Appearance and Request for Notice Filed by Heather S. Cleary on behalf of Command Center, Inc.... (Cleary, Heather) (Entered: 07/03/2013) |
| 06/28/2013 | 35 (3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)34 Order on |

| | | |
|---|---|---|
| | | Application to Employ). No. of Notices: 1. Notice Date 06/28/2013. (Admin.) (Entered: 06/28/2013) |
| 06/26/2013 | <u>34</u><br>(1 pg) | Order Granting Application to Employ Weinman & Associates, P.C. as Counsel for Debtors-in-Possession (related document(s):<u>19</u> Application to Employ). (rxc) (Entered: 06/26/2013) |
| 06/25/2013 | <u>33</u><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Kevin D. Allen on behalf of Lynette Pearce Evanson, Terry Lee Evanson... (Allen, Kevin) (Entered: 06/25/2013) |
| 06/25/2013 | <u>32</u><br>(2 pgs) | Certificate of Non-Contested Matter Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>19</u> Application to Employ). (Weinman, Jeffrey) (Entered: 06/25/2013) |
| 06/24/2013 | <u>31</u><br>(4 pgs; 2 docs) | 9013-1.1 Notice Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):<u>25</u> Application to Employ).. 9013 Objections due by 7/10/2013 for <u>25</u>,. (Attachments: # <u>1</u> Certificate of Service) (Vellone, Patrick) (Entered: 06/24/2013) |
| 06/22/2013 | <u>30</u><br>(3 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>29</u> Notification Entry). No. of Notices: 3. Notice Date 06/22/2013. (Admin.) (Entered: 06/22/2013) |
| 06/20/2013 | <u>29</u><br>(2 pgs; 2 docs) | Public Notice of Deficient Filing, Error or Defect and Application of L.B.R. 5005-4(l). The Electronic Filer of Document Number 26 is hereby notified the errors noted below shall be corrected by the close of the third court day following transmittal of this Notice, failing which the electronic document will be deemed stricken and, absent order of the court, no further action will be taken on the document. Error to be corrected: Pleading filed using the incorrect event.. E-Filer is to Please refile your notice by using the 9013-1 event. Thank you. (related document(s)<u>26</u> Notice). (rxc) (Entered: 06/20/2013) |
| 06/19/2013 | <u>28</u><br>(5 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)<u>24</u> Other Order). No. of Notices: 1. Notice Date 06/19/2013. (Admin.) (Entered: 06/19/2013) |

| 06/19/2013 | 27 (3 pgs) | Notice of Appearance and Request for Notice Filed by Tatiana G. Popacondria on behalf of Lynette Pearce Evanson, Terry Lee Evanson... (Popacondria, Tatiana) (Entered: 06/19/2013) |
|---|---|---|
| 06/19/2013 | 26 (2 pgs) | **This entry was docketed in error using the incorrect event. Refer to Document # 31 per CM review.** Notice Re: Application to Employ Allen & Vellone, P.C. as Special Counsel to Debtors-in-Possession. Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):25 Application to Employ)... (Vellone, Patrick) **Modified on 6/25/2013 (rxc).** (Entered: 06/19/2013) |
| 06/19/2013 | 25 (7 pgs; 3 docs) | Application to Employ Allen& Vellone, P.C. as Special Counsel Filed by Patrick D. Vellone on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Exhibit A Verified Statement # 2 Proposed/Unsigned Order) (Vellone, Patrick) (Entered: 06/19/2013) |
| 06/17/2013 | 24 (3 pgs) | Order Establishing Interim Compensation Procedure for All Professionals and Approving Retainer to Weinman and Associates PC (related document(s):9 Other Motion). (rxc) (Entered: 06/17/2013) |
| 06/17/2013 | 23 (5 pgs; 2 docs) | Certificate of Non-Contested Matter Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):9 Other Motion). (Attachments: # 1 Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 06/17/2013) |
| 06/11/2013 | 22 (2 pgs) | Chapter 11 Statement of Current Monthly Income - Form 22B Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):1 Voluntary Petition- Chapter 11, 12 Notice of Deficiency, 21 Statement of Financial Affairs and Schedules). (Weinman, Jeffrey) (Entered: 06/11/2013) |
| 06/11/2013 | 21 (32 pgs) | Statement of Financial Affairs and Schedules Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):1 Voluntary Petition- Chapter 11, 12 Notice of Deficiency). (Weinman, Jeffrey) (Entered: 06/11/2013) |

| 06/07/2013 | 20 (5 pgs; 2 docs) | 9013-1.1 Notice Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):19 Application to Employ).. 9013 Objections due by 6/21/2013 for 19,. (Attachments: # 1 Certificate of Service) (Weinman, Jeffrey) (Entered: 06/07/2013) |
|---|---|---|
| 06/07/2013 | 19 (7 pgs; 3 docs) | Application to Employ Weinman & Associates, P.C. as Counsel for Debtors-in-Possession Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Affidavit # 2 Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 06/07/2013) |
| 06/07/2013 | 18 (3 pgs) | Notice of Appearance and Request for Notice Filed by William C. Brittan on behalf of Keith Anderson... (Brittan, William) (Entered: 06/07/2013) |
| 06/06/2013 | 17 (2 pgs) | Notice of Appearance and Request for Notice Filed by Clarissa M. Raney on behalf of Moreton Insurance of Colorado... (Raney, Clarissa) (Entered: 06/06/2013) |
| 05/31/2013 | 16 (4 pgs) | Courts Notice or Order and BNC Certificate of Mailing (related document(s)12 Notice of Deficiency). No. of Notices: 1. Notice Date 05/31/2013. (Admin.) (Entered: 05/31/2013) |
| 05/31/2013 | 15 (6 pgs) | Courts Notice and BNC Certificate of Mailing Re: Meeting of Creditors (related document(s)13 Meeting of Creditors Chapter 11). No. of Notices: 13. Notice Date 05/31/2013. (Admin.) (Entered: 05/31/2013) |
| 05/31/2013 | 14 (3 pgs) | Courts Notice and BNC Certificate of Mailing Re: Notice of Reassignment (related document(s)11 Notice of Reassignment Due To Prior Filing or Related Filings). No. of Notices: 1. Notice Date 05/31/2013. (Admin.) (Entered: 05/31/2013) |
| 05/29/2013 | 13 (3 pgs) | Meeting of Creditors. 341(a) meeting to be held on 7/8/2013 at 02:00 PM at US Trustee Room C. Last day to oppose discharge or dischargeability is 9/6/2013. Set per directive from the US Trustee's office. (mjp) (Entered: 05/29/2013) |
| 05/29/2013 | 12 (2 pgs) | Notice of Deficiency For Failure to File Stmt of Fin. Affairs and/or Schedules and/or Corp. Resolution |

| | | |
|---|---|---|
| | | and Omission of Info (related document(s)1 Voluntary Petition- Chapter 11). All Schedules due 6/11/2013. Statement of Financial Affairs due 6/11/2013.Chapter 11 Statement of Current Monthly Income Due by 6/11/2013. Summary of schedules due 6/11/2013. (ek) (Entered: 05/29/2013) |
| 05/29/2013 | 11 (1 pg) | Notice of Reassignment of Case. There Is A Related Case Pending In This District under Case No. 13-10006 MER. Pursuant to L.B.R. 1073-1, this case is hereby reassigned to the Judge that heard and/or is assigned the previous case. Judge Michael E. Romero added to case. Involvement of Judge Elizabeth E. Brown Terminated. (ek) (Entered: 05/29/2013) |
| 05/28/2013 | 10 (7 pgs; 2 docs) | 9013-1.1 Notice Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):9 Other Motion).. 9013 Objections due by 6/11/2013 for 9,. (Attachments: # 1 Certificate of Service) (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | 9 (10 pgs; 2 docs) | Motion For Order Establishing Interim Compensation Procedure for All Professionals and to Approve Retainer to Weinman & Associates, P.C. Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Attachments: # 1 Proposed/Unsigned Order) (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | 8 (1 pg) | Notice of Automatic Stay with COS Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson... (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | 7 (2 pgs) | Amended List of Creditors Holding 20 Largest Unsecured Claims Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | 6 (5 pgs) | Verification of Creditor Address Mailing Matrix Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):1 Voluntary Petition- Chapter 11). (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | | |

| | 5<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Alan K. Motes on behalf of US Trustee... (Motes, Alan) (Entered: 05/28/2013) |
|---|---|---|
| 05/28/2013 | 4 | Receipt of Voluntary Petition- Chapter 11(13-19032) [misc,volp11a] (1213.00) Filing Fee. Receipt number 18432119. Fee amount 1213.00 (U.S. Treasury) (Entered: 05/28/2013) |
| 05/28/2013 | 3<br>(2 pgs) | List of Creditors Holding 20 Largest Unsecured Claims Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson. (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | 2 | Statement of Social Security Number Filed by Jeffrey Weinman on behalf of Lynette Pearce Evanson, Terry Lee Evanson (related document(s):1 Voluntary Petition- Chapter 11). (Weinman, Jeffrey) (Entered: 05/28/2013) |
| 05/28/2013 | 1<br>(14 pgs) | Chapter 11 Voluntary Petition. Total Number of Creditors Uploaded: 28. Chapter 11 Plan due by 09/25/2013. Disclosure Statement due by 09/25/2013.Section 521 Incomplete Filings due by 07/12/2013. (Weinman, Jeffrey) (Entered: 05/28/2013) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/07/2016 13:30:28 | | | |
| PACER Login: | xw0022:3391775:4299065 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 13-19032-MER Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| Billable Pages: | 19 | Cost: | 1.90 |

# District of Colorado
# Claims Register

## 13-19032-MER Terry Lee Evanson and Lynette Pearce Evanson

**Judge:** Michael E. Romero     **Chapter:** 11
**Office:** Denver            **Last Date to file claims:**
**Trustee:**                  **Last Date to file (Govt):**

| Creditor: (15363428)<br>Discover Bank<br>DB Servicing Corporation<br>PO Box 3025<br>New Albany, OH 43054-3025 | **Claim No: 1**<br>Original Filed<br>Date: 06/03/2013<br>Original Entered<br>Date: 06/03/2013 | Status:<br>Filed by: CR<br>Entered by: Discover Financial Services<br>Modified: |
|---|---|---|

| Amount claimed: $12206.53 |
|---|

| History: | | | |
|---|---|---|---|
| Details | 1-1 | 06/03/2013 | Claim #1 filed by Discover Bank, Amount claimed: $12206.53 (Discover Financial Services) |

| Description: |
|---|
| Remarks: |

| Creditor: (15364677)<br>Wells Fargo Card Services<br>1 Home Campus<br>3rd Floor<br>Des Moines, IA 50328 | **Claim No: 2**<br>Original Filed<br>Date: 06/03/2013<br>Original Entered<br>Date: 06/03/2013 | Status:<br>Filed by: CR<br>Entered by: Wells Fargo Card Services<br>Modified: |
|---|---|---|

| Amount claimed: $11427.09 |
|---|

| History: | | | |
|---|---|---|---|
| Details | 2-1 | 06/03/2013 | Claim #2 filed by Wells Fargo Card Services, Amount claimed: $11427.09 (Wells Fargo Card Services) |

| Description: |
|---|
| Remarks: |

| Creditor: (15377384)  History<br>Santander Consumer USA<br>P.O. Box 961245<br>Fort Worth, TX 76161 | **Claim No: 3**<br>Original Filed<br>Date: 06/10/2013<br>Original Entered<br>Date: 06/10/2013 | Status:<br>Filed by: CR<br>Entered by: Santander (ecl)<br>Modified: |
|---|---|---|

| History: | | | |
|---|---|---|---|
| Details | 3-1 | 06/10/2013 | Claim #3 filed by Santander Consumer USA, Amount claimed: $26767.43 (Santander (ecl)) |

| Description: (3-1) 10 HONDA PILOT |
|---|
| Remarks: |

Government
Exhibit 16

| Amount | claimed: | $26767.43 | |
| Secured | claimed: | $26767.43 | |

| History: | | | |
|----------|-----|-----------|---|
| Details | 3-1 | 06/10/2013 | Claim #3 filed by Santander Consumer USA, Amount claimed: $26767.43 (Santander (ecl)) |

Description: (3-1) 10 HONDA PILOT

Remarks:

---

| Creditor:          (15363428) Discover Bank DB Servicing Corporation PO Box 3025 New Albany, OH 43054-3025 | **Claim No: 4** Original Filed Date: 06/11/2013 Original Entered Date: 06/11/2013 Last Amendment Filed: 01/07/2015 Last Amendment Entered: 01/07/2015 | Status: Filed by: CR Entered by: Discover Financial Services Modified: |
|---|---|---|

| Amount | claimed: | $7792.53 | |

| History: | | | |
|----------|-----|------------|---|
| Details | 4-1 | 06/11/2013 | Claim #4 filed by Discover Bank, Amount claimed: $10492.53 (Discover Financial Services) |
| Details | 4-2 | 01/07/2015 | Amended Claim #4 filed by Discover Bank, Amount claimed: $7792.53 (Discover Financial Services) |

Description:

Remarks:

---

| Creditor:          (15363428) Discover Bank DB Servicing Corporation PO Box 3025 New Albany, OH 43054-3025 | **Claim No: 5** Original Filed Date: 06/11/2013 Original Entered Date: 06/11/2013 | Status: Filed by: CR Entered by: Discover Financial Services Modified: |
|---|---|---|

| Amount | claimed: | $7530.95 | |

| History: | | | |
|----------|-----|------------|---|
| Details | 5-1 | 06/11/2013 | Claim #5 filed by Discover Bank, Amount claimed: $7530.95 (Discover Financial Services) |

Description:

Remarks:

| Creditor:        (15344025)   History<br>Internal Revenue Service<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | Claim No: 6<br>Original Filed<br>Date: 06/13/2013<br>Original Entered<br>Date: 06/13/2013<br>Last Amendment<br>Filed: 03/12/2014<br>Last Amendment<br>Entered: 03/12/2014 | Status:<br>Filed by: CR<br>Entered by: IRS (ecl)<br>Modified: |
|---|---|---|

| Amount | claimed: | $945427.14 | |
|---|---|---|---|
| Secured | claimed: | $26940.00 | |
| Priority | claimed: | $251812.26 | |

| History: | | | |
|---|---|---|---|
| Details | 6-1 | 06/13/2013 | Claim #6 filed by Internal Revenue Service, Amount claimed: $724882.79 (IRS (ecl)) |
| Details | 6-2 | 01/14/2014 | Amended Claim #6 filed by Internal Revenue Service, Amount claimed: $946974.04 (IRS (ecl)) |
| Details | 6-3 | 03/12/2014 | Amended Claim #6 filed by Internal Revenue Service, Amount claimed: $945427.14 (IRS (ecl)) |

| Description: |
|---|
| Remarks: |

| Creditor:        (15398911)<br>Sprint Nextel<br>Attn Bankruptcy Dept<br>PO Box 7949<br>Overland Park KS 66207-0949 | Claim No: 7<br>Original Filed<br>Date: 06/19/2013<br>Original Entered<br>Date: 06/19/2013 | Status:<br>Filed by: CR<br>Entered by: Nextel West Corp<br>Modified: |
|---|---|---|

| Amount | claimed: | $888.72 | |
|---|---|---|---|

| History: | | | |
|---|---|---|---|
| Details | 7-1 | 06/19/2013 | Claim #7 filed by Sprint Nextel, Amount claimed: $888.72 (Nextel West Corp) |

| Description: |
|---|
| Remarks: |

| Creditor:        (15344033)   History<br>Colorado Dept of Revenue<br>1375 Sherman St, Rm 504<br>Denver, CO 80261-0004 | Claim No: 8<br>Original Filed<br>Date: 06/20/2013<br>Original Entered<br>Date: 06/20/2013 | Status:<br>Filed by: CR<br>Entered by: Colorado Department of Revenue (ecl)<br>Modified: |
|---|---|---|

| Amount | claimed: | $1838.00 | |
|---|---|---|---|

| History: | | | |
|---|---|---|---|
| Details | 8-1 | 06/20/2013 | Claim #8 filed by Colorado Dept of Revenue, Amount claimed: $1838.00 (Colorado Department of Revenue (ecl)) |

| Description: |
|---|
| Remarks: |

| Creditor:        (15403099)<br>Wells Fargo Bank N.A.<br>PO Box 10438 MAC X2505-036<br>Des Moines, IA 50306 | Claim No: 9<br>Original Filed<br>Date: 06/20/2013<br>Original Entered<br>Date: 06/20/2013 | Status:<br>Filed by: CR<br>Entered by: Wells Fargo Bank<br>Modified: |
|---|---|---|

| Amount claimed: $5180.04 | |
|---|---|

**History:**

| Details | 9-1 | 06/20/2013 | Claim #9 filed by Wells Fargo Bank N.A., Amount claimed: $5180.04 (Wells Fargo Bank) |
|---|---|---|---|

Description: (9-1) Unsecured

Remarks:

---

| Creditor:        (15408490)<br>Douglas County Treasurer<br>Attn: Stephanie Cook<br>100 Third Street<br>Castle Rock, CO 80104 | Claim No: 10<br>Original Filed<br>Date: 06/24/2013<br>Original Entered<br>Date: 06/24/2013 | Status: Withdraw 118<br>Filed by: CR<br>Entered by: Christina Cramer<br>Modified: |
|---|---|---|

| Amount claimed: $5246.00 | |
|---|---|

**History:**

| Details | 10-1 | 06/24/2013 | Claim #10 filed by Douglas County Treasurer, Amount claimed: $5246.00 (Cramer, Christina ) |
|---|---|---|---|
| | 118 | 06/20/2014 | Notice of Withdrawal of Claim Number 10. Filed by Diane A. Holbert ... . (jss) Status: Withdraw |

Description:

Remarks:

---

| Creditor:        (15409833)<br>FIA CARD SERVICES, N.A.<br>P O Box 982284<br>El Paso, TX 79998-2238 | Claim No: 11<br>Original Filed<br>Date: 06/24/2013<br>Original Entered<br>Date: 06/24/2013 | Status:<br>Filed by: CR<br>Entered by: Bank of America / Stacey N. Crawford<br>Modified: |
|---|---|---|

| Amount | claimed: | $3082.38 | |
|---|---|---|---|
| Secured | claimed: | $0.00 | |
| Priority | claimed: | $0.00 | |

**History:**

| Details | 11-1 | 06/24/2013 | Claim #11 filed by FIA CARD SERVICES, N.A., Amount claimed: $3082.38 (Bank of America / Stacey N. Crawford) |
|---|---|---|---|

Description:

Remarks:

| Creditor:        (15452890) US BANK N.A. BANKRUPTCY DEPARTMENT P.O. BOX 5229 CINCINNATI, OH 45201-5229 | Claim No: 12 Original Filed Date: 07/12/2013 Original Entered Date: 07/12/2013 | Status: Filed by: CR Entered by: US Bank (ecl) Modified: |
|---|---|---|

| Amount claimed: $12475.07 |
|---|

| History: |
|---|
| Details | 12-1 | 07/12/2013 | Claim #12 filed by US BANK N.A., Amount claimed: $12475.07 (US Bank (ecl)) |

| Description: (12-1) 0412 |
|---|
| Remarks: |

| Creditor:        (15559957) American Express Bank, FSB c o Becket and Lee LLP POB 3001 Malvern, PA 19355-0701 | Claim No: 13 Original Filed Date: 08/27/2013 Original Entered Date: 08/27/2013 | Status: Filed by: CR Entered by: Thomas A. Lee (ecl) Modified: |
|---|---|---|

| Amount claimed: $474.50 |
|---|

| History: |
|---|
| Details | 13-1 | 08/27/2013 | Claim #13 filed by American Express Bank, FSB, Amount claimed: $474.50 (Thomas A. Lee (ecl)) |

| Description: (13-1) CREDIT CARD DEBT |
|---|
| Remarks: |

| Creditor:        (15559958) American Express Bank, FSB c o Becket and Lee LLP POB 3001 Malvern, PA 19355-0701 | Claim No: 14 Original Filed Date: 08/27/2013 Original Entered Date: 08/27/2013 | Status: Filed by: CR Entered by: Thomas A. Lee (ecl) Modified: |
|---|---|---|

| Amount claimed: $7141.39 |
|---|

| History: |
|---|
| Details | 14-1 | 08/27/2013 | Claim #14 filed by American Express Bank, FSB, Amount claimed: $7141.39 (Thomas A. Lee (ecl)) |

| Description: (14-1) CREDIT CARD DEBT |
|---|
| Remarks: |

| | | |
|---|---|---|

| History: |
|---|
| Details | 15-1 | 08/27/2013 | Claim #15 filed by American Express Bank, FSB, Amount claimed: $11162.92 (Thomas A. Lee (ecl)) |

| Description: (15-1) CREDIT CARD DEBT |
|---|
| Remarks: |

| Creditor:        (15559959)<br>American Express Bank, FSB<br>c o Becket and Lee LLP<br>POB 3001<br>Malvern, PA 19355-0701 | Claim No: 15<br>Original Filed<br>Date: 08/27/2013<br>Original Entered<br>Date: 08/27/2013 | Status:<br>Filed by: CR<br>Entered by: Thomas A. Lee (ecl)<br>Modified: |
|---|---|---|

| Amount claimed: $11162.92 |
|---|

| History: | | | |
|---|---|---|---|
| Details | 15-1 | 08/27/2013 | Claim #15 filed by American Express Bank, FSB, Amount claimed: $11162.92 (Thomas A. Lee (ecl)) |

Description: (15-1) CREDIT CARD DEBT

Remarks:

---

| Creditor:        (15606598)   History<br>Wells Fargo Bank<br>PO Box 5058 MAC P6053-021<br>Portland, OR 97208 | Claim No: 16<br>Original Filed<br>Date: 09/16/2013<br>Original Entered<br>Date: 09/16/2013 | Status:<br>Filed by: CR<br>Entered by: Wells Fargo Bank (ecl)<br>Modified: |
|---|---|---|

| Amount claimed: $518.23 |
|---|

| History: | | | |
|---|---|---|---|
| Details | 16-1 | 09/16/2013 | Claim #16 filed by Wells Fargo Bank, Amount claimed: $518.23 (Wells Fargo Bank (ecl)) |

Description: (16-1) DDA

Remarks:

---

| Creditor:        (16306542)<br>NTL Capital, LLC. c/o Hidden Oak<br>Group,Inc.<br>35 E. Grassy Sprain Road Ste. 210<br>Yonkers, NY 10710        Claimant<br>History | Claim No: 17<br>Original Filed<br>Date: 10/24/2013<br>Original Entered<br>Date: 10/24/2013 | Status: Transfer/Assign 121<br>Filed by: CR<br>Entered by: Josh T. McKinley<br>Modified: |
|---|---|---|

| Amount claimed: $100247.79 |
|---|

| History: | | | |
|---|---|---|---|
| Details | 17-1 | 10/24/2013 | Claim #17 filed by US Bank, Amount claimed: $100247.79 (McKinley, Josh ) |
| | 121 | 09/10/2014 | Notice of Assignment/Transfer of Claim Number 17 With Waiver Transfer Agreement 3001 (e) 2 Transferor: US Bank (Claim No. 17) To NTL Capital, LLC. c/o Hidden Oak Group,Inc.. Fee Amount $25.. (Attachments: # 1 Exhibit Bill of Sale # 2 Exhibit Agreement) (Hidden Oak Group, Inc., ) Status: Transfer/Assign |

Description:

Remarks:

| Creditor:      (15408490)<br>Douglas County Treasurer<br>Attn: Stephanie Cook<br>100 Third Street<br>Castle Rock, CO 80104 | Claim No: 18<br>Original Filed<br>Date: 12/03/2014<br>Original Entered<br>Date: 12/03/2014 | Status:<br>Filed by: CR<br>Entered by: Adair Kowach<br>Modified: |
|---|---|---|

| Amount claimed: $5214.00 | |
|---|---|

| History: | | | |
|---|---|---|---|
| Details | 18-1 | 12/03/2014 | Claim #18 filed by Douglas County Treasurer, Amount claimed: $5214.00 (Kowach, Adair ) |

| Description: |
|---|
| Remarks: |

## Claims Register Summary

**Case Name:** Terry Lee Evanson and Lynette Pearce Evanson
**Case Number:** 13-19032-MER
**Chapter:** 11
**Date Filed:** 05/28/2013
**Total Number Of Claims:** 18

| Total Amount Claimed* | $1164620.71 |
|---|---|
| Total Amount Allowed* | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| Secured | $53707.43 | |
| Priority | $251812.26 | |
| Administrative | | |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/07/2016 13:40:48 | | | |
| PACER Login: | xw0022:3391775:4299065 | Client Code: | |
| Description: | Claims Register | Search Criteria: | 13-19032-MER<br>Filed or Entered<br>From: 1/1/1990<br>Filed or Entered<br>To: 11/7/2016 |
| | 2 | Cost: | 0.20 |

| Billable Pages: | | | |
|---|---|---|---|